William W. Taylor, III (*pro hac vice* motion to be filed)
Caroline J. Mehta (*pro hac vice* motion to be filed)
Steven N. Herman (*pro hac vice* motion to be filed)
ZUCKERMAN SPAEDER LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
wtaylor@zuckerman.com
cmehta@zuckerman.com
sherman@zuckerman.com

Jamie L. Dupree (158105)
FUTTERMAN DUPREE DODD CROLEY MAIER LLP
180 Sansome Street, 17th Floor
San Francisco, CA 94104
Tel:  (415) 399-3840
Fax: (415) 399-3838
jdupree@fddcm.com

*Attorneys for Plaintiff*
*Sujit Choudhry*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUJIT CHOUDHRY, | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| REGENTS OF THE UNIVERSITY OF CALIFORNIA, JANET NAPOLITANO, NICHOLAS B. DIRKS, CAROL CHRIST, JANET BROUGHTON, AND BENJAMIN HERMALIN, | |
| Defendants. | |

Plaintiff Professor Sujit Choudhry, by and through his attorneys, states as follows:

## INTRODUCTION

1.      Professor Choudhry seeks preliminary and permanent injunctive relief against the Defendants' violation of his rights to due process of law and equal protection, and damages for the harm they have unlawfully caused and are continuing to cause him. Defendants are attempting to deprive him of his employment, his salary, his reputation and his career under the

1

pretext of a disciplinary proceeding based upon conduct and allegations which were investigated and resolved with a negotiated agreement on July 31, 2015.  In this effort Defendants violate the most basic principles of due process, as well as their own word and the regulations of the University.  Without relief from this Court, Professor Choudhry will suffer irreparable harm.

2.    The University of California, a state owned and operated institution (the "University") has faced widespread criticism for its handling of sexual harassment allegations on its campuses.  In the spring of 2016, when the University's inconsistent response to sexual harassment became the subject of national media attention, University President Janet Napolitano chose to use the case of Sujit Choudhry, the former Dean and tenured professor at the University of California, Berkeley School of Law ("Berkeley Law"), as a means to try to improve the University's image as well as her own.

3.    In March, 2015, Ms. Tyann Sorrell, then-Dean Choudhry's executive assistant, complained that she was uncomfortable with certain of his conduct toward her. Specifically, he publicly hugged her and kissed her on the cheek, in gestures of greeting and support, which she recognized as being intended as "a warm and friendly greeting."  He apologized and did not repeat the conduct again.  Remarkably, unlike the string of cases involving Caucasian faculty and administrators for which the University meted out almost no punishment – despite findings of pervasive, predatory sexual misconduct – *no one* has ever suggested that Professor Choudhry's conduct was sexually motivated or predatory.

4.    In July 2015, Professor Choudhry and the University resolved Ms. Sorrell's complaint by agreeing to a negotiated resolution under the University's governing rules (the "Settlement").  The Settlement included a 10 percent cut in Professor Choudhry's salary; training and professional coaching at Professor Choudhry's expense; a written apology to Ms. Sorrell; and monitoring by the University's Office for the Prevention of Harassment and Discrimination ("OPHD").   The Settlement was approved by the entire leadership of the University of California, Berkeley ("UC Berkeley"), including Chancellor Nicholas Dirks, Executive Vice Chancellor and Provost ("EVCP") Claude Steele, Vice Provost for Faculty Janet Broughton, and Chief Campus Counsel Christopher Patti, who proposed sanctions they all deemed proportional

2

1   to the conduct alleged.  In accepting the Settlement, Professor Choudhry gave up the rights to

2   challenge factual findings he contested, and continues to contest, and to insist on a full hearing

3   under the disciplinary rules.

4        5.     Professor Choudhry complied with his obligations under the agreement and

5   continued to serve as Dean of Berkeley Law.

6        6.     On March 8, 2016, amid reports that the University had mishandled other cases of

7   serious sexual misconduct, Ms. Sorrell filed a civil suit against the University and Professor

8   Choudhry. In the media firestorm that followed, Napolitano directed that the University start new

9   disciplinary proceedings against Professor Choudhry for the very same conduct for which he had

10   already been punished.  That second "investigation," justified under the pretext that the previous

11   proceeding only involved his "administrative" punishment, is now underway.  A new

12   "investigative" report has been submitted to the new Vice Provost for Faculty, Defendant

13   Hermalin, containing new recommended punishment.  Despite requests, Professor Choudhry has

14   not been provided a copy of that report.

15        7.     President Napolitano and the University have made Professor Choudhry a pariah,

16   repeatedly threatening to "ban" him from campus and giving false information about his conduct

17   to the national press.  Napolitano falsely accused him publicly of "groping" Ms. Sorrell.

18        8.     At the start of this new academic year, the University has now, among other

19   things:  (a) refused to assign Professor Choudhry classes, eliminating his ability to perform his

20   duties and maintain eligibility for future merit increases of salary; (b) repeatedly threatened to

21   ban him from its campus; and (c) circulated statements suggesting that students should "protect

22   themselves" given Professor Choudhry's presence on campus and listing resources including

23   rape crisis and sexual assault organizations and night escort campus services to ensure safety.

24   More recently, President Napolitano has stated that Professor Choudhry will not teach in the

25   spring semester either.

26        9.     On information and belief, the pretextual proceeding against Professor Choudhry

27   is a direct effort to minimize the University's gross mismanagement of Ms. Sorrell's employment

28   and meager response to actual predatory conduct on campus.  After reaching the Settlement with

1    Professor Choudhry and Professor Choudhry's full acceptance of responsibility for making Ms.

2    Sorrell feel uncomfortable, the University deserted Ms. Sorrell, whom it turned down for ten

3    successive jobs elsewhere in the University and who has now sued the University.  By targeting

4    Professor Choudhry, who is of South Asian descent and a non-U.S. citizen, the University hopes

5    to deflect attention from its failure to meaningfully punish Caucasian faculty and administrators

6    who were found to have committed appalling sexual misconduct, and from the fact that it

7    deserted Ms. Sorrell.

8         10.    The University has threatened to "ban" Professor Choudhry from campus and

9    seeks to impose the harshest punishment imaginable – loss of tenure – as a second, duplicative

10   punishment on Professor Choudhry while not seeking to impose a second round of discipline,

11   much less a campus "ban," on Caucasian administrators and faculty members who its

12   investigations found committed hideous sexual acts against students and staff.

13                          **JURISDICTION AND VENUE**

14        11.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28

15   U.S.C. §1343(a)(3).

16        12.    This Court has the authority to render injunctive and declaratory relief pursuant to

17   28 U.S.C. §§ 2201 and 2202.

18        13.    Venue is proper pursuant to both 28 U.S.C §§ 1391(b)(1) & (2).

19                                **PARTIES**

20        14.    Plaintiff Professor Sujit Choudhry is the I. Michael Heyman Professor of Law and

21   former Dean of Berkeley Law.  Professor Choudhry is a recognized expert in the field of

22   comparative constitutional law.  He has been a tenured faculty member at New York University

23   ("NYU") Law School and the University of Toronto Faculty of Law.  From June 2014 until

24   March 9, 2016, he served as Dean of Berkeley Law.

25        15.    Defendants Regents of the University of California ("Regents") administer and

26   oversee the University of California.  The Regents have general rule-making and policy-making

27   power in regard to the University, and are fully empowered to govern the University.

28

16.     Defendant Janet Napolitano is the President of the University.   As discussed below, President Napolitano initiated the improper second disciplinary process, and committed other wrongs against Professor Choudhry.   President Napolitano is sued in her personal and official capacity.

17.     Defendant Nicholas Dirks is the Chancellor of UC Berkeley.   As Chancellor, Dirks is the chief campus officer.   He is responsible for all campus internal administration and discipline.   Chancellor Dirks approved the Settlement in July 2015, was subsequently ordered by President Napolitano in March 2016 to initiate the improper second disciplinary process and, on information and belief, initiated the second disciplinary process.   Chancellor Dirks is sued in his official capacity.   Chancellor Dirks has recently stated that he will resign as Chancellor.   If he does so during the pendency of this lawsuit, his replacement will become a Defendant to this lawsuit in his or her official capacity.

18.     Defendant Carol Christ is the interim EVCP of UC Berkeley.   She replaced EVCP Claude Steele.   Pursuant to UC Berkeley's disciplinary procedures, she has the authority to stop the improper second disciplinary process.   EVCP Christ is sued in her official capacity.

19.     Defendant Janet Broughton is the former Vice Provost for Faculty ("Vice Provost") of UC Berkeley.   Vice Provost Broughton participated in and approved Professor Choudhry's Settlement, made representations about the finality of the Settlement, and then, as an agent of the Regents, breached the Settlement and disregarded her representations by initiating the improper second disciplinary proceeding.   Broughton subsequently retired from the role after initiating the second process. Vice Provost Broughton is sued in her official capacity.

20.     Defendant Benjamin E. Hermalin is the current Vice Provost for Faculty of UC Berkeley.   He replaced Vice Provost Broughton.   Vice Provost Hermalin continues to play a role in deciding matters in relation to the second disciplinary process that would normally be handled by the EVCP.   As such, he too has the authority to halt the second disciplinary process.   Vice Provost Hermalin is sued in his official capacity.

## BACKGROUND

**I.      Facts Leading to First Investigation.**

21.      Professor Choudhry served as Dean of Berkeley Law from June 2014 until March 9, 2016.  Ms. Sorrell, who had worked for the outgoing dean, Christopher Edley, was assigned to work for Professor Choudhry when he assumed the role as Dean.

22.      In the fall of 2014, Ms. Sorrell informed then-Dean Choudhry that she would need to resign from the executive assistant position because the work load was too demanding under his leadership.  Professor Choudhry urged Ms. Sorrell to stay and hired additional staff to attempt to alleviate stress on Ms. Sorrell and make the office function better.

23.      On several occasions, Ms. Sorrell informed Professor Choudhry that she was feeling anxiety from her increased responsibilities and longer hours.  Ms. Sorrell also complained to the Chief of Staff, Areca Smit, that Professor Choudhry had asked her to perform personal tasks including getting lunch or coffee.  Ms. Smit raised that concern with Professor Choudhry, who immediately ceased making those requests of Ms. Sorrell.

24.      On March 19, 2015, Ms. Sorrell e-mailed Professor Choudhry.  She raised a number of complaints about their working relationship, including what she believed was an excessive work load, and behavior on the part of Professor Choudhry that she considered rude.

25.      Toward the end of the e-mail, Ms. Sorrell, complained that Professor Choudhry hugged her and kissed her cheek.  None of her objections or complaints accused or suggested that Professor Choudhry's conduct toward her was of a sexual nature or suggested sexual interest or intent.

26.      Approximately once or twice a week, Professor Choudhry hugged Ms. Sorrell and gave her a kiss on the cheek to express support and appreciation for Ms. Sorrell's work.  At no point prior to her March 19, 2015 email did Ms. Sorrell indicate in any way any discomfort with these gestures.

27.      Referring to Professor Choudhry's conduct, Ms. Sorrell stated: "I know you do not mean anything by it other than, perhaps, a warm and friendly greeting."  The e-mail states that Professor Choudhry's behavior made Ms. Sorrell uncomfortable, but that Ms. Sorrell

6

recognized that he did not "mean anything wrong by [his] actions," that he had "pure intentions," and that he was "unaware" that he was making her uncomfortable.  The e-mail also explicitly states that Ms. Sorrell had never said anything to Professor Choudhry about his behavior making her uncomfortable, and that "[b]ecause she assume[d] that [he meant] nothing by these gestures, [her] reflex has been not to show that [she] is bothered by [him] doing these things . . . ."

28.    The e-mail was the first time that anyone had informed Professor Choudhry that Ms. Sorrell was uncomfortable with his behavior.

29.    Professor Choudhry was surprised and embarrassed by the e-mail.  He was surprised to learn that his "warm and friendly" gestures bothered Ms. Sorrell.  He has apologized to Ms. Sorrell.

30.    Professor Choudhry has employed women research assistants, has taught women law students for 18 years, and oversaw other women employees at the University of Toronto, NYU, and in the Dean's Office at Berkley Law.  No other individual with whom Professor Choudhry has worked has ever made an allegation or complaint of sexual harassment against him.  Nor has anyone made such allegations following Ms. Sorrell's now public allegations.

31.    Ms. Sorrell forwarded the March 19, 2015 e-mail to Sheri Showalter, Berkeley Law's Director of Human Resources.  Ms. Showalter reported the matter to the OPHD.

## II.    The University of California's Procedures for Investigation of Sexual Harassment and Imposition of Discipline.

32.    The procedures through which the University may impose discipline on administrators and faculty are contained in Academic Personnel Manual ("APM")-015, APM-016, and the Disciplinary Procedures and Sanctions for UC Berkeley.  APM-016 sets out the University Policy on Faculty Conduct and the Administration of Discipline.  APM-015 contains the Faculty Code of Conduct.

33.    It is a violation of the Faculty Code of Conduct for a faculty member to engage in sexual harassment or violate the University of California Sexual Harassment Policy.

34.    The Disciplinary Procedures and Sanctions describe the process to be followed in imposing discipline for violations of the Faculty Code of Conduct.

35.     APM-016 instructs that: "There should be an appropriate mechanism for consideration and investigation of allegations of misconduct received from members of the faculty, staff, students, the administration, and other members of the University community. Procedures should be developed which encourage a *single formal investigation* of the allegations leading to the proposed disciplinary action." (emphasis added).

36.     Allegations of sexual harassment are investigated by OPHD, which has campus-wide authority to perform such investigations, including against faculty members.    The Disciplinary Procedures and Sanctions therefore permit OPHD Campus Complaint Resolution Officers to investigate potential violations of the Faculty Code of Conduct that involve sexual harassment, whereas most other violations of the Faculty Code of Conduct are investigated by fellow faculty members.    Where Campus Complaint Resolution Officers perform the investigative function, they are substitutes for faculty investigators.  *Disciplinary Procedures and Sanctions* ¶ 3(b).

37.     To perform the investigation, the Campus Complaint Resolution Officer reviews the pertinent documents and interviews the party that has alleged misconduct (the "Complainant") and the individual against whom the allegations have been made (the "Respondent").    *Id.*  ¶  4.    Then, within 90 days of appointment, the Campus Complaint Resolution Officer reports "findings in writing."  *Id.*

38.     The investigative findings are then submitted to the EVCP.  *Id.* ¶ 6.  The EVCP has 14 days to decide whether to file formal charges against the Respondent faculty member with the University's Privilege and Tenure Committee ("P&T Committee").  *Id.* ¶ 7.  However, "[b]efore filing formal charges with the P&T [Committee], the EVCP may offer a settlement involving a proposed sanction.  If the settlement is accepted by the accused faculty member, a hearing before P&T shall not be necessary."  *Id.* ¶ 8.

39.     There are two ways that a Respondent can accept settlement: (1) explicitly; or (2) by informing the EVCP that he or she does not contest discipline.  *Id.* ¶ 10.  Either method ends the matter completely.  *Id.* (stating that the EVCP files a complaint with the P&T only "if the

matter is not thus resolved"); *see also id.* ¶ 8 ("If the settlement is accepted by the accused faculty member, a hearing before the P&T shall not be necessary.").

**III.     The First Disciplinary Process Against Dean Choudhry Followed the Procedures.**

40.     The first investigation and disciplinary process against Professor Choudhry followed the disciplinary procedures discussed above.

41.     On April 16, 2015, Professor Choudhry received notice that OPHD was opening an investigation into the conduct complained of by Ms. Sorrell.  Pursuant to the disciplinary procedures, the investigation was conducted by a Campus Complaint Resolution Officer, Andrea LaCampagne.  *Id.* ¶ 3(b).

42.     Pursuant to the disciplinary procedures, the investigators interviewed Ms. Sorrell and Professor Choudhry.  *Id.* ¶ 4.  During his interview, Professor Choudhry answered all of the investigators' questions and acknowledged his friendly hugs and kisses on the cheek of Ms. Sorrell.  He reiterated (and concurred with Ms. Sorrell's assessment) that there was no sexual intent or desire motivating his actions, and contested Ms. Sorrell's allegations regarding the frequency of the conduct and her characterization of some of his conduct.

43.     The investigators also interviewed two female employees who worked in the Office of the Dean.  Neither of them supported Ms. Sorrell's account of the frequency of the conduct.  Both indicated that they had on one or more occasions received a hug from Professor Choudhry and were not offended by it.

44.     On July 7, 2015, OPHD submitted its report (the "OPHD Report") to EVCP Steele.  The OPHD Report stated that Professor Choudhry "was unconscious of his actions." Nevertheless, OPHD found, by a preponderance of the evidence, that Professor Choudhry had violated the University of California Policy on Sexual Harassment and Sexual Violence, because, even if his behavior lacked sexual intent, as he stated and Ms. Sorrell acknowledged in her e-mail, it was, according to OPHD, unwelcome, objectively sexual in nature, and affected Ms. Sorrell's employment.

45.     Professor Choudhry disagreed, and continues to disagree, with several of the factual findings in the OPHD Report, as well as its conclusion that he violated the University's

1  Policy on Sexual Harassment and Sexual Violence, although he accepted that Ms. Sorrell

2  reported that his actions made her feel uncomfortable, for which he is sincerely remorseful.

3  46.  The OPHD Report stated that it would be "forwarded to the Provost's [EVCP

4  Steele's] Office for further review *under the Faculty Code of Conduct*." (emphasis added).

5  47.  On May 27, 2015, while OPHD was performing its investigation, Professor

6  Choudhry met with Vice Provost Broughton, who told him that, in lieu of sending a case to a full

7  disciplinary proceeding, the administration can reach a settlement agreement with the faculty

8  member.  *See Disciplinary Procedures and Sanctions* ¶ 8.  Since their meeting involved an

9  entirely different topic, Professor Choudhry also understood Vice Provost Broughton's statement

10  to indicate that she was aware of the pending OPHD investigation.  Based on Broughton's

11  statement, Professor Choudhry understood for the first time that if he agreed to proposed

12  discipline as part of a settlement agreement, it would end the matter.

13  48.  On July 27, 2015, Professor Choudhry again met with Vice Provost Broughton on

14  an unrelated matter.  During the meeting, Vice Provost Broughton asked Dean Choudhry how his

15  first year had gone.  She stated that she did not want him to return to his prior employer, NYU.

16  Based on her statements, Professor Choudhry understood that Vice Provost Broughton wanted

17  him to remain Dean of Berkeley Law.

18  49.  On July 31, 2015, Professor Choudhry met with EVCP Steele.  The purpose of the

19  meeting was to discuss the disciplinary sanctions that EVCP Steele proposed in response to the

20  OPHD investigation's findings.  *Id.*  At the meeting, EVCP Steele provided Professor Choudhry

21  with a disciplinary sanction letter stating that EVCP Steele had reviewed the OPHD Report and

22  "discussed it with Chancellor Dirks, Vice Provost Broughton, and Chief Campus Counsel Patti."

23  The letter outlined the disciplinary sanction that EVCP Steele and those campus officials

24  believed "was warranted and appropriate for this situation."  The sanctions included: (1) a ten

25  percent reduction in salary for one year; (2) one-on-one training for 6 to 12 months for which

26  Professor Choudhry was financially responsible; (3) a written apology to Ms. Sorrell to be

27  provided by August 17, 2015; and (4) periodic monitoring by OPHD.  The letter also stated that,

28  if EVCP Steele received "any credible evidence that you have *again* violated UC Policy on

Sexual Harassment and Sexual Violence, you may be subject to immediate *further* disciplinary action . . ." (emphasis added).  The letter concluded: "You have a very promising career as Berkeley's Law School Dean with your innovative ideas, high energy, and enthusiastic citizenship, and I trust that you will grow into the kind of leader that we both know you can be."

50.     Consistent with the statements in the letter, during the meeting, EVCP Steele represented that the sanctions ended the matter.  EVCP Steele informed Professor Choudhry that he had made a mistake, and the letter contained proposed sanctions, but that he should not infer for a moment that the UC Berkeley administration "did not back him fully."  EVCP Steele reiterated that the UC Berkeley administration had "great expectations," and that he knew Professor Choudhry would "learn from this experience."

51.     The Settlement offered to Professor Choudhry by EVCP Steele was done at the precise phase at which the Disciplinary Procedures permit a final resolution, i.e., when the EVCP has received the report substantiating misconduct and has the authority – in lieu of filing formal charges with the P&T Committee – to resolve the matter with the accused member of the faculty. *Disciplinary Procedures* ¶ 7, 8, 10.

52.     EVCP Steele had the authority to offer a binding settlement that resolved both Professor Choudhry's administrative discipline and faculty discipline.  He offered the Settlement and proposed discipline as an exercise of his power under the Disciplinary Procedures to resolve the matter.

53.     In reliance on the repeated representations made to him that the Settlement ended the matter, as well as the written disciplinary policies that permit the EVCP to reach a resolution and thereby obviate additional proceedings before the P&T Committee, *see id.* ¶¶ 8 & 10, Professor Choudhry accepted the proposed discipline.  Professor Choudhry and all of the administrators involved recognized that accepting the Settlement would allow him to continue his career in academia and maintain his position at Berkeley Law, where, as EVCP Steele said, he "had a very promising future."

54.     By accepting the Settlement, Professor Choudhry gave up important procedural rights, guaranteed to him under University policies as well as the United States Constitution, including:

a.     He did not contest the OPHD investigation or its findings, despite the fact that he contested many of the conclusions OPHD reached, including but not limited to the conclusion that his conduct violated the UC Policy on Sexual Harassment and Sexual Violence.

b.     He gave up the opportunity to have a hearing at which, among other things, his counsel could have called and cross-examined witnesses, and put on and challenged documentary evidence.

c.     He accepted the discipline without the EVCP having to prove the allegations against him.

55.     Professor Choudhry materially changed his position to his detriment in reliance on University officials' representations that the Settlement was final.

56.     No University official ever said or suggested that the Settlement and accompanying sanctions only constituted "administrative action" or a partial resolution of the matter.  All representations by the University officials were that the Settlement and accepted sanctions completely resolved the matter.  Professor Choudhry never would have accepted the Settlement unless it was represented to be, and he understood it to be, a complete and final resolution.

57.     Consistent with the Settlement, with the assurances given to Professor Choudhry, and with the University's disciplinary policies, no one raised the possibility of any further disciplinary proceedings.  Pursuant to the University's policies and Settlement, none were permissible, and none occurred until the events which are the subject of this Complaint.

58.     Professor Choudhry had engaged counsel to represent him in the disciplinary process.  Once he accepted the July 2015 Settlement, he discharged his counsel, Nanci Clarence.

/ / /

/ / /

/ / /

**IV.     Professor Choudhry Continues to Work as Dean of Berkeley Law, Complies with the Terms of the Settlement, and Receives Further Assurances that, Consistent with the University's Procedures and the Settlement, the Matter Was "Over."**

59.     From July 2015 until March 2016, Professor Choudhry continued his Deanship of Berkeley Law.

60.     Pursuant to the Settlement, Professor Choudhry completed and abided by all components of the agreed upon disciplinary sanctions.  He commenced his one-on-one coaching sessions; accepted his salary reduction; and agreed to OPHD monitoring.  Professor Choudhry wrote Ms. Sorrell an official apology letter and delivered it to EVCP Steele on or around August 17, 2015.  Unbeknownst to Professor Choudhry, EVCP Steele failed to provide the apology letter to Ms. Sorrell for nearly two months.

61.     In mid-December, 2015, Professor Choudhry met with EVCP Steele to discuss his annual performance assessment for 2014/2015.  Before the meeting, EVCP Steele sent Professor Choudhry an e-mail that said the meeting would be a "heartening conversation."

62.     Professor Choudhry met with EVCP Steele approximately one week later, on or around December 21, 2015.  At the meeting, EVCP Steele explained that Dean Choudhry would not receive a salary increase that year because it would be inconsistent with the salary reduction component of the discipline.  EVCP Steele did not suggest then or ever that Dean Choudhry might face a second disciplinary proceeding.  On the contrary, as part of a discussion about the controversy surrounding the University's handling of Professor Geoffrey Marcy's sexual harassment case (discussed below),  EVCP Steele reiterated that the disciplinary process was "over" for Professor Choudhry.

**V.      Ms. Sorrell Files a Civil Complaint; Defendants Steele and Broughton Provide Dean Choudhry with Further Assurances.**

63.     On October 27, 2015, three months after Professor Choudhry accepted the Settlement, EVCP Steele met with Ms. Sorrell, provided Ms. Sorrell with Professor Choudhry's apology letter, and discussed with Ms. Sorrell the discipline that the University had agreed to with Dean Choudhry.

64.     At no time did Professor Choudhry resist Ms. Sorrell's return to work at Berkeley Law or the University.  On the contrary, he made it clear throughout the process, on numerous occasions, that Ms. Sorrell's position at the law school remained open, should she choose to return.  Professor Choudhry repeatedly spoke to University administrators and urged them to focus on Ms. Sorrell's search for employment and to assist her in every way possible.

65.     Unbeknownst to Professor Choudhry, Ms. Sorrell applied for up to ten positions with the University and did not receive a single offer of employment.  Professor Choudhry believed that the University would assist Ms. Sorrell to find another position if she did not wish to return to the law school.  On information and belief, one of the jobs for which she applied, and was rejected, was with President Napolitano's office.

66.     On March 8, 2016, Ms. Sorrell filed a civil complaint against the Regents and Professor Choudhry alleging retaliation and sexual harassment.  One of the reasons her lawyer gave for the lawsuit was Ms. Sorrell's view that the University had unfairly shown concern for Professor Choudhry's career, but not her career.  On information and belief, based on statements by Ms. Sorrell and her attorney, at no point did EVCP Steele, or anyone else, inform Ms. Sorrell that further discipline was possible.

67.     On March 9, 2016, Professor Choudhry met with EVCP Steele.  Because of Ms. Sorrell's lawsuit, EVCP Steele suggested that Professor Choudhry take an immediate and indefinite leave from the Dean's position, which Professor Choudhry agreed to do.  EVCP Steele said that he had drafted a statement, which he said he had discussed with his wife, to defend the discipline imposed.  Consistent with the University policies, the Settlement, and his intent to defend the sanction as appropriate, EVCP Steele never suggested that a second disciplinary proceeding was possible.

68.     Following his meeting with EVCP Steele, Professor Choudhry saw Vice Provost Broughton, who invited him into her office and gave him a hug.  Vice Provost Broughton said that she had been up all night, concerned about Professor Choudhry.  She stated that she stood by the sanctions imposed in the Settlement.

69.     On March 9, 2016, EVCP Steele, Professor Choudhry, and Berkeley Law issued statements.  EVCP Steele stated:

> A thorough investigation of this case found that Dean Choudhry's behavior in this situation violated policy . . . . Based on the findings of the investigation I believed that a combination of *disciplinary actions*, monitoring of his behavior and formal training would be an *appropriate and effective response*, and would produce the necessary changes in his behavior.

(emphasis added).

70.     On the morning of March 10, 2016 Professor Choudhry spoke to EVCP Steele and offered to resign as Dean.  EVCP Steele rejected his offer to resign.  Following that discussion, EVCP Steele and Chancellor Dirks convened a meeting with the Berkeley Law faculty.  EVCP Steele did not immediately inform the faculty that Professor Choudhry had offered to resign as Dean.  Then, approximately one hour into the meeting, EVCP Steele announced that Professor Choudhry had offered to resign as Dean.  At approximately 9:45 a.m., EVCP Steele called Professor Choudhry to accept his resignation as Dean, and then announced the resignation to the Berkeley Law faculty.  Neither EVCP Steele nor anyone else suggested to Professor Choudhry at that juncture that a second disciplinary procedure might occur.

## VI.     The University Disregards the Settlement and Launches an Improper Second "Investigation "of the Identical Conduct Subject to the Prior Discipline.

71.     Ms. Sorrell's complaint generated criticism by certain students, faculty and staff, and others that the University had repeatedly mishandled sexual harassment complaints, and that Professor Choudhry should have been disciplined more harshly.

72.     The University had been previously criticized for its handling of other instances of alleged sexual harassment, including those of its Vice Chancellor for Research and Professor of Chemistry, Graham Fleming, and of Professor of Astronomy Geoffrey Marcy.  The facts surrounding the Fleming and Marcy matters are described in detail in Paragraphs 152-167 below.

73.     On March 11, 2016, President Napolitano ordered Chancellor Dirks to "take steps to ensure that Sujit Choudhry does not return to [the UC Berkeley campus] for the remainder of the term; and to "[i]nstitute disciplinary proceedings against Mr. Choudhry through the Privilege

and Tenure process." She also wrote that the "University does not intend to defend or indemnify former Dean Choudhry in the litigation currently pending against him and the University brought by Ms. Sorrell."

74.     Professor Choudhry learned of President Napolitano's actions against him by reading an article in the *Los Angeles Times*.

75.     President Napolitano then falsely reported to the press that Professor Choudhry had been "banned" from campus. She falsely referred to Professor Choudhry's conduct with Ms. Sorrell in an interview with the *Sacramento Bee* as "groping." President Napolitano made other knowingly false and harmful statements that injured Professor Choudhry's reputation.

76.     On March 14, 2016, Professor Choudhry's counsel spoke with the University's Office of General Counsel, who confirmed that there was no "ban" in place against Professor Choudhry but that the University requested that he agree to remain off campus through the end of the semester.

77.     Professor Choudhry had, of course, remained on campus without incident, as Dean, for many months following Ms. Sorrell's e-mail and the OPHD investigation.

78.     On March 15, 2016, Vice Provost Broughton sent Professor Choudhry a two-sentence e-mail titled "preliminary notification" of a second investigation and disciplinary process. Broughton stated her intent to appoint one or more faculty investigators ("Investigative Officers") to begin an investigation into the identical conduct previously investigated by OPHD, and to determine whether Professor's Choudhry's conduct constituted a violation of the Faculty Code of Conduct. In July 2015, OPHD had directed EVCP Steele to assess *its* findings that Dean Choudhry had violated the University Sexual Harassment Policy under the Faculty Code of Conduct, which ultimately lead to Professor Choudhry's acceptance of the discipline EVCP Steele proposed in full settlement of the matter.

79.     The 2015 OPHD conclusion that Dean Choudhry had, by a preponderance of the evidence, violated the University's Sexual Harassment Policy was tantamount to a finding of "probable cause" (a far lower standard) that he violated the Faculty Code of Conduct. As directed by OPHD, EVCP Steele was to assess those findings under the Faculty Code of Conduct

and then exercise his authority to either bring formal disciplinary charges or offer a full resolution with Professor Choudhry. At a "Town Hall" convened at Berkeley Law on September 8, 2016, to discuss the issue of whether Professor Choudhry should be allowed on campus, Vice Provost Hermalin stated that OPHD makes the equivalent of a "probable cause" finding in sexual harassment investigations.

80. A second investigation of identical conduct is not contemplated anywhere in UC Berkeley's written disciplinary policies.

81. The faculty "Investigative Officers" have finished their report, but have refused to furnish a copy to Professor Choudhry. Their report is now in the hands of Vice Provost Hermalin (Vice Provost Broughton's successor). At the same "Town Hall" discussed in paragraph 79, Hermalin intimated to the gathered students that formal charges against Professor Choudhry are imminent.

82. EVCP Steele represented that Professor Choudhry's July 2015 Settlement was a complete resolution at the time it was made. He repeated those representations on several occasions.

83. As late as March 9, 2016, EVCP Steele continued to defend the sanctions imposed and completed by Professor Choudhry as "appropriate and effective," and he never mentioned the possibility of a second disciplinary proceeding.

84. On information and belief, Vice Provost Broughton only initiated the second disciplinary proceeding because she was ordered by President Napolitano and Chancellor Dirks to do so.

85. Professor Choudhry justifiably and detrimentally relied on EVCP Steele's representations. Although he disagreed with the OPHD Report's factual findings, and its "legal" finding that he had violated the University's Sexual Harassment Policy under a "preponderance of the evidence" standard, Professor Choudhry accepted the report and proposed discipline in full settlement of the charges against him. He then faithfully fulfilled the terms of the July 2015 Settlement.

86.     At the phase at which then Dean Choudhry was confronted with the OPHD investigation, he had the right to demand additional process, including invoking his right to a full hearing at which he could cross-examine witnesses, review all documents and investigative material, and argue the evidence in his defense against a finding of a violation, Professor Choudhry instead accepted the disciplinary sanctions, and decided not to contest the OPHD Report, in exchange for finality and to put the matter behind him.

87.     Under the United States Constitution, Dean Choudhry was entitled to procedural due process as a public employee prior to receiving adverse employment action, including a cut in his salary.  He gave up his rights to that process, including a right to a hearing, by accepting the Settlement and sanctions in reliance upon EVCP Steele's representations that the July 2015 Settlement was the final resolution of the matter.

88.     Professor Choudhry also relied on the representation in the Settlement that all Berkeley leadership – including the Chancellor, Vice Provost of Faculty, Chief Campus Counsel, and EVCP – considered the sanctions being offered to be appropriate to resolve the entire matter and approved those sanctions as a final resolution.  He believed EVCP Steele statement, in imposing discipline, that "[y]ou have a very promising career as Berkeley's Law School Dean with your innovative ideas, high energy, and enthusiastic citizenship, and I trust that you will grow into the kind of leader that we both know you can be."

89.     In reliance on those representations, and the understanding that the Settlement expressly contemplated that his career would continue at the University, he remained as Dean of Berkeley Law, foregoing the opportunity either to dispute the entire set of findings and conclusions and clear his name, or even to seek employment elsewhere.  Professor Choudhry relied upon EVCP Steele's representation, that it was "over."

90.     Other administrators confirmed that the first disciplinary process and the Settlement ended the matter.  Six days before e-mailing the "preliminary notification," of a second proceeding, Vice Provost Broughton hugged Dean Choudhry and said that she stood by the sanctions imposed.  She had earlier told him that she did not want him to leave and return to his tenured faculty position at NYU.

91.   Professor Choudhry's detrimental reliance on the July 2015 Settlement cannot at this stage be remedied.  In exchange for the July 2015 Settlement, he did not contest the OPHD Report at the time it was issued.  Several of the employees interviewed by OPHD have since left the University's employ.  Ms. Sorrell has now initiated a lawsuit seeking vast sums from the University and Professor Choudhry.

92.   As detailed below, the faculty "Investigative Officers" actually performed *no* investigation but simply adopted the findings of the OPHD Report that Professor Choudhry left unchallenged when he accepted the Settlement.

93.   Any process to which Professor Choudhry is now submitted is also tainted by the public attacks on him in the media, the conduct of the Academic Senate (whose members are participating and will continue to participate in the second disciplinary process), and the actions of President Napolitano and University administrators.  After Ms. Sorrell filed suit in March 2016, President Napolitano tainted the process by falsely referring to Professor Choudhry's conduct as "groping," and suggesting he is such a threat that he must be "banned" from the UC Berkeley campus.

94.   The second, unlawful process is also tainted by other events that have occurred post-Settlement.  Once Ms. Sorrell filed suit, the University sought to cover up its bungling of her ten applications for other positions on campus.  It also used Professor Choudhry as an example to appear tough on sexual harassment after bungling the Marcy and Fleming matters.

95.   EVCP Steele, who stood by the sanctions and wanted Professor Choudhry to continue as Dean, some weeks later published an article in UC Berkeley's campus paper about how, perhaps, he should have imposed tougher sanctions.  The article does *not* say that such a "failure" on his part might be remedied by a second and duplicative disciplinary process aimed at stripping Professor Choudhry of tenure, the harshest sanction imaginable in academia.  Nor did it say that Professor Choudhry had done anything other than faithfully fulfill the requirements under the July 2015 Settlement.

96.   The P&T Committee, which would conduct an unprecedented disciplinary hearing in this situation, is a Committee of the Academic Senate.  The Academic Senate is not impartial

as to Professor Choudhry in this matter.   When Ms. Sorrell's lawsuit became public, the Academic Senate held multiple public forums on sexual harassment and discussed, among other things, the allegations against Professor Choudhry.   On March 18, over 120 members of the Academic Senate wrote an open letter to the University administration expressing the view that Professor Choudhry's discipline reflected a lack of seriousness about the need to address sexual harassment and disrespect toward victims.   In April, 2016, the Academic Senate met in emergency session and passed a motion to grant Ms. Sorrell an award for outstanding service to the University by a staff member, in recognition of how her allegations against Professor Choudhry brought sexual harassment prevention and response to the forefront of administrative priorities.

97.     On September 2, 2016, the Office of Student Services at Berkeley Law circulated a statement from the Boalt Hall Student Association, which stated that Professor Choudhry's presence on campus made it a "hard time for everyone," and that there were resources available to "help students protect themselves," including:   night time safety escort services; rape crisis counselors; and other psychological assistance.   Professor Choudhry's counsel wrote to the University's outside counsel insisting that the University stop sponsoring and promoting the false and defamatory narrative that Professor Choudhry is some sort of predator or any sort of threat whatsoever.   To date, the University's counsel has not responded.

98.     Individuals, in the media and on UC Berkeley's campus, have now seized upon the uncontested OPHD Report and mischaracterizations of Professor Choudhry's conduct to argue that he should be banned from campus and permanently expelled from academia.   The Daily Californian, UC Berkeley's campus paper, recently had to correct misstatements it published that Professor Choudhry's conduct involved sexual assault and "forcible" kissing. Defendants have refused to correct or address the absurd notion that Professor Choudhry poses a risk (an assertion belied by the UC Berkeley leadership supporting his continuing as Dean of Berkeley Law, which he did for nearly a year, without incident, after Ms. Sorrell made her allegations).   These events further demonstrate and compound the taint caused by Professor

Choudhry foregoing procedural rights in reliance on the Settlement, and his inability to receive a fair result now, over a year later.

99.     Chancellor Dirks is not impartial as to this matter.  He was ordered by President Napolitano to ban Professor Choudhry from campus and, in violation of the Settlement, initiate the second disciplinary proceedings.  Chancellor Dirks will not approach any decision with respect to Professor Choudhry's punishment unaffected by his own self-interest, and the negative reaction to the discipline that he, EVCP Steele, Vice Provost Broughton and Chief Campus Counsel Patti approved in the July 2015 Settlement.

100.     Other administrators similarly are not impartial in this matter.  Like Chancellor Dirks, they will be affected by their own self-interest, and the negative reaction to the Settlement discipline.  Vice Provost Hermalin, who will apparently make the decision regarding duplicate punishment and lodge formal charges with the P&T Committee, is not impartial.   In the September 8, 2016 "Town Hall" meeting, he suggested that faculty members might be more harsh, than OPHD, because they "care about the students."  Tellingly, in describing the process, at the Town Hall meeting, Vice Provost Hermalin also stated that, after a hearing, the P&T Committee makes a recommendation to the Chancellor, and then it goes to the Regents "to remove tenure."  Removal of tenure is the harshest of a range of punishments, but it is the one Vice Provost Hermalin focused on in describing Professor Choudhry's ongoing case.

101.     President Napolitano and the Regents are not impartial in this matter.  Napolitano has prejudged this matter, ordered an unprecedented "ban" of Professor Choudhry from campus, and ordered the duplicate investigation and disciplinary process now underway.

**VII.    The University's False Justification for the "Second," Duplicative Investigation.**

102.     Professor Choudhry immediately protested the second, duplicative investigation concerning the identical conduct that was the subject of his prior, completed discipline.  On March 18, 2016, Professor Choudhry's counsel wrote to President Napolitano demanding that the Settlement be respected and all action against him cease immediately.  On March 29, 2016, having received no response to the earlier letter, Professor Choudhry's counsel sent a letter to

Vice Provost Broughton explaining how the University's actions, carried out by President Napolitano, EVCP Steele, Chancellor Dirks, and Vice Provost Broughton violated the University's disciplinary procedures, and the July 2015 Settlement. Professor Choudhry's counsel demanded that the second, duplicative investigation be stopped.

103. A week later, on April 6, 2016, Chief Campus Counsel Patti responded. In his letter, he stated for the first time that the July 2015 Settlement and sanctions were, in the University's view, only "administrative actions taken in connection with his appointment as Dean of Berkeley Law School." Therefore, per Patti, the University had the right to conduct a second, duplicative process concerning the identical conduct, which was a "faculty disciplinary process."

104. Chief Campus Counsel Patti's letter cited language in APM-016 that states: "[f]aculty members serving in administrative roles may be subject to disciplinary sanctions under this policy in addition to administrative actions, if the faculty member's misconduct in the role of an administrator also violates the ethical and professional standards for faculty set forth in the Faculty Code of Conduct."

105. The record refutes any suggestion that Chief Campus Counsel Patti's position is tenable. Among other things: (1) the OPHD Report was sent to EVCP Steele in July 2015 for review under the *Faculty Code of Conduct* (*i.e.*, exactly the review now supposedly taking place); (2) EVCP Steele was empowered to offer a settlement that encompassed *both* administrative and faculty discipline that would resolve the matter and, consistent with the disciplinary procedures, offered the Settlement; (3) EVCP Steele explicitly told Professor Choudhry that the disciplinary process stemming from the Sorrell matter was "over."

106. The initial discipline was not solely "administrative action." The initial investigation commenced in March 2015, and was settled in July 2015. The second, duplicative investigation was not commenced until March 2016, after Ms. Sorrell filed her lawsuit, with Professor Choudhry continuing to serve as Dean until after the lawsuit was filed. Given that Chief Campus Counsel Patti was involved in approving the Settlement and discipline in July 2015, on information and belief, Defendants would not have waited nearly a full year after the

1   commencement of the first investigation to commence a second, duplicative investigation and

2   disciplinary process geared toward removing Professor Choudhry from the faculty, during which

3   time Professor Choudhry continued to serve as Dean of Berkeley Law.

4       107.    On information and belief, but for Ms. Sorrell's civil complaint and President

5   Napolitano's effort to deflect negative attention from herself and the University, no second

6   investigation or "faculty disciplinary process" would ever have been invented or initiated.

7       108.    University administrators, including Chief Campus Counsel Patti, invoked the

8   false "administrative" vs. "faculty" distinction only after Ms. Sorrell filed her suit, and after

9   President Napolitano, in response to public pressure, ordered an investigation that they had

10  already conducted and resolved in accordance with the governing disciplinary rules, in order to

11  provide an after-the-fact rationalization for their illegal decision.

12      109.    On April 22, 2016, Professor Choudhry filed a grievance with the Academic

13  Senate's P&T Committee demanding that the second, duplicative disciplinary process cease

14  immediately.  On May 31, 2016, the P&T Committee improperly rejected the grievance as failing

15  to state a *prima facie* case of a violation of Professor Choudhry's rights and privileges.  The

16  Committee also claimed that the grievance was, in other respects, premature, given that the result

17  of the second investigation and disciplinary process for the identical conduct previously

18  disciplined was not yet known.

19      110.    On August 1, 2016, Professor Choudhry filed a second grievance challenging the

20  P&T Committee's actions.  On August 24, 2016, he received a denial of that grievance.

21      111.    On information and belief the P&T Committee has received direct instruction

22  from the administration and its legal counsel that the grievance should be rejected and Professor

23  Choudhry should be denied relief.  Professor Choudhry's grievances were denied without the

24  P&T Committee speaking to a single witness or conducting any investigation.

25  / / /

26  / / /

27  / / /

28

**VIII.    The Sham Second Investigation Started a Year After the Settlement, Is Based on the Same Conduct, Adopted the Same Findings Made by OPHD and Is a Pretext for a Coordinated Effort to Strip Professor Choudhry of Tenure and Terminate Him.**

112.    As discussed above, on March 15, 2016, Vice Provost Broughton notified Professor Choudhry that she intended to appoint faculty Investigative Officers to begin the second, duplicative investigation.  Broughton claimed that the impetus for her action was that the 2015 OPHD Report "had been referred to her for assessment under the Faculty Code of Conduct."    The University then went silent.    Professor Choudhry received no further communication from the administration of the University for three months.

113.    On July 12, 2016, Professor Choudhry's counsel wrote to Chief Campus Counsel Patti and Valerie Shelton, Senior Counsel in the University's Office of General Counsel, demanding that the University provide Professor Choudhry with information, including the identity of the faculty Investigative Officers and the scope of their investigation.  Counsel for Professor Choudhry reiterated that a second investigation and disciplinary process violated the University's own rules, basic fairness, and Professor Choudhry's rights under the Settlement and the law.

114.    On July 18, 2016, outside counsel to the University, Marie Holvick, notified counsel for Professor Choudhry that an unknown number of Investigative Officers had been appointed on *June 15*, 2016, some three months after Vice Provost Broughton's notification to Professor Choudhry.  Ms. Holvick stated that the investigators would finish their work within the 90-day timeframe provided in the rules.    Ms. Holvick denied knowing any additional information, despite being designated by the University to speak to Professor Choudhry's counsel, who had raised multiple questions in the July 12 letter.

115.    On July 20, 2016, counsel for Professor Choudhry wrote to Ms. Holvick and her law partner, Michael Lucey, again demanding answers to basic questions about the investigation and objecting to it as impermissible under the University's rules.  The letter requested a meeting with the faculty Investigative Officers conducting the second, duplicative investigation.  Over a month later, on August 23, 2016, the University responded, stating that Professor Choudhry was not entitled to a meeting with the Investigative Officers.

24

116.    The Disciplinary Procedures and Sanctions state that investigators "shall normally" meet with the Complainant and the Respondent.    *Disciplinary Procedures and Sanctions* ¶ 4.    As discussed above, the Campus Complaint Resolution Officers met with both Professor Choudhry and Ms. Sorrell during the first investigation.    The faculty Investigative Officers met with neither in the "second investigation."

117.    On August 10, 2016, Professor Choudhry received by courier at his home an envelope containing the "preliminary report" of the faculty "Investigative Officers."    This was the first that Professor Choudhry learned their identity:    Professor Christina Romer and Professor Stephen Raphael.

118.    According to the "preliminary report," Professors Raphael and Romer did not interview Ms. Sorrell, Professor Choudhry, or a single other fact witness, or do any investigation aside from reading the OPHD Report and speaking to the staff of OPHD who conducted the first investigation.    In other words, based on an already completed investigation, as EVCP Steele did a year earlier, they simply read that investigation and assessed its conclusions.

119.    On August 17, 2016, *after* the Investigative Officers had filed their preliminary investigative report, Professor Choudhry and his counsel were permitted to meet with the Investigative Officers and Assistant Campus Counsel Theresa Leone.    At that meeting, Professors Raphael and Romer learned for the *first time* – from Professor Choudhry and his counsel – (a) that Professor Choudhry had been given a full set of sanctions in July 2015 for the identical conduct, as approved by Chancellor Dirks, Chief Campus Counsel Patti, Vice Provost Broughton, and EVCP Steele; (b) that Professor Choudhry had abided by and fulfilled all of those sanctions and continued as Dean for an additional seven months; and (c) that Professor Choudhry had twice filed grievances with the P&T Committee, through its Chair, Professor Vern Paxson, asserting that the second, duplicative investigation and disciplinary process were in violation of the University's rules, contravened the Settlement he accepted in July 2015, and otherwise violated his due process rights.

120.    On information and belief, the University administration misled the Investigative Officers into a false belief that Professor Choudhry had escaped discipline for conduct committed

a year earlier, then asked them to assess the OPHD Report (unaware that Professor Choudhry agreed *not* to contest it in exchange for the July 2015 Settlement), and expected the Investigative Officers to recommend harsh punishment, in the currently charged atmosphere about the allegations in this matter and the outcry about UC Berkeley's handling of this and other sexual harassment cases, regardless of the July 2015 Settlement.

121.    The Investigative Officers, in their draft report, recommended a range of punishment, up to and including Professor Choudhry's loss of tenure and termination from the University.

122.    The Investigative Officers' final report has now been sent to Vice Provost Hermalin, but has not been furnished to Professor Choudhry despite his multiple requests for it. At the September 8, 2016 "Town Hall" meeting, Professor Hermalin described how, at this point, just as with the first disciplinary process, there can be the equivalent of a "plea agreement."

123.    The second, duplicative investigation was a pretextual effort by the University to deprive Professor Choudhry of his entitlement to a complete resolution of this matter and to change the agreed upon, in EVCP Steele's words, "appropriate and effective" discipline agreed to in the Settlement.

124.    On information and belief, every senior administrator at Berkeley involved in the discipline following the OPHD investigation – Chancellor Dirks, EVCP Steele, Vice Provost Broughton, and Chief Campus Counsel Patti – understood the July 2015 Settlement to completely end the matter.  Through their words and actions, they conveyed that same understanding to Professor Choudhry consistently, over a period of many months, up to and including the day after Ms. Sorrell filed her lawsuit.

125.    On information and belief, if President Napolitano had not ordered a second, duplicative investigation in a discriminatory attempt to mask her and the University's mishandling of other investigations and Ms. Sorrell's employment, the UC Berkeley administrators would have adhered to the Settlement.

126.    As detailed below in Count Two, Defendants' treatment of Professor Choudhry, who is South Asian (Indian) and a non-U.S. citizen, has been vastly different from the same

1    administrators' handling of allegations of sexual harassment against Caucasian administrators

2    and professors at UC Berkeley who are U.S. citizens.

3    **IX.    The Improper Second, Duplicative Investigation Has Harmed and Will Irreparably**
     **Harm Professor Choudhry.**

4

5          127.    Defendants' conduct has harmed, and continues to harm, Professor Choudhry.

6                  a.    Professor Choudhry was denied a summer salary.  In denying the salary,

7    the University administrators pointed to the on-going, illegitimate second disciplinary process.

8    On information and belief, Professor Choudhry was the only professor at Berkeley Law denied a

9    summer salary.

10                 b.    Defendants, citing the ongoing disciplinary process, have not assigned

11   Professor Choudhry classes to teach for the fall semester.  This action prevents Professor

12   Choudhry from fulfilling the terms of his employment and deprives him of eligibility for merit

13   pay and other advancement as a faculty member.  In recent press reports, President Napolitano is

14   reported to have stated that Professor Choudhry will not teach in the spring semester either.

15                 c.    Professor Choudhry lost important procedural rights, including the right to

16   challenge the OPHD Report, as part of the July 2015 Settlement.  Now, the OPHD Report and its

17   findings are being accepted as the definitive record to be used against him in the second,

18   duplicative disciplinary process.  Professor Choudhry has no meaningful ability to challenge the

19   findings now.  The alleged conduct took place well-over a year ago; multiple witnesses have left

20   the University; Ms. Sorrell is litigating against Professor Choudhry and seeking substantial

21   money damages.  Defendants' actions have harmed Professor Choudhry's reputation and, if

22   allowed to continue, will irreparably harm him and his ability to pursue his profession.

23                 d.    Defendants' repeated threat that they will ban Professor Choudhry from

24   campus has inflicted a profound stigma that he is a dangerous threat, which irreparably harms

25   him and impairs his ability to obtain employment.

26                 e.    Defendants' threatened ban of Professor Choudhry from campus deprives

27   him of his rights to association and speech guaranteed under the United States Constitution.

28

f.      Defendants' sponsorship of statements that Professor Choudhry's presence on campus requires students to find resources to "protect themselves" further produces a stigma unique to his case.

g.      The Settlement to which Professor Choudhry and the University agreed creates a property interest for purposes of due process protections under the United States Constitution.  Defendants' conduct has deprived Professor Choudhry of the benefits of the Settlement, including the right to be free from additional discipline in exchange for the rights Professor Choudhry relinquished.

128.    Professor Choudhry seeks declaratory and injunctive relief, because no monetary relief (to the extent available), or relief granted at the conclusion of the second disciplinary proceeding, will be adequate to remedy the violations of his rights.

129.    In the absence of immediate relief, Defendants will continue to ignore the University's governing procedures and violate the July 2015 Settlement, violate Professor Choudhry's due process rights, and inflict irreparable harm on Professor Choudhry.

**COUNT ONE:  VIOLATION OF DUE PROCESS**

**(42 U.S.C. § 1983; Fourteenth Amendment)**
**(Against All Defendants in their Official Capacity and Against President Napolitano in her Individual Capacity)**

130.    Professor Choudhry repeats and realleges the allegations set forth in paragraphs 1 through 129 as if set forth fully.

131.    The Fourteenth Amendment of the United States Constitution provides: "nor shall any state deprive any person of life, liberty, or property, without due process of law . . . ."

132.    42 U.S.C. § 1983 provides:  "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . .  subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

28

133.   Acting under color of state law, Defendants Napolitano; Dirks; Broughton; Christ; and Hermalin have deprived Professor Choudhry of rights secured to him by the Constitution and laws.

134.   Professor Choudhry has a property interest (*i.e.*, a clear entitlement) in the benefits guaranteed by the July 2015 Settlement, including finality and protection from any additional University discipline based on the same conduct for which he has already been disciplined.

135.   Professor Choudhry has a liberty interest in being free from the unfair stigma the University attempts to impose on him, which has and will continue to impair his ability to obtain employment.

136.   Professor Choudhry has a First Amendment right to engage in speech and association with his colleagues and students at the University of California, which Defendants' conduct has infringed profoundly.

137.   Defendants have separated Professor Choudhry from his profession, stripped him of any teaching role, and denied him summer salary, all of which are additional tangible property deprivations that were imposed without any process.

138.   Defendants have, by ordering, initiating, and refusing to cease the second, duplicative disciplinary process, deprived Professor Choudhry of each of these property and liberty interests without *any* process whatsoever.  There is no process by which the University, acting through its agents, can act in flagrant disregard of its own rules and procedures, in violation of a binding settlement made with Professor Choudhry, and in a manner devoid of any fundamental fairness.

139.   Professor Choudhry has been denied the right to neutral decision makers.

140.   The special facts and circumstances of this case show that the risk of unfairness is intolerably high.  Direct and circumstantial evidence demonstrates that that bias, prejudice, and lack of impartiality have operated to deny Professor Choudhry due process.

141.   It is a violation of due process for the government to induce reliance on an agreement, then breach that agreement and seek to impose duplicative punishment based on admissions and facts it elicited from the person with whom it entered the agreement.

142.   As a matter of fundamental fairness inherent in due process, promises made by the government – in this case, an arm of the State of California – to induce cooperation for the purpose of imposing a punitive sanction on a citizen must be fulfilled.

143.   An actual, explicit promise was made to Dean Choudhry that, if he accepted the Settlement and did not contest the OPHD findings, the matter involving Ms. Sorrell's allegations would be over.

144.   Defendants' official conduct in this matter is so arbitrary as to violate the due process clause of the United States Constitution.

### COUNT TWO: VIOLATION OF EQUAL PROTECTION

### (42 U.S.C. § 1983; Fourteenth Amendment)
### (Against All Defendants in their Official Capacity and Against President Napolitano in her Individual Capacity)

145.   Professor Choudhry repeats and realleges the allegations set forth in paragraphs 1 through 144 as if set forth fully.

146.   The Fourteenth Amendment of the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."   It prohibits discrimination on the basis of race and national origin.

147.   42 U.S.C. § 1983 provides:   "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ."

148.   Defendants Napolitano; Dirks; Broughton; Christ and Hermalin, acting under color of state law, have violated Professor Choudhry's right to equal protection.

149.   Professor Choudhry is of South Asian descent, being of Indian origin, and a non-United States citizen.

150.   Defendants unilaterally breached the Settlement, initiated a second investigation and disciplinary proceeding against Professor Choudhry, announced that he was banned him from campus, stripped him of a teaching role, deprived him of his summer salary, threatened

1  repeatedly to *actually* ban him from campus, sponsored the falsehood that students must "protect

2  themselves" against him, and have threatened revocation of his tenure.

3      151.   Other employees of the Regents and the University, who are not members of a

4  protected class, have been found to have committed actual predatory conduct yet been treated

5  more favorably than Professor Choudhry in the context of sexual harassment investigations and

6  discipline.

7                    **a.  Graham Fleming Sexual Harassment Case**

8      152.   In 2014, President Napolitano's office retained an attorney to investigate

9  allegations of sexual harassment against UC Berkeley's Vice Chancellor for Research and

10 Professor of Chemistry Graham Fleming.  Fleming was accused of sexual misconduct with one

11 or more subordinate employees in his office.

12     153.   The investigator in the Fleming matter found that "Fleming said he was in love

13 with and wanted to sleep with [redacted]."  In an e-mail, Fleming wrote to "[redacted] that he did

14 not want her to lose too much weight so that he would have something to hold onto."  Fleming

15 admitted telling "[redacted] to turn around so he could molest [redacted] . . . ."  The investigator

16 also found it "more likely than not that Fleming grabbed [redacted's] breasts . . . ."  The

17 investigator's report also reflects that "[redacted] allege[d] that Fleming told her . . . about . . . [a]

18 sexual encounter he had with a female graduate student," involving "the student giving him oral

19 sex in a hotel room or an office."  The report also documents that "[Fleming] admitted that he

20 approached her from behind and touched her hair to move it out of the way so that he could kiss

21 her neck."  The report also reflects that "Fleming admitted . . . an incident . . . wherein he offered

22 to and did massage [redacted's] feet with lotion and then laid down next to her on a hotel room

23 bed fully clothed . . . . During the same trip, [redacted] stated that Fleming told her he wanted to

24 sleep with her."  Based on the investigation, the investigator concluded that "[redacted] more

25 likely than not felt Fleming's erection on one occasion" when he hugged her.

26     154.   The Fleming matter was handled directly by the University's Office of the

27 President.  The investigative findings against Vice Chancellor Fleming resulted in him resigning

28

1   his administrative position, citing personal reasons, in April 2015.  Fleming retained his position

2   as a tenured chemistry professor at UC Berkeley, which he still holds today.

3        155.   On information and belief, Professor Fleming, after agreeing to resign as Vice

4   Chancellor of Research, has not faced any further faculty discipline or a second, duplicative

5   investigation.

6        156.   President Napolitano, who directed the initial investigation into, and, on

7   information and belief, the resolution of the Fleming matter, has never directed the UC Berkeley

8   Chancellor to ban Professor Fleming from campus, or to initiate disciplinary proceedings against

9   Professor Fleming through the Privilege and Tenure process. No other Defendant has suggested,

10   much less initiated a second, duplicative investigation or disciplinary proceeding against

11   Professor Fleming in his capacity as a faculty member, or suggested that Professor Fleming be

12   "banned" from campus, or taken any other action that would affect his standing.

13        157.   Professor Fleming is Caucasian and a United States citizen.

14            **b.  Geoffrey Marcy Sexual Harassment Case**

15        158.   Geoffrey Marcy is a retired Professor of Astronomy.

16        159.   In 2015, OPHD performed an investigation of allegations that Professor Marcy

17   had engaged in sexual harassment and misconduct with students.

18        160.   OPHD found that Professor Marcy kissed a student on the forehead and cheek.  It

19   found that he had discussed his sex life with another student, invited her to attend a tennis match,

20   and squeezed her neck after driving her home.  It also found credible another Complainant's

21   description that Professor Marcy, at a conference in Washington, D.C., touched an

22   undergraduate's thigh, bought the undergraduate drinks, and took her back to her hotel room.

23   Professor Marcy contended that he was assisting an intoxicated student, whom he knew, but

24   OPHD noted that it was strange that he did not try to find the student's friends, and questioned

25   Professor Marcy's motive for escorting her all the way to her bed.  OPHD also found that it was

26   more likely than not that Professor Marcy put his hand up the skirt of a student at another

27   University, where Professor Marcy gave a talk, and that, when he did so, Professor Marcy

28   grabbed the student's private areas.

161.   Toward the end of its report on Professor Marcy, OPHD stated that the "pervasiveness of Respondent's [Marcy's] behavior is unusually high."

162.   On June 27, 2015, Professor Marcy's matter was referred to the Vice Provost Broughton to "evaluate whether these behaviors constitute possible violations of the Faculty Code of Conduct and, if so, pursue appropriate resolution process according to the Code." (emphasis added).

163.   On July 13, 2015, Vice Provost Broughton reached a settlement with Professor Marcy that, in effect, directed him not to repeat the conduct and warned of additional discipline if he violated the agreement by repeating the conduct.   Later, after the Marcy allegations and investigation came to light, it was reported that Professor Marcy agreed to resign.   Professor Marcy maintains that he retired.  He is currently Professor Emeritus at UC Berkeley.

164.   Professor Marcy continued to receive pay and benefits as a faculty member until the end of 2015.   In defending the fact that Professor Marcy continued to receive pay and benefits, a University spokesman explained that a faculty member who was terminated would probably stop getting paid immediately, but "no one here can recall any instance of a tenured faculty member being terminated at Berkeley."

165.   On information and belief, Professor Marcy will receive his full pension benefits. He also remains Professor Emeritus of the University, which entitles him to continued membership in his Department and in the Academic Senate, including voting rights and eligibility to serve on Academic Senate committees, as well as access to campus resources.

166.   President Napolitano has never directed the UC Berkeley Chancellor to ban Professor Marcy from campus, or to initiate disciplinary proceedings against Professor Marcy through the Privilege and Tenure process. No other Defendant has suggested, much less initiated a second, duplicative investigation or disciplinary proceeding against Professor Marcy, or suggested that Professor Marcy be "banned" from campus, or taken any other action that would affect his standing.

167.   Professor Marcy is Caucasian and a United States citizen.

168.   Defendants' uniquely harsh and unprecedented treatment of Professor Choudhry is motivated by discrimination based on his race, color, and national origin.

169.   Professor Choudhry has been injured by the Defendants' violation of his right to equal protection.   If Defendants' actions are not declared improper and enjoined, Professor Choudhry will be irreparably harmed.

**COUNT THREE: RACIAL DISCRIMINATION (42 U.S.C. § 2000e)**

**(42 U.S.C. § 1983; Fourteenth Amendment)**
**(Against All Defendants in their Official Capacity and Against President Napolitano in her Individual Capacity)**

170.   Professor Choudhry repeats and realleges the allegations set forth in paragraphs 1 through 169 as if set forth fully.

171.   As set forth in Count Two, Professor Choudhry is a member of protected classes with respect to his race, color, and national origin.

172.   On information and belief, Professor Choudhry has suffered adverse employment decisions due to his race, color and national origin.   Other individuals, who are not members of a protected class, have been treated more favorably.

173.   Professor Choudhry has been injured by Defendants' disparate treatment of him.

174.   If the Defendants' actions are not enjoined, Professor Choudhry will be irreparably injured.

175.   On August 31, 2016 Professor Choudhry was issued a right to sue letter in this matter under Title VII by the United States Department of Justice Civil Rights Division.

**COUNT FOUR:  DECLARATORY JUDGMENT**
**(Against All Defendants)**

176.   Professor Choudhry repeats and realleges the allegations set forth in paragraphs 1 through 175 as if set forth fully.

177.   As set forth in this complaint, a justiciable controversy exists and is ripe for adjudication.   Accordingly, Professor Choudhry respectfully requests that this Court enter a declaratory judgment that:

34

1          a.      The Settlement agreement was a valid agreement that completely resolved

2 the University disciplinary process against Professor Choudhry in relation to Ms. Sorrell's

3 allegations.

4          b.      The second, duplicative disciplinary process, purportedly initiated on

5 March 15, 2016, violates Professor Choudhry's rights and may not proceed.

6 **REQUESTED RELIEF**

7      WHEREFORE, Plaintiff demands judgment in his favor against Defendants as follows:

8     A.      Preliminary and permanent injunctive relief prohibiting Defendants from

9 proceeding with a second, duplicative disciplinary process, and enjoining Defendants' breach of

10 the Settlement and violation of Professor Choudhry's rights;

11     B.      Declaratory relief as requested in Count Four

12     C.      Actual damages for harms caused by the Defendants' unlawful conduct;

13     D.      Punitive damages where allowed by law;

14     E.      Reasonable attorneys' fees and costs, as permitted by law, incurred in maintaining

15 this action; and

16     F.      Such other and further relief as is just and proper.

17 **DEMAND FOR JURY TRIAL**

18      Plaintiff demands a jury trial in this matter.

19

20 Dated:   September 15, 2016       Respectfully submitted,

21

22                   William W. Taylor, III (*pro hac vice* motion pending)

Caroline J. Mehta (*pro hac vice* motion pending)

23                   Steven N. Herman (*pro hac vice* motion pending)

ZUCKERMAN SPAEDER LLP

24                   1800 M Street, NW, Suite 1000

Washington, D.C. 20036

25                   Tel: (208) 778-1800

Fax: (202) 822-8106

26                   wtaylor@zuckerman.com

cmehta@zuckerman.com

27                   sherman@zuckerman.com

28

1

/s/  Jamie L. Dupree
2                          Jamie L. Dupree

Jamie L. Dupree
FUTTERMAN DUPREE DODD CROLEY MAIER LLP
180 Sansome Street, 17th Floor
San Francisco, CA 94104
Tel:  (415) 399-3840
jdupree@fddcm.com

*Attorneys for Plaintiff*
*Sujit Choudhry*

COMPLAINT