1   BRADLEY S. PHILLIPS (State Bar No. 85263)
    brad.phillips@mto.com
2   SARA N. TAYLOR (State Bar No. 288573)
    sara.taylor@mto.com
3   MUNGER, TOLLES & OLSON LLP
    355 South Grand Avenue
4   Thirty-Fifth Floor
    Los Angeles, California 90071-1560
5   Telephone:    (213) 683-9100
    Facsimile:    (213) 687-3702
6
    BRYAN H. HECKENLIVELY (State Bar No. 279140)
7   bryan.heckenlively@mto.com
    MUNGER, TOLLES & OLSON LLP
8   560 Mission Street, Twenty-Seventh Floor
    San Francisco, CA 94105-2907
9   Telephone:    (415) 512-4000
    Facsimile:    (415) 512-4077
10
    Attorneys for Defendants
11  THE REGENTS OF THE UNIVERSITY OF
    CALIFORNIA, JANET NAPOLITANO,
12  NICHOLAS B. DIRKS, CAROL CHRIST,
    JANET BROUGHTON, AND BENJAMIN
13  HERMALIN

14

15                  UNITED STATES DISTRICT COURT

16      NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

17

18  SUJIT CHOUDHRY,                         Case No. 3:16-cv-05281-RS

19            Plaintiff,                    **DEFENDANTS' OPPOSITION TO
                                            PLAINTIFF'S MOTION FOR
20       vs.                                PRELIMINARY INJUNCTION**

21  REGENTS OF THE UNIVERSITY OF            [REDACTED VERSION OF DOCUMENT
    CALIFORNIA, JANET NAPOLITANO,           SOUGHT TO BE SEALED]
22  NICHOLAS B. DIRKS, CAROL CHRIST,
    JANET BROUGHTON, AND BENJAMIN           Judge:   Hon. Richard Seeborg
23  HERMALIN,                               Date:    November 3, 2016
                                            Time:    1:30 p.m.
24            Defendants.                   Crtrm.:  3, 17th Floor

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.    BACKGROUND ................................................................................................. 3

    A.    Choudhry's Misconduct and the University's Investigation .................................... 3

    B.    Administrative Action Taken Against Choudhry in His Capacity as Dean ............. 4

    C.    The Current Faculty Disciplinary Proceedings ......................................................... 6

III.    ARGUMENT ................................................................................................. 8

    A.    This Court Should Abstain from Interfering with the State Disciplinary
           Proceeding Under *Younger v. Harris* ...................................................................... 8

           1.    UC's Disciplinary Proceeding Is an Ongoing State Judicial
                  Proceeding ..................................................................................................... 8

           2.    UC's Disciplinary Proceeding Implicates an Important State Interest .......... 9

           3.    The State Proceedings Afford Choudhry an Adequate Opportunity
                  for Review of His Federal Constitutional Claims ...................................... 10

           4.    Choudhry's Request for Injunctive Relief Implicates *Younger*
                  Policies ........................................................................................................ 10

           5.    No Extraordinary Circumstances Warrant an Exception to
                  Abstention ................................................................................................... 10

    B.    Choudhry Has Not Established That He Is Entitled to An Injunction ................... 12

           1.    Choudhry Is Not Likely to Succeed on the Merits ..................................... 12

                  (a)    Choudhry Is Not Likely to Prevail on His Due-Process Claim ....... 12

                          (i)    UC Did Not Deprive Choudhry of a Property Interest ........ 13

                          (ii)    UC Did Not Deprive Choudhry of a Liberty Interest .......... 17

           2.    Choudhry Is Not Likely to Prevail on His Equal Protection Claim ........... 20

            3.    Choudhry Will Not Suffer Irreparable Harm Absent Injunctive
                  Relief ........................................................................................................... 21

           4.    The Balance of Equities Weighs Against an Injunction ............................ 23

           5.    An Injunction Would Be Against the Public Interest ................................. 25

IV.    CONCLUSION ................................................................................................. 25

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*AmerisourceBergen Corp. v. Roden*,
    495 F.3d 1143 (9th Cir. 2007)....................................................................10

*AT&T Techs., Inc. v. Comm'cns Workers of Am.*,
    475 U.S. 643 (1986) ...................................................................................23

*Baffert v. Cal. Horse Racing Bd.*,
    332 F.3d 613 (9th Cir. 2003).....................................................................8, 9

*Bonnell v. Lorenzo*,
    241 F.3d 800 (6th Cir. 2001).......................................................3, 23, 24, 25

*Cameron v. Ariz. Bd. of Regents*,
    2008 WL 4838710 (D. Ariz. Nov. 6, 2008) ...................................2, 8, 9, 10

*Caribbean Marine Servs. Co., Inc. v. Baldrige*,
    844 F.2d 668 (9th Cir. 1988)..................................................................22, 23

*Chaffin v. Shoshone Cty.*,
    2005 WL 3307214 (D. Idaho Dec. 5, 2005).................................................18

*Colo. River Water Conversation Dist. v. United States*,
    424 U.S. 800 (1976) .....................................................................................8

*Contreras v. Tyco Elecs. Corp.*,
    2010 WL 5088801 (N.D. Cal. Dec. 8, 2010) ..............................................14

*DeBoer v. Pennington*,
    287 F.3d 748 (9th Cir. 2002)........................................................................15

*Dix v. Cty. of Shasta*,
    963 F.2d 1296 (9th Cir. 1992), *overruled on other grounds by Sandin v.*
    *Conner*, 515 U.S. 472 (1995) .....................................................................15

*Doe v. Ohio State Univ.*,
    136 F. Supp. 3d 854, 871 (S.D. Ohio 2016).........................................24, 25

*Dowden v. City of Sacramento*,
    40 F. Supp. 2d 1146 (E.D. Cal. 1999)..........................................................11

*Graphic Comm'cns Conf. v. Bakersfield Californian*,
    541 F. Supp. 2d 1117 (E.D. Cal. 2008) .....................................................3, 21

*Hines v. Cal. Pub. Util. Comm'n*,
    2011 WL 724658 (N.D. Cal. Feb. 23, 2011)................................................22

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Huffman v. Pursue, Ltd.*,
420 U.S. 592 (1975) ...........................................................................................8

4

*Ingber v. N.Y.C. Dep't of Educ.*,
5    2014 WL 2575780 (S.D.N.Y. June 9, 2014) .....................................................9

6

*Jackson v. Univ. of Ky.*,
7    2016 WL 3951084 (E.D. Ky. July 20, 2016) .....................................................9

8

*Kenneally v. Lungren*,
967 F.2d 329 (9th Cir. 1992).............................................................................11

9

*Kinlaw v. Kozak*,
10   2010 WL 986925 (N.D. Cal. Mar. 17, 2010) ..................................................20

11

*Krainski v. Nev. ex. rel. Bd. of Regents of Nev. Sys. of Higher Educ.*,
12   616 F.3d 963 (9th Cir. 2010).............................................................................19

13

*Lee v. City of L.A.*,
250 F.3d 668 (9th Cir. 2001).............................................................................20

14

*Levich v. Liberty Cent. Sch. Dist.*,
15   258 F. Supp. 2d 339 (S.D.N.Y. 2003) ....................................................9, 10, 23

16

*Lujan v. G&G Fire Sprinklers, Inc.*,
17   532 U.S. 189 (2001) ..........................................................................................15

18

*Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*,
457 U.S. 423 (1982) ............................................................................................8

19

*Navarro v. Block*,
20   72 F.3d 712 (9th Cir. 1995)...............................................................................20

21

*Ogunleye v. Arizona*,
22   66 F. Supp. 2d 1104 (D. Ariz. 1999).................................................................21

23

*Olim v. Wakinekona*,
461 U.S. 238 (1983) ..........................................................................................15

24

*Paul v. Davis*,
25   424 U.S. 693 (1976) ..........................................................................................19

26

*Peacock v. Bd. of Regents of Univs. & State Colls. of Ariz.*,
27   380 F. Supp. 1081 (D. Ariz. 1974) ...................................................................18

28

*Personnel Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979) ..........................................................................................20

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3
*Portland Gen. Elec. Co. v. Liberty Mutual Ins. Co.*,
2016 WL 4059658 (D. Or. July 27, 2016) ................................................................23

4

5
*Partingon v. Gedan*,
961 F.2d 852 (9th Cir. 1992)........................................................................10, 11

6

*Requa v. Kent Sch. Dist. No. 415*,
7
492 F. Supp. 2d 1272 (W.D. Wash. 2007) ..........................................................24, 25

8
*Robbins v. U.S. Bureau of Land Mgmt.*,
438 F.3d 1074 (10th Cir. 2006)......................................................................2, 15

9

*Robinson v. Cal. State Bar*,
10
2015 WL 3486724 (N.D. Cal. May 28, 2015) ..................................................3, 22, 23

11
*Sampson v. Murray*,
415 U.S. 61 (1974) ........................................................................................21, 23

12

13
*Sanchez v. Ariz. Bd. of Regents*,
2015 WL 6956288 (D. Ariz. Nov. 10, 2015) ............................................................9

14

*Santobello v. New York*,
15
404 U.S. 257 (1971) ...............................................................................................16

16
*Start v. Apple Computer, Inc.*,
1996 WL 161630 (N.D. Cal. Mar. 29, 1996) ..........................................................14

17

18
*Stiesberg v. California*,
80 F.3d 353 (9th Cir. 1996)..................................................................17, 18, 19

19

*Stott Outdoor Advert. v. Cty. of Monterey*,
20
601 F. Supp. 2d 1143 (N.D. Cal. 2009) ..................................................................12

21
*Taylor v. Bowersox*,
329 F.3d 963 (8th Cir. 2003).................................................................................16

22

23
*Touche Ross & Co. v. S.E.C.*,
609 F.2d 570 (2nd Cir. 1979)...............................................................................20

24
*Town of Castle Rock, Colo. v. Gonzales*,
545 U.S. 748 (2005) ...............................................................................................15

25

26
*United States v. Baron*,
172 F.3d 1153 (9th Cir. 1999).............................................................................16

27

28
*United States v. Charles*,
476 F.3d 492 (7th Cir. 2007)...............................................................................17

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES
### (continued)

Page

*United States v. Hall,*
730 F. Supp. 646 (M.D. Pa. 1990) ...........................................................................16

*United States v. Hallam,*
472 F.2d 168 (9th Cir. 1973) ....................................................................................16

*United States v. Litton Indus., Inc.,*
462 F.2d 14 (9th Cir. 1972) ...............................................................................11, 22

*United States v. Traynoff,*
53 F.3d 168 (7th Cir. 2007) ...............................................................................16, 17

*Usher v. City of L.A.,*
828 F.2d 556 (9th Cir. 1987) ....................................................................................20

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.,*
429 U.S. 252 (1977) ..............................................................................................3, 20

*Wilkinson v. Austin,*
545 U.S. 209 (2005) ..................................................................................................12

*Williams v. Red Bank Bd. of Ed.,*
662 F.2d 1008 (3d Cir. 1981), *overruled on other grounds by Schall v. Joyce,*
885 F.2d 101 (3d Cir. 1989) ..........................................................................8, 10, 25

*Winter v. N.R.D.C.,*
555 U.S. 7 (2008) ...............................................................................................2, 12, 21

*Wisconsin v. Constantineau,*
400 U.S. 433 (1971) ..................................................................................................19

*Withrow v. Larkin,*
421 U.S. 35 (1975) ....................................................................................................12

*Younger v. Harris,*
401 U.S. 37 (1971) ...........................................................................................2, passim

**STATE CASES**

*Bustamante v. Intuit, Inc.,*
141 Cal. App. 4th 199 (2006) ...................................................................................14

*Charles S. v. Bd. of Educ.,*
20 Cal. App. 3d 83 (1971) ...............................................................................3, 24, 25

*Davies v. Sallie Mae, Inc.,*
168 Cal. App. 4th 1086 (2009) .................................................................................14

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1

2

# TABLE OF AUTHORITIES
## (continued)

Page

3

*Goldberg v. Regents of Univ. of Cal.*,
    248 Cal. App. 2d 867 (1967)................................................................10

4

5

*Haight v. City of S.D.*,
    228 Cal. App. 3d 413 (1991)................................................................18

6

*Ishimatsu v. Regents of Univ. of Cal.*,
    266 Cal. App. 2d 854 (1968)................................................................8

7

8

*McGill v. Regents of Univ. of Cal.*,
    44 Cal. App. 4th 1776 (1996)................................................................10

9

*Miklosy v. Regents of Univ. of Cal.*,
    44 Cal. 4th 876 (2008)................................................................8

10

11

*Woodbury v. Brown-Dempsey*,
    108 Cal. App. 4th 421 (2003)................................................................10

12

13

**CONSTITUTIONAL PROVISIONS**

14

U.S. Const. amend. XIV, § 1................................................................12, 20

15

**STATE STATUTES**

16

Cal. Penal Code §§ 1017-18................................................................16

17

**FEDERAL RULES**

18

Fed. R. Crim. P. 11................................................................16

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## I.   <u>INTRODUCTION</u>

Plaintiff Sujit Choudhry asks the Court to take the extraordinary step of interfering with a pending state proceeding, which a federal court will do only in the rarest of circumstances, none of which is present here. That proceeding arises from the fact that the UC Berkeley Office for Prevention of Harassment and Discrimination ("OPHD") concluded that, while he was Dean of the University of California Berkeley School of Law ("Berkeley Law"), Choudhry violated UC policy regarding sexual harassment in his conduct toward his executive assistant, Tyann Sorrell. The OPHD investigation found that, over several months, he touched her inappropriately multiple times per day; frequently hugged and kissed her, rubbed her arms, and touched and kissed her from behind while she sat at her desk; and held her hands to his waist. (Declaration of Bryan Heckenlively ("Heckenlively Decl."), Ex. C-1 at 9-10.) Sorrell told the investigator this conduct ███████████████████████████████████████████████; that she feared that his conduct compromised her professional reputation in the office where she worked; and that Choudhry's conduct caused Sorrell to experience "a significant amount of stress and anxiety . . . for a very long time." (*Id.* at 3-4, 11; Ex. C-2 at 3-4, 10-11.)

Choudhry has failed to take any meaningful responsibility for his conduct. In his motion for a preliminary injunction, Choudhry minimizes his actions and utterly disregards the harm he inflicted. He selectively quotes from an email Sorrell sent to him, saying that she recognized he perhaps meant some of his conduct as "a warm and friendly greeting." (Mot. at 3, 9.) This ignores that Sorrell also wrote ████████████████████████████████████████████████ ███████████████████████████████████████████████ (Heckenlively Decl., Ex. C-2 at 10-11.) In an effort to avoid discipline for the serious, harmful misconduct found by OPHD, Choudhry seeks to enjoin a disciplinary proceeding the University of California ("UC" or the "University") has commenced pursuant to the Faculty Code of Conduct, the Academic Personnel Manual, and the Bylaws of the University of California Academic Senate.

Choudhry's motion is based in large part on his unsupported assertion that UC entered into a "settlement" with him, in which he purportedly agreed to accept certain disciplinary measures in his administrative capacity as Dean in exchange for an agreement by the University not to pursue

1    additional sanctions through the separate disciplinary process for faculty members. UC policies

2    expressly allow disciplinary proceedings under the Faculty Code of Conduct even after

3    administrative actions have been taken with regard to a faculty member's position as a dean. There

4    is no basis for Choudhry's "settlement" argument. UC did not enter into a settlement with

5    Choudhry; the University took administrative action against him and gave him no opportunity to

6    accept, reject, or negotiate its decision. Tellingly, there is no settlement agreement or other

7    document signed by Choudhry (who was represented by counsel, and himself a lawyer and Dean

8    of the law school). Rather, Choudhry was presented with a letter signed by Executive Vice

9    Chancellor and Provost ("EVCP") Claude Steele informing Choudhry of the actions that Steele

10   "ha[d] decided on." (Mot., Ex. 16 at 1.) The letter makes no reference to any settlement or other

11   agreement. That was consistent with UC policy: Steele had discretion to take action against

12   Choudhry in his capacity as Dean without Choudhry's consent or agreement, because he served in

13   that position at the discretion of the Chancellor. Choudhry had no right to refuse, accept, appeal, or

14   otherwise contest that action and therefore had nothing to offer the University in "settlement."

15       Choudhry's motion is also wrong on the law. As a threshold matter, all of his claims will

16   fail because this Court must abstain under *Younger v. Harris*, 401 U.S. 37 (1971), in deference to

17   the ongoing UC disciplinary process. *Cameron v. Ariz. Bd. of Regents*, 2008 WL 4838710, at *2

18   (D. Ariz. Nov. 6, 2008) (abstaining for faculty misconduct proceedings).

19       Choudhry has also failed to establish any of the prerequisites for a preliminary injunction.

20   *See Winter v. N.R.D.C.*, 555 U.S. 7, 20-22 (2008). *First*, Choudhry has failed to show that he is

21   likely to succeed on the merits. Choudhry's due-process claim will fail because he has not

22   presented evidence of any property or liberty interest that was infringed when UC commenced

23   faculty disciplinary proceedings. There was no settlement, and, as noted, UC policies expressly

24   provide for faculty disciplinary proceedings separate from administrative actions with regard to a

25   faculty member's position as a dean. Moreover, the law is clear that the right to avoid procedures

26   is not a constitutionally cognizable property interest. *Robbins v. U.S. Bureau of Land Mgmt.*, 438

27   F.3d 1074, 1085-86 (10th Cir. 2006). Choudhry's equal-protection claim will fail because he

28   presents no evidence other than a purported disparate impact, which is plainly insufficient. *See*

1    *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265, 270 (1977).

2         *Second*, Choudhry has not shown irreparable harm. A temporary inability to enjoy all the

3    benefits of one's profession is not irreparable harm, *Graphic Comm'cns Conf. v. Bakersfield*

4    *Californian*, 541 F. Supp. 2d 1117, 1125 (E.D. Cal. 2008); nor is having to expend resources to

5    defend oneself in a disciplinary proceeding or the risk that discipline will result. *Robinson v. Cal.*

6    *State Bar*, 2015 WL 3486724, at *4 (N.D. Cal. May 28, 2015).

7         *Third*, the balance of equities strongly favors UC. Not only did OPHD find that Choudhry

8    engaged in serious and harmful misconduct, but he has also shown alarming disregard for both its

9    seriousness and its effect. Preventing UC from disciplining Choudhry would potentially expose

10   students, faculty, and staff to a harassing and hostile environment and would interfere with UC's

11   ability to govern its internal affairs. *See Bonnell v. Lorenzo*, 241 F.3d 800, 826 (6th Cir. 2001)

12   (reversing order enjoining professor's disciplinary proceeding and citing harm to university).

13        *Fourth*, an injunction would be against the public interest. The public has a substantial

14   interest in a safe environment on university campuses and in preventing sexual harassment.

15   *Charles S. v. Bd. of Educ.*, 20 Cal. App. 3d 83, 90 (1971); *Bonnell*, 241 F.3d at 826.

16   **II.    BACKGROUND**

17        **A.    Choudhry's Misconduct and the University's Investigation**

18        Choudhry became Dean of Berkeley Law in June 2014. Within the first year of his tenure

19   as Dean, his executive assistant, Sorrell, came forward with allegations of serious misconduct. On

20   March 19, 2015, Sorrell sent an email to Choudhry explaining that she was uncomfortable with

21   and upset by his verbally and physically harassing behavior. (Heckenlively Decl., Ex. C at 1, 4.) In

22   the email, Sorrell described Choudhry's conduct as "rude and demeaning" and informed him that

23   it "caused her a significant amount of stress and anxiety . . . for a very long time." (*Id.* at 1, 4.)

24   Sorrell informed Choudhry that ████████████████████████████████

25   ███████████████████████████████████████████████████████████████

26   ███████████████████████████████ (*Id.*, Ex. C-2 at 10.) She told him ███████

27   ███████████████████████████████████████████████████

28   ███████████████████████████████████████ (*Id.* at 10-11.)  She said the

1   behavior distressed her so much that █████████████████████████████████

2   (*Id.* at 11.)

3          That day, Sorrell forwarded the email to other officials at Berkeley Law. (*Id.*, Ex. C-1 at 1.)

4   On April 6, 2015, Sorrell contacted OPHD. (*Id.*) In interviews and a written statement, Sorrell told

5   the OPHD investigator the following about Choudhry's behavior and the profound effect that it

6   had on her: Choudhry made unwanted physical contact with Sorrell for months. At first, Choudhry

7   would give her "bear hugs" every few days, but over time the behavior escalated. (*Id.* at 3.) He

8   began to hug her and kiss her on the cheek five or six times per day. (*Id.* at 3.) The hugs became

9   tighter and Choudhry would linger, ██████████████████████████████████

10  ████████████████████ making her feel "smothered" and "encroached upon." (*Id* at 3; *Id.*, Ex. C-

11  2 at 5.) Choudhry would come up to Sorrell from behind while she was at her desk and rub her

12  shoulders, arms, and elbows. (*Id.*, Ex. C-1 at 3.) One time, in January 2015, Choudhry took

13  Sorrell's hands, put them on his waist and, while holding her hands to his waist, rubbed her hands

14  and wrists and kissed her on the cheek. After this incident, Sorrell went to the bathroom and cried.

15  (*Id.*) Sorrell also reported other upsetting behavior, saying that Choudhry addressed her in

16  "demeaning, loud language" and instructed her to do personal errands for him, beyond those

17  required as part of her job. (*Id.* at 2.)  Sorrell stated that she was extremely upset by Choudhry's

18  behavior, which ███████████████████████████████ and made her fear

19  that her professional reputation was compromised. (*Id*. at 3-4; *Id.*, Ex. C-2 at 4-5)

20         In addition to interviewing Sorrell, OPHD spoke with two other witnesses, reviewed key

21  documents, and interviewed Choudhry (who was represented by counsel) to give him an

22  opportunity to respond to Sorrell's allegations and explain his recollection of their relationship.

23  (*Id.*, Ex. C-1 at 5-8.) As a result of the investigation, OPHD concluded that Choudhry's conduct

24  was "unwelcome and objectively sexual in nature" and affected Sorrell's employment. (*Id.* at 9.)

25  Based on these findings, OPHD concluded that Choudhry had "violated the sexual harassment

26  provisions of the UC Policy on Sexual Harassment and Sexual Violence." (*Id.* at 12.)

27         **B.    Administrative Action Taken Against Choudhry in His Capacity as Dean**

28             OPHD submitted its report to EVCP Steele, Choudhry's direct supervisor. (Declaration of

1   Claude M. Steele ("Steele Decl.") ¶ 4.) After receiving the report, Steele consulted with other

2   administrators and decided on the administrative actions that would be taken with respect to

3   Choudhry in his capacity as Dean. (*Id.*) Steele described these actions in a letter dated July 30,

4   2015, and he presented them to Choudhry in a meeting on July 31, 2015. (*Id.* ¶¶ 4-6; *see also*

5   Mot., Ex. 16 at 1.) In the letter, Steele informed Choudhry of the following actions: Choudhry's

6   salary would be reduced by approximately 10 percent for one year; Choudhry would take a course

7   of one-on-one training and coaching on sexual harassment, at Choudhry's expense; and Choudhry

8   would prepare a written apology to Sorrell. In addition, the letter informed Choudhry that OPHD

9   would conduct periodic monitoring of Choudhry's behavior and that he could be subject to

10  immediate further disciplinary action, up to and including "termination *as Dean*," if Steele

11  received any credible evidence that he had again violated the UC Policy on Sexual Harassment

12  and Sexual Violence. (*Id.* ¶¶ 5-6; Mot. Ex. 16 at 1 (emphasis added).)

13      As the italicized language indicates, the administrative actions described in Steele's July

14  30, 2015 letter were taken against Choudhry in his capacity as Dean. (*Id.* ¶ 5.) Steele, acting as the

15  Chancellor's designee, had express discretion to take administrative action against Choudhry in

16  his capacity as Dean without Choudhry's agreement or consent. (Heckenlively Decl., Ex. B at 7

17  (deans serve at the discretion of the Chancellor and their appointment may be terminated at will).)

18  Choudhry was expressly informed of that policy in the letter appointing him Dean. (*Id.*, Ex. G.)

19  Steele's letter did not say anything about whether Choudhry would be subject to disciplinary

20  proceedings under the Faculty Code of Conduct. (Mot., Ex. 16 at 1.) This is significant because,

21  under University policy, even "[t]ermination of a Dean appointment does not affect the underlying

22  faculty appointment." (Heckenlively Decl., Ex. B at 6.) The faculty appointments of those who

23  also serve as Deans, like those of other faculty members, are subject to discipline under a separate,

24  formal process spelled out in detail in University and campus policies.

25      The administrative action imposed on Choudhry was not an agreement or settlement, and

26  Choudhry and Steele never discussed it in those terms. (Steele Decl. ¶ 7.) The course of action was

27  mandatory, and that is how Steele presented it to Choudhry. (*Id.*) Choudhry was never invited to

28  and did not have the option to reject, accept, negotiate, or appeal from the action. (*Id.*) Tellingly,

1  there was no place for Choudhry to countersign the letter from Steele, and he did not sign that

2  document or any other document memorializing the purported "settlement." (*Id.*) By contrast,

3  when a faculty member does settle a dispute with the University related to charges or potential

4  charges for violating the Faculty Code of Conduct, the faculty member and a University

5  administrator both sign a document memorializing the settlement agreement. (Declaration of Janet

6  S. Broughton ("Broughton Decl.") ¶ 8.)

7          On March 10, 2016, after a lawsuit filed by Sorrell against Choudhry and the University

8  made the allegations against Choudhry public, Steele asked Choudhry to take an indefinite leave

9  of absence from his deanship, and Choudhry agreed. The next day, Choudhry offered to resign as

10  Dean of Berkeley Law. He made that offer to Steele by phone just as Steele was being introduced

11  to a meeting of the Berkeley Law faculty. Steele ended the call to begin the faculty meeting and,

12  during that meeting, learned that Choudhry had completely lost the support of the law faculty.

13  Steele then decided to return Choudhry's call and accept his resignation. (Steele Decl. ¶¶ 9-10.)

14          **C.      The Current Faculty Disciplinary Proceedings**

15          UC later commenced proceedings to determine whether Choudhry's misconduct violated

16  the Faculty Code of Conduct. The University Policy on Faculty Conduct and the Administration of

17  Discipline expressly gives the University authority to pursue discipline against Choudhry pursuant

18  to the Faculty Code of Conduct in addition to any administrative taken against Choudhry in his

19  capacity as dean, and it chose to do so. (Heckenlively Decl., Ex. A.) That policy states that

20                      Faculty members serving in administrative roles may be subject to
                        disciplinary sanctions under this policy in addition to administrative
21                      actions, if the faculty member's misconduct in the role of an
                        administrator also violates the ethical and professional standards for
22                      faculty set forth in the Faculty Code of Conduct.

23  (*Id.* at 2.) The policy further provides, on page 7:

24                      A disciplinary action against a faculty member holding an
                        administrative title may proceed in two parts. One part involves the
25                      removal of an administrative title or other administrative action
                        under procedures established by The Regents and the administration.
26                      … The other part involves the proposed imposition any type of
                        disciplinary sanction set forth in this policy …. The removal of the
27                      administrative title or other administrative action does not preclude
                        or require the imposition of a disciplinary sanction under this policy.

28          ████████████████████████████████████████████████████

1 ███████████████████████████████████████████████████████████

2 ██████████████████████████████████ (*Id.*, Ex. D. at 1.) ███████████████

3 █████████████████████████████████████████████████████████████████

4 ██████████ (*Id.* at 1-3.) ███████████████████████████████████████

5 █████████████████████████████████████████████████████████████

6 ████████ (*Id.* at 7-8.) The University then filed a disciplinary charge, referring the charges to

7 the Academic Senate Committee on Privilege and Tenure. (*Id.* ¶ 2; *see also id.*, Exs. E, F.)

8         The disciplinary charges are pending. (*Id.* ¶ 2.)  The charges will be reviewed by an

9 Academic Senate hearing panel pursuant to Academic Senate Bylaw 336, which sets out robust

10 procedures for the review of charges of faculty misconduct. (Mot., Ex. 14.) Pursuant to Bylaw

11 336, the Privilege and Tenure Committee of the Academic Senate will appoint a three-member

12 hearing panel—not including any member of the respondent's department or administrative unit or

13 any member who might, under the circumstances, be unable to objectively consider the case—to

14 review the charges and make a recommendation to the Chancellor. (*Id.*, at D.1.) The faculty panel

15 will then convene a hearing, at which each party has "the right to be represented by counsel, to

16 present its case by oral and documentary evidence, to submit rebuttal evidence, and to conduct

17 such cross examination as may be required for a full and true disclosure of facts." (*Id.*, at D.3.)

18 Choudhry has the right to "request files and documents under the control of the Administration."

19 (*Id.*, at D.4.) At the hearing, which will be recorded, the University "has the burden of proving the

20 allegations by clear and convincing evidence." (*Id.*, at D.8 & D.11.) Choudhry may enter into a

21 settlement with the University to avoid this hearing. (Mot., Ex. 4 at 11.) If the faculty committee

22 makes findings and recommendations adverse to Choudhry, he will have a further opportunity to

23 present to the Chancellor reasons the committee's findings and/or recommendations should not be

24 followed. (Mot., Ex. 4 at 12.) It is this procedure, in its entirety, that Choudhry seeks to enjoin.

25         Choudhry remains a tenured member of the law faculty. He has an office in a campus

26 building and an administrative assistant, and he has been instructed to perform research and

27 complete service projects assigned by the Interim Dean of Berkeley Law. (Mot., Ex. 23;

28 Declaration of Melissa Murray ("Murray Decl.") ¶¶ 5-6.)

III. **ARGUMENT**

A. **This Court Should Abstain from Interfering with the State Disciplinary Proceeding Under *Younger v. Harris***

Under *Younger v. Harris*, 401 U.S. 37 (1971), federal courts must abstain from enjoining state judicial proceedings when four criteria are satisfied: (1) there is an ongoing state proceeding; (2) the state proceeding implicates important state interests; (3) the plaintiff is not barred from litigating his federal claims in the state proceeding; and (4) the policies behind the *Younger* doctrine are implicated by the actions requested of the federal court. *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982). When these criteria are met, the court has "no discretion to grant injunctive relief," absent evidence that the proceeding was instituted in bad faith or to harass or that other extraordinary circumstances exist. *Colo. River Water Conversation Dist. v. United States*, 424 U.S. 800, 816 & n.22 (1976) (explaining the *Younger* doctrine); *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 612 (1975). All of the *Younger* criteria are satisfied here and no other circumstances give the Court discretion to grant injunctive relief.

1. **UC's Disciplinary Proceeding Is an Ongoing State Judicial Proceeding**

The law is clear that public university disciplinary proceedings are "state judicial proceedings" within the meaning of *Younger*, *see Cameron*, 2008 WL 4838710, at *3 (university tenure-revocation proceeding), particularly where they have quasi-judicial and quasi-criminal features like the ones present here, *see Middlesex Cty.*, 457 U.S. at 433-34 (state bar disciplinary hearings); *Baffert v. Cal. Horse Racing Bd.*, 332 F.3d 613, 618 (9th Cir. 2003) (horse-racing license revocation proceedings). It is settled that UC's disciplinary proceedings at issue here are quasi-judicial. *See Miklosy v. Regents of Univ. of Cal.*, 44 Cal. 4th 876, 889 (2008) (California Constitution grants "quasi-judicial powers" to UC); *Ishimatsu v. Regents of Univ. of Cal.*, 266 Cal. App. 2d 854, 864 (1968) ("The University is a statewide administrative agency possessing adjudicatory powers derived from the Constitution as to the problems and purposes of its personnel."); *see also Williams v. Red Bank Bd. of Ed.*, 662 F.2d 1008, 1015 (3d Cir. 1981), *overruled on other grounds by Schall v. Joyce*, 885 F.2d 101, 108-109 (3d Cir. 1989) (affirming *Younger* abstention in favor of "quasi-judicial" state tenure proceeding against school teacher).

In *Cameron*, the court held that a disciplinary proceeding against a university faculty member was "clearly judicial in nature" when it involved "a judicial-type fact finding hearing, which included the opportunity to create a record, to be represented by counsel, and to question adverse witnesses." 2008 WL 4838710, at *3. In *Sanchez v. Arizona Board of Regents*, 2015 WL 6956288 (D. Ariz. Nov. 10, 2015), the court reached the same conclusion about student disciplinary proceedings where the student faced "tangible sanctions," he had a right to a hearing, he would be represented by counsel and both parties would present evidence, and the University had the burden of proof. *Id.*, at *2. Decisions from district courts in other circuits are in accord. *E.g.*, *Jackson v. Univ. of Ky.*, 2016 WL 3951084, at *2 (E.D. Ky. July 20, 2016) (applying *Younger* to university student disciplinary proceeding); *Ingber v. N.Y.C. Dep't of Educ.*, 2014 WL 2575780, at *1, 4 (S.D.N.Y. June 9, 2014) (disciplinary proceeding against public school teacher); *Levich v. Liberty Cent. Sch. Dist.*, 258 F. Supp. 2d 339, 342 (S.D.N.Y. 2003) (same).

The quasi-judicial features present here are similar. The proceedings Choudhry faces will include a recorded hearing before a three-member panel, where he may be represented by counsel; where both Choudhry and UC will have an opportunity to offer argument and evidence, including presenting and cross-examining witnesses; and where the University must prove the allegations presented against Choudhry by clear and convincing evidence. (Mot. Ex. 14.) The proceedings are quasi-criminal because Choudhry faces—at the conclusion of the entire process—the possibility of serious sanctions, including suspension, dismissal, and loss of tenure. *See Baffert*, 332 F.3d at 617-18 (proceedings quasi-criminal because plaintiff's horse-racing license could be revoked). As in *Cameron* and *Sanchez*, the proceedings here are "state judicial proceedings."

> **2.    UC's Disciplinary Proceeding Implicates an Important State Interest**

The University's disciplinary proceeding implicates a number of important state interests, such as "ensuring the smooth functioning of its state university system and the integrity of its tenure process," *Cameron*, 2008 WL 4838710, at * 4, and "establishing a fair, transparent, and just disciplinary system," *Sanchez*, 2015 WL 6956288, at *3. Particularly relevant here, the state's interest certainly includes the fair imposition of discipline on public university professors accused of misconduct. *Cameron*, at *4; *see also Ingber*, 2014 WL 2575780, at *4 (recognizing the state's

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1    interest in disciplining public school teachers); *Levich*, 258 F. Supp. 2d at 342 (same).

2              **3.      The State Proceedings Afford Choudhry an Adequate Opportunity for
                         Review of His Federal Constitutional Claims**

3            The third element is satisfied because the state provides an adequate forum for review of

4    Choudhry's constitutional claims. If the UC proceeding eventually results in an adverse decision

5    for Choudhry, he may challenge that decision in state court, where he may raise his constitutional

6    arguments. Indeed, California courts regularly review constitutional challenges to school

7    disciplinary decisions. *See, e.g.*, *McGill v. Regents of Univ. of Cal.*, 44 Cal. App. 4th 1776, 1785-

8    86 (1996) (reviewing professor's claim that UC's decision denying him tenure violated his due

9    process rights); *Woodbury v. Brown-Dempsey*, 108 Cal. App. 4th 421, 429-30 (2003) (reviewing

10   writ petition brought by students claiming school violated their due process rights in expulsion

11   proceedings); *Goldberg v. Regents of Univ. of Cal.*, 248 Cal. App. 2d 867, 881 (1967) (reviewing

12   students' claims that school violated their procedural due process rights in suspension

13   proceedings). The opportunity to raise constitutional challenges in state court is sufficient to

14   satisfy this element. *See Williams*, 662 F.2d at 1012 (satisfied when plaintiff had the right to

15   challenge school proceeding in state court); *Cameron*, 2008 WL 4838710, at *4 (same).

16             **4.      Choudhry's Request for Injunctive Relief Implicates *Younger* Policies**

17           The fourth and final element is satisfied when the requested action "would enjoin, or have

18   the practical effect of enjoining, ongoing state court proceedings." *AmerisourceBergen Corp. v.

19   Roden*, 495 F.3d 1143, 1149 (9th Cir. 2007). Here, Choudhry asks the Court to enjoin the ongoing

20   disciplinary proceedings and injunction would, if granted, necessarily have the effect of enjoining

21   those state judicial proceedings. *See Cameron*, 2008 WL 4838710, at *5 n.2.

22             **5.      No Extraordinary Circumstances Warrant an Exception to Abstention**

23           Choudhry has offered no evidence of extraordinary circumstances that would permit the

24   Court to enjoin the faculty disciplinary process currently in progress. There is no evidence that the

25   proceedings were motivated by bad faith or that the tribunal is biased. Generally, to show bad

26   faith, a plaintiff must prove either that the agency took repeated actions with "no intention of

27   securing a conclusive resolution . . . [or] pecuniary bias by the tribunal." *Partingon v. Gedan*, 961

28

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1    F.2d 852, 862 (9th Cir. 1992). Choudhry can make no such showing here. UC has instituted one

2    faculty-discipline proceeding against him, in full compliance with UC policies, ██████████

3    ████████████████████████████████████████████████████████████████████

4    ███████████ *See Dowden v. City of Sacramento*, 40 F. Supp. 2d 1146, 1148, 1152 (E.D. Cal. 1999)

5    (no bad faith when police department suspended plaintiff and then demoted him for misconduct).

6          Choudhry also cannot show that the tribunal is biased. Choudhry does not even attempt to

7    allege pecuniary bias, *see Partingon*, 961 F.2d at 862, and "courts do not normally consider

8    assertions of [other types of] administrative bias prior to the completion of an adjudicative

9    proceeding," *United States v. Litton Indus., Inc.*, 462 F.2d 14, 17 (9th Cir. 1972). Even when

10   courts do consider bias claims before a proceeding is complete, "[o]nly in the 'exceptional' case

11   where the court is presented with undisputed allegations of fundamental administrative prejudice

12   will the court interrupt the progress of the adjudicative hearing." *Id.*

13         Choudhry has not presented such an exceptional case. His claims of bias are based on a

14   mischaracterization of the facts. He claims that UC President Janet Napolitano called him a

15   "grop[er]" and "ordered" UC administrators to institute a disciplinary proceeding "aimed at

16   stripping him of his tenure and dismissing him from the University." (Mot. at 6, 12-13.) First,

17   Napolitano did not call Choudhry a "grop[er]." The statement to which Choudhry refers appears in

18   an editorial in the *Sacramento Bee* that discussed sexual harassment at UC generally. (*Id.*, Ex. 2.)

19   Napolitano is quoted in the editorial as saying that "[p]eople ought to be able to come to work

20   without being groped, as a minimal standard." (*Id.* at 3.) She is not quoted as making specific

21   comments about Choudhry personally, nor did she call him a "grop[er]." (*Id.*) Second, Napolitano

22   did not "order" administrators to "strip" Choudhry of his tenure. She directed the Chancellor to

23   institute a proceeding that, pursuant to the Academic Senate Bylaws, would include a full factual

24   hearing, but she did not recommend any particular sanction. The available sanctions include

25   several well short of termination. (*Id.*, Exs. 6, 14.)

26         Choudhry's general allegations of a "tainted" atmosphere at UC Berkeley, which are not

27   directed at any specific individual responsible for adjudicating his case, are also plainly

28   insufficient to show bias. *Kenneally v. Lungren*, 967 F.2d 329, 334 (9th Cir. 1992) (refusing to

1   impute bias from some members of an agency to others). Napolitano's alleged statements and

2   conduct similarly fail to show bias. Choudhry has failed to point to any specific statements

3   Napolitano has made about him that show that she has prejudged his case, and her general

4   statements regarding sexual harassment are insufficient to show such bias. *See Stott Outdoor*

5   *Advert. v. Cty. of Monterey*, 601 F. Supp. 2d 1143, 1157 (N.D. Cal. 2009) (county supervisors'

6   statements of their personal views that there were too many billboards in the county did not show

7   bias against applicant for permit to erect billboards). Under well-established Supreme Court

8   authority, the mere fact that she both directed UC Berkeley to commence disciplinary proceedings

9   and may ultimately have authority to review the resulting recommendations does not create an

10  unacceptable risk of bias—particularly because tenure can be removed only by The Regents. *See*

11  *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (no bias when agency was responsible for instituting,

12  investigating, and adjudicating claims). This Court should abstain.

13          **B.          Choudhry Has Not Established That He Is Entitled to An Injunction**

14          If the Court does not abstain, Choudhry's motion should nonetheless be denied because he

15  cannot show that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm

16  absent an injunction, (3) the balance of equities favors him; and (4) an injunction serves the public

17  interest. *Winter*, 555 U.S. at 7, 20-22. Indeed, he can show none of the four.

18          **1.          Choudhry Is Not Likely to Succeed on the Merits**

19                  **(a)          Choudhry Is Not Likely to Prevail on His Due-Process Claim**

20          The Due Process clause of the Fourteenth Amendment provides that no State shall

21  "deprive any person of life, liberty, or property, without due process of law. . ." U.S. Const.

22  amend. XIV, § 1. In order to invoke the protection of the Due Process Clause, a plaintiff must

23  establish that one of these interests—life, liberty, or property—is at stake. *Wilkinson v. Austin*, 545

24  U.S. 209, 221 (2005). Choudhry has not done so.

25          Choudhry claims that UC interfered with his right to due process by commencing

26  disciplinary proceedings pursuant to the Faculty Code of Conduct. Significantly, Choudhry does

27  not assert that he has been deprived of due process in connection with the administrative actions

28  that have already been imposed for his harassment of Sorrell. He contends only that UC violated

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1  his due-process rights by *commencing* the current disciplinary proceedings. Choudhry's due-

2  process claim will fail because he does not have any property or liberty interest that is infringed by

3  the mere commencement of proceedings. Any claim that he *would be* deprived of due process *if* he

4  were ultimately disciplined under the Faculty Code of Conduct is speculative and premature.

5                    **(i)    UC Did Not Deprive Choudhry of a Property Interest**

6         Choudhry asserts that commencing disciplinary proceedings deprives him of a property

7  right derived from the "settlement" he claims he entered into with the University regarding

8  Sorrell's claims of harassment. He claims that this "settlement" provided a property right to

9  finality in the resolution of Sorrell's claims and to continued employment. (Mot. at 12.)

10        This argument fails at the outset because Choudhry's claim that he entered into a

11 "settlement" with the University that finally resolved Sorrell's claims of sexual harassment and

12 ensured his continued tenure is, as explained above, fiction. *See supra* at 2, 6-7. UC decided upon

13 actions to take against Choudhry as Dean and Steele presented those actions to him as mandatory.

14 Vice Provost Janet Broughton did not tell Choudhry otherwise; she consciously avoided

15 discussing Sorrell's allegations or the ensuing investigation with Choudhry. (Broughton Decl.¶¶ 4-

16 7.)  Choudhry did not have the option to accept, reject, negotiate, or challenge the administrative

17 action, so there was nothing for him to offer the University in a settlement. He did not countersign

18 Steele's letter, enter into a written agreement, or sign any other document, as one would have

19 expected a law school dean represented by counsel to do if there were, in fact, a settlement.

20 Indeed, in faculty discipline cases that UC does settle, both parties sign a document. (*Id.* ¶ 8.)

21        The plain text of the July 30 letter from Steele to Choudhry confirms that it was not a

22 settlement agreement. After informing Choudhry that OPHD found that his conduct toward Sorrell

23 violated the UC Policy on Sexual Harassment, Steele wrote: "Based on the OPHD findings, *I have*

24 *decided* on the following course of action, which I believe is warranted and appropriate in this

25 situation . . . ." (Mot., Ex. 16 at 1.) Steele further wrote: "I hope it is clear how seriously I take this

26 matter, and I sincerely hope that this plan of action immediately alters your behavior." (*Id.* at 2.)

27 The letter makes no reference to any agreement; it does not promise Choudhry finality; and it does

28 not guarantee that UC would not pursue discipline under the Faculty Code of Conduct or that

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Choudhry could continue as a tenured professor at UC Berkeley. (*See id.*) The letter fails to meet the most basic requirements of a contract. A letter like this one, that is merely informative and contains no promises of any kind, is not a contract. *Davies v. Sallie Mae, Inc.*, 168 Cal. App. 4th 1086, 1091 (2009) (series of letters explaining a borrower's financial hardship did not create a contract because none of the letters included a promise by the author); *see also Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th 199, 209 (2006) (contract must "provide a basis for determining what obligations the parties have agreed to" (internal quotation marks and citation omitted)).

The statements in the letter regarding Steele's hope for Choudhry's future success at UC Berkeley did not create a binding contract, and neither did any similar oral statements alleged by Choudhry. Under California law, vague, optimistic statements, like Steele's statement that Choudhry had a "promising career" at UC Berkeley, do not create a binding employment contract. In *Contreras v. Tyco Electronics Corp.*, 2010 WL 5088801 (N.D. Cal. Dec. 8, 2010), the plaintiffs asserted that their employer had created an implied-in-fact contract for continued employment by telling them that "they should view their employment as a long-term career" and that "after they advanced to full time status they would remain Tyco employees for as long as they completed their assigned tasks and barring any layoffs for a reduction in force." *Id.* at *5. The court held that these statements could not create a contract for continued employment because the statements did not provide "any particular term or condition of employment." *Id.* Here, too, Choudhry has identified only vague statements that, even if made, do not identify any particular term or condition of employment and therefore do not establish any contractual rights.

Moreover, these vague statements could not have created a binding contract because Choudhry offered no consideration in return for finality or continued tenure. As explained above, Choudhry had no right to refuse or challenge the imposition of administrative sanctions; under the terms of his position as Dean, he was obligated to accept the administrative action UC chose to pursue. Choudhry's supposed agreement to do what he was already obligated to do—namely, accept sanctions imposed on him by the University in his capacity as Dean—cannot constitute valid consideration. *See Start v. Apple Computer, Inc.*, 1996 WL 161630, at *3 (N.D. Cal. Mar. 29, 1996) (no contract was created by promise to perform pre-existing duty).

1     Even if Choudhry's invented claim that he entered into a settlement agreement were true,

2 that would not be sufficient to create a property interest in avoiding the faculty discipline

3 process—the only alleged deprivation currently at stake—as distinct from the results of that

4 process. The law is clear that an entitlement related merely to process, as opposed to a substantive

5 outcome, is not a cognizable property interest. *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S.

6 748, 764 (2005). In *Castle Rock*, the Supreme Court held that a plaintiff who had obtained a

7 restraining order against her husband had no "property interest" in having the police seek a

8 warrant for her husband's arrest, because initiating that process would not necessarily result in his

9 arrest or guarantee any substantive outcome. *Id.* at 763-64. And "an entitlement to nothing but

10 procedure" cannot "be the basis for a property interest." *Id.* at 764; *see also Dix v. Cty. of Shasta*,

11 963 F.2d 1296, 1300 (9th Cir. 1992), *overruled on other grounds by Sandin v. Conner*, 515 U.S.

12 472 (1995) ("expectation of receiving process is not, without more, a liberty interest protected by

13 the Due Process Clause'" (quoting *Olim v. Wakinekona*, 461 U.S. 238, 250 & n.12 (1983))).

14     The same is true of an alleged entitlement to *avoid* procedure. In *Robbins v. U.S. Bureau of*

15 *Land Management*, a rancher entered into a settlement agreement in which the Bureau of Land

16 Management promised that he would not have to pursue pending administrative appeals if he

17 complied with certain conditions. 438 F.3d at 1077. After the rancher violated some of those

18 conditions, the Bureau voided the agreement and required the rancher to pursue the appeals. *Id.*

19 The Tenth Circuit held that the settlement agreement did not give the rancher a property interest in

20 avoiding the administrative appeals because that was a procedural right, not a substantive one. *Id.*

21 at 1085-86. The court emphasized that this was true "regardless of the expense that these

22 proceedings may entail, and regardless of the consequences of a negative outcome." *Id.* at 1086.

23     As the Ninth Circuit has explained, "the common law breach of contract claim provides

24 adequate process for the deprivation of a property right derived from a contract, unless the

25 deprivation constitutes denial of a present entitlement." *DeBoer v. Pennington*, 287 F.3d 748, 749

26 (9th Cir. 2002) (citing *Lujan v. G&G Fire Sprinklers, Inc.*, 532 U.S. 189, 195-96 (2001)). A

27 present entitlement is a substantive right "to exercise ownership dominion over real or personal

28 property" or "pursue a gainful occupation," *Lujan*, 533 U.S. at 196, not a right to avoid process.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1   The only judicial authority Choudhry cites for his "property" claim are cases holding that

2   criminal defendants are entitled to special protections when entering into plea agreements. These

3   cases are irrelevant here. UC's imposition of sanctions on Choudhry for his misconduct is not at

4   all analogous to a plea agreement entered into between the state and a criminal defendant. The

5   plea-agreement cases Choudhry cites all rely on the existence of a valid plea agreement. (Mot. at

6   14-16 (citing *Santobello v. New York*, 404 U.S. 257, 259 (1971) (petitioner accepted plea with the

7   condition that the prosecutor would not make a sentencing recommendation); *United States v.*

8   *Hallam*, 472 F.2d 168, 169 (9th Cir. 1973) (defendant convicted based on valid plea agreement);

9   *United States v. Hall*, 730 F. Supp. 646, 647 (M.D. Pa. 1990) (same)). No agreement of any kind

10   exists here, and the plea-agreement cases are inapposite for that reason alone. *See Taylor v.*

11   *Bowersox*, 329 F.3d 963, 968 (8th Cir. 2003) (*Santobello* line of cases does not apply absent

12   "bargained-for exchange, evidenced by a plea agreement or, at least, some explicit negotiation").

13   It is also clear, as explained above, that the presence of an administrative settlement

14   agreement is not sufficient to confer a property right. Plea agreements are unique contracts, as this

15   Court is well aware. They are formed and enforced only after strict procedural requirements and

16   safeguards have been satisfied. *See Santobello*, 404 U.S. at 262. A defendant negotiating a plea

17   agreement must be represented by counsel, unless he waives that right, *id.* at 261, and the Court

18   may accept the plea only after the defendant appears in open court, before a judge, on the record

19   and participates in a formal plea colloquy, *see* Fed. R. Crim. P. 11; *see also* Cal. Penal Code §§

20   1017-18. Further, plea agreements are unlike ordinary contracts because of the significant rights a

21   criminal defendant relinquishes. *United States v. Baron*, 172 F.3d 1153, 1158 (9th Cir. 1999).

22   The Supreme Court's holding in *Santobello* was grounded in the Court's recognition of the

23   unique nature of plea agreements and concern with "enforcing governmental promises that []

24   induced the defendant to plead guilty." *United States v. Traynoff*, 53 F.3d 168, 171 (7th Cir. 2007).

25   Courts have declined to extend the rule articulated in *Santobello* to governmental promises and

26   agreements that did not induce a defendant to plead guilty. In *Traynoff*, for example, a federal

27   prosecutor had reneged on a promise that he would withdraw federal parole-revocation

28   proceedings against a criminal defendant if he were sentenced in a concurrent state criminal

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1   proceeding. *Id.* at 169. Because, at the time of the promise, the defendant had already pled guilty,

2   so that the promise could not have induced the plea, the court declined to enforce the prosecutor's

3   promise. *Id.* In *United States v. Charles*, 476 F.3d 492 (7th Cir. 2007), the court held that a

4   detective's promise to request leniency if the defendant cooperated was not enforceable because

5   there was "no formal plea agreement." *Id.* at 498.

6      Here, no formal procedures governed Choudhry's purported "settlement" with UC—there

7   is not even a signed document—and Choudhry certainly cannot allege that any promise by UC

8   induced him to plead guilty to a crime, forfeit his liberty, or sacrifice his constitutional rights. In

9   short, the plea agreement cases are of no relevance here.

10                    **(ii)     UC Did Not Deprive Choudhry of a Liberty Interest**

11      Choudhry argues that UC deprived him of a liberty interest by preventing him from

12   teaching, stigmatizing him through allegedly false public statements, and initiating a process that

13   he claims will result in "extraordinarily harsh discipline." None of these circumstances supports

14   the claim that UC interfered with a protected liberty interest.

15      With respect to Choudhry's employment-related arguments, he does not claim a

16   deprivation resulting from wrongful termination of his employment or revocation of his tenure.

17   Nor could he: Choudhry remains employed as a tenured professor, continuing to collect his salary,

18   receive benefits, and perform many of the duties of his position, including participating in research

19   and service projects. (Mot., Ex. 23; Murray Decl. ¶¶ 5-6.) Instead, Choudhry claims that UC has

20   interfered with his liberty interest in continued employment by cancelling his classes and

21   assigning him an office that is on campus but not in the law school. Such minor, temporary

22   changes in the terms of Choudhry's employment do not infringe on a liberty interest, especially

23   because he continues to receive the salary and benefits of his position and thus has suffered no

24   financial hardship from the commencement of disciplinary proceedings. *See Stiesberg v.*

25   *California*, 80 F.3d 353, 356 (9th Cir. 1996).

26      The Ninth Circuit's analysis in *Stiesberg* is instructive. Choudhry relies on *Stiesberg* for

27   the proposition that UC's conduct here deprived him of a liberty interest (Mot. at 13), but it in fact

28   supports the opposite conclusion. The plaintiff there was transferred from one division of the

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1   California Highway Patrol to another, in an action he believed to be punitive. *Id.* at 355. Though

2   the transfer was inconvenient, it was not a "constructive demotion or discharge." *Id.* at 357. As

3   such, the plaintiff had alleged no federally cognizable deprivation of his liberty. *Id.* at 357-58.

4          Decisions applying *Stiesberg* have held that employment actions short of suspension or

5   discharge do not infringe an employee's liberty. In *Chaffin v. Shoshone County*, 2005 WL

6   3307214 (D. Idaho Dec. 5, 2005), for example, the court rejected the plaintiff's claim that his

7   employer infringed a liberty or property interest by transferring him to a less prestigious position,

8   causing him to lose promotion opportunities and the opportunity to work overtime. *Id.* at *1, 6.

9   The Court held that the plaintiff had no federally cognizable interest in the privileges he claimed to

10  have lost. *Id*. Here, as in *Stiesberg* and *Chaffin*, Choudhry has lost some benefits he had enjoyed,

11  but he remains employed, has not been discharged or suspended, and continues to perform many

12  duties of his position. Any losses thus fall short of implicating a protected liberty interest.[1]

13         Choudhry also claims that UC violated his due-process right by publicly making false

14  statements about him that harmed his reputation and will make it difficult for him to find

15  employment elsewhere. As an initial matter, Defendants deny that any false statements were made

16  concerning Choudhry. Even if such statements had been made, moreover, a preliminary injunction

17  would do nothing to remedy any harm from them; certainly the Court may not enter a prior

18  restraint with respect to unknown future public statements by University officials. Choudhry's

19  due-process claim will, in any event, fail to the extent it is based on alleged reputational harm

20  because such harm alone does not constitute a violation of a liberty interest. "It is well established

21  [that] a person's protected interests are not infringed merely by defamatory statements, for an

22  interest in reputation alone is not a constitutionally protected liberty interest." *Stiesberg*, 80 F.3d at

23  357 (quoting *Haight v. City of S.D.*, 228 Cal. App. 3d 413, 418 (1991)). In order to be actionable

---

[1] *Peacock v. Board of Regents of the Universities and State Colleges of Arizona*, 380 F. Supp. 1081 (D. Ariz. 1974) (*see* Mot. at 12), is unhelpful to Choudhry for two reasons. First, the *Peacock* court held that the plaintiff's dismissal from his administrative position as Head of the Department of Surgery—comparable to Choudhry's deanship—did not "violate[] any protected interest in 'liberty.'" 380 F. Supp. at 1086. Second, the court held that the plaintiff's suspension with pay from his tenured professorship did not violate any liberty interest. *Id*. at 1087-88.

1    under the Fourteenth Amendment, defamation must "occur in the course of the termination of

2    employment." *Paul v. Davis*, 424 U.S. 693, 710 (1976); *see also Krainski v. Nev. ex. rel. Bd. of*

3    *Regents of Nev. Sys. of Higher Educ.*, 616 F.3d 963, 971 (9th Cir. 2010). Choudhry has not lost his

4    employment or any other government benefit, and any harm to his reputation alone therefore

5    cannot support a due-process claim. *Paul*, 424 U.S. at 709; *Stiesberg*, 80 F.3d at 357.

6         The Ninth Circuit's decision in *Krainski* makes this clear. In *Krainski*, a student alleged

7    that the University of Nevada violated her due-process rights by charging her with violations of

8    the Student Code of Conduct, finding her "responsible" for the charges, and tarnishing her

9    educational transcript and record. 616 F.3d at 971. The student did not allege that she was

10   suspended or expelled, but only that she suffered reputational injury and potential loss of future

11   income. *Id.* The Court held that these allegations "amount[ed] to mere reputational injury" and "do

12   not rise to the level of a constitutionally protected liberty or property interest" under the Supreme

13   Court's holding in *Paul*. *Id.* (citing *Paul*, 424 U.S. at 697, 710-12). Here, UC did not suspend or

14   terminate Choudhry and, as in *Krainski*, any harm to his reputation from the commencement of

15   disciplinary proceedings does not amount to a constitutional injury. *See id.*[2]

16         Finally, to the extent Choudhry claims that he will *in the future* be deprived of due process

17   because the disciplinary process *may* result in his wrongful termination, his claim is speculative

18   and premature. Choudhry asserts that the process will result in "extraordinarily harsh punishment"

19   because, he asserts, there is no neutral decision-maker at UC Berkeley who can review his case.

20   (Mot. at 17-18.) As explained above, courts generally do not consider assertions of administrative

21   bias prior to the completion of an adjudicative proceeding, and the evidence Choudhry has

22   submitted of bias is insufficient to overcome the presumption of regularity in administrative

23   proceedings. *See supra* at 11-12. "Until [UC] has acted and actual bias has been demonstrated, the

24   orderly administrative procedures of the agency should not be interrupted by judicial

---

25   [2]   Choudhry's reliance on *Wisconsin v. Constantineau*, 400 U.S. 433 (1971), is misplaced

26   *Constantineau* does not stand for the broad proposition Choudhry asserts. Analyzing
     *Constantineau*, the Court explained that "the defamatory character of the posting was doubtless an

27   important factor in evaluating the extent of harm worked by that act, *but we do not think that such
     defamation, standing alone, deprived Constantineau of any 'liberty' protected by the procedural*

28   *guarantees of the Fourteenth Amendment*." *Paul*, 424 U.S. at 707-09 (emphasis added).

1  intervention." *See Touche Ross & Co. v. S.E.C.*, 609 F.2d 570, 575 (2nd Cir. 1979).

2            **2.**       **Choudhry Is Not Likely to Prevail on His Equal Protection Claim**

3        The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall .

4  . . deny to any person within its jurisdiction the equal protection of the law." U.S. Const. amend

5  XIV, § 1. A claim for violation of the Equal Protection Clause requires proof that the defendant

6  "acted with an *intent or purpose* to discriminate against the plaintiff based upon membership in a

7  protected class." *Lee v. City of L.A.*, 250 F.3d 668, 686-87 (9th Cir. 2001) (emphasis added

8  (quotation marks and citation omitted)). The plaintiff must prove that the defendant was

9  "motivated by discriminatory animus," *id.* at 687, in that he chose "a particular course of action at

10  least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group,"

11  *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). To satisfy this standard, evidence

12  of disproportionate impact alone is insufficient. *Arlington Heights*, 429 U.S. at 270. Rather, a

13  plaintiff must show some "other evidence" of a discriminatory intent in addition to a

14  disproportionate impact. *Id.* at 266-67. For example, a plaintiff may establish animus with

15  evidence that decisionmakers made statements showing a hostility toward a particular group,

16  *Usher v. City of L.A.*, 828 F.2d 556, 561 (9th Cir. 1987) (officers used racial slurs when arresting

17  plaintiff), or deviated from normal procedures, *Navarro v. Block*, 72 F.3d 712, 716 (9th Cir. 1995).

18        Choudhry has failed to present such "other evidence." He has not presented evidence of

19  any kind, direct or circumstantial, that any UC official was motivated by animus against him based

20  on his race. *Arlington Heights*, 429 U.S. at 266-67; *cf. Usher*, 828 F.2d at 561. His only evidence

21  is that two white professors were, he claims, treated differently from him; but—even assuming

22  these professors were similarly situated to Choudhry, which they were not—such evidence of

23  purportedly disproportionate impact alone is insufficient. *Arlington Heights*, 429 U.S. at 266-67;

24  *Kinlaw v. Kozak*, 2010 WL 986925, at *1 (N.D. Cal. Mar. 17, 2010) (granting summary judgment

25  to defendants when plaintiff's only evidence in support of his equal protection claim was that

26  white applicant was granted more favorable child-visitation rights). Moreover, Choudhry's claim

27  necessarily assumes that the standards for a university's response to sexual harassment by faculty

28  members (and students) is frozen in time, when in fact those standards are evolving with

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1    remarkable speed. Choudhry also has not (and cannot) show that he will, in fact, be disciplined

2    more severely than others, because his disciplinary process has not yet run its course.

3         **3.      Choudhry Will Not Suffer Irreparable Harm Absent Injunctive Relief**

4         The extraordinary remedy of a preliminary injunction is warranted only if the plaintiff

5    presents clear evidence that he is *likely* to suffer *irreparable* harm absent relief. *Winter*, 555 U.S.

6    at 20-21. A mere possibility or potential for future harm is insufficient to warrant an injunction. *Id.*

7    at 22 (holding that a "possibility" standard for injunctive relief was too lenient). Similarly,

8    injunctive relief is not warranted to prevent injury that can be cured by compensatory or other

9    relief in the ordinary course of litigation. *Sampson v. Murray*, 415 U.S. 61, 90 (1974). "Mere

10   injuries, however substantial, in terms of money, time and energy necessarily expended in the

11   absence of a stay, are not enough." *Id.* (internal quotation marks omitted). Choudhry has identified

12   several harms he asserts he will suffer absent a preliminary injunction, but he has not shown that

13   these injuries are likely to occur or that they would be irreparable.

14        First, Choudhry contends that he is suffering harm because he is "unable to go to work or

15   teach," which he characterizes as a "*de facto* suspension." (Mot. at 12, 20.) This ignores that

16   Choudhry is still a tenured faculty member paid his salary by the University, and that he has been

17   given an office in a University building and assigned research and administrative duties.

18   Regardless, Choudhry's argument fails because a temporary interruption of employment does not

19   constitute irreparable injury. *Bakersfield Californian*, 541 F. Supp. 2d at 1125 (holding that

20   "disruption of workers' lives and habits," including temporary loss of employment, does not

21   constitute irreparable injury sufficient to warrant injunctive relief); *Ogunleye v. Arizona*, 66 F.

22   Supp. 2d 1104, 1111 (D. Ariz. 1999) (loss of employment insufficient to show irreparable injury).

23        Second, Choudhry argues that he will suffer harm if he must answer to charges and

24   participate in a disciplinary hearing because "the outcome is all but preordained" and he has "lost

25   any meaningful right to confront" the accusations against him. (Mot. at 21.) This is no more than

26   speculation about what might happen in an adversarial proceeding that is in its initial stages. As

27   detailed above, the Bylaws of the Academic Senate provide a robust adversarial procedure for

28   imposition of discipline on a faculty member. Unless a case is resolved voluntarily through

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

mediation or early resolution, charges against a faculty member are presented to a three-member hearing committee, appointed from among the faculty at UC Berkeley. (Mot., Ex. 14 at D.1.) The Bylaws specifically ensure the neutrality of the committee by providing that no committee member may be appointed from the accused faculty member's department and that committee members must recuse themselves if there are "any circumstances that may interfere with their objective consideration of the case." (*Id.*) The bylaws further provide that each party to the proceeding, including the faculty member, has "the right to be represented by counsel, to present its case by oral and documentary evidence, to submit rebuttal evidence, and to conduct such cross examination as may be required for a full and true disclosure of facts." (*Id.*, at D.3.)

Choudhry's only support for his contention that the outcome is preordained are general assertions about the "tainted atmosphere" at the University, including the assertion that a number of faculty members wrote a public statement expressing that they believed the UC Berkeley administration had mishandled three sexual harassment cases, one of which was Choudhry's. He has offered no specific or actual proof of bias on the part of any person responsible for adjudicating his case, nor could he because these people have not yet even been selected. *See Litton*, 462 F.2d at 17-18 (recognizing that courts will not presume bias in administrative proceedings). Moreover, the Academic Senate procedures described above specifically provide for recusal of any committee member unable to fairly review his case. As a result, Choudhry's claim of irreparable harm is based entirely on his own "subjective apprehensions and unsupported predictions," which are "not sufficient to satisfy [his] burden of demonstrating an immediate threat of irreparable harm." *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 675-76 (9th Cir. 1988); *see also Hines v. Cal. Pub. Util. Comm'n*, 2011 WL 724658, at *2 (N.D. Cal. Feb. 23, 2011) (no irreparable harm based on reputational harm that "may ensue" from job suspension).

A court in this district recently rejected a claim of irreparable harm based on circumstances closely analogous to those present here. *See Robinson*, 2015 WL 3486724, at *4. There, the plaintiff argued that he would suffer irreparable harm if the California State Bar continued with disciplinary proceedings against him because he would lose and the State Bar would discipline him. *Id.* The Court rejected this argument because "the result of an adversary proceeding is never a

foregone conclusion" and the plaintiff's claimed harms were too speculative to warrant injunctive relief. *Id.* As in *Robinson*, Choudhry has made unfounded predictions about the outcome of a disciplinary proceeding that is in its initial stages. The outcome of the disciplinary proceeding, like the outcome of any adversary proceeding, is not a foregone conclusion and Choudhry's own speculation about what will occur cannot support a finding that he will suffer irreparable harm absent a preliminary injunction. *Id.*; *see also Caribbean*, 844 F.2d at 675-76.

Third, Choudhry asserts that he will be harmed by expending resources to defend himself in the disciplinary proceeding. Generally, injuries in the form of "money, time and energy" do not warrant injunctive relief. *Sampson*, 415 U.S. at 90. Choudhry offers no basis to conclude that, contrary to this general rule, the resources he will expend in defending the disciplinary proceeding will cause him irreparable harm. He relies on authority that "forcing a party to submit to arbitration[], *when it did not agree to do so*, constitutes per se irreparable harm." (Mot. at 21 n.7 (quoting *Portland Gen. Elec. Co. v. Liberty Mutual Ins. Co.*, 2016 WL 4059658, at *8 (D. Or. July 27, 2016) (emphasis added)).) Those cases are inapposite. Arbitration is a unique procedure, to which parties may not be required to submit absent express agreement. *AT&T Techs., Inc. v. Comm'cns Workers of Am.*, 475 U.S. 643, 648 (1986). UC's internal disciplinary procedure is not similar to arbitration, and Choudhry cites no authority for treating it as such.

Courts have repeatedly declined to enjoin disciplinary proceedings similar to the one pending against Choudhry, finding that no irreparable harm would result from requiring the plaintiffs to complete such proceedings. *See Robinson*, 2015 WL 3486724, at *4 (refusing to enjoin state bar disciplinary proceeding); *Levich.*, 258 F. Supp. 2d at 344 (finding no irreparable harm in permitting school to proceed with disciplinary action against teacher). Other such cases are, as explained above, dismissed under *Younger* based on similar reasoning. *See supra* at 10.

### 4. The Balance of Equities Weighs Against an Injunction

The balance of equities weighs heavily against issuing an injunction that would interfere with the University's ability to maintain an educational and employment environment free from sexual harassment—an interest that is indisputably of paramount importance to the University. *See Bonnell*, 241 F.3d at 822 ("A college's or university's interest in maintaining a hostile-free

1   learning environment, particularly as it relates to its Title IX funding, is well recognized.");

2   *Charles S.*, 20 Cal. App. 3d at 90. An injunction would harm the University, as well as its

3   students, faculty, and staff, because it would effectively bar the University from implementing its

4   own disciplinary procedures and undermine its ability to protect the safety of its students and

5   employees. If the University is unable to enforce its sexual harassment policies and faculty

6   disciplinary procedures, students, faculty, and staff "may be forced to endure a hostile learning

7   environment and may be intimidated into remaining silent." *Bonnell*, 241 F.3d at 826; *see also*

8   *Doe v. Ohio State Univ.*, 136 F. Supp. 3d 854, 871 (S.D. Ohio 2016) (enjoining university's

9   disciplinary proceedings against student accused of sexual misconduct would "chill and dissuade

10  individuals from reporting misconduct"). An injunction under these circumstances could also

11  undermine the deterrent effect of UC's disciplinary proceedings. *Requa v. Kent Sch. Dist. No. 415*,

12  492 F. Supp. 2d 1272, 1282 (W.D. Wash. 2007) (recognizing that enjoining disciplinary

13  proceeding might weaken deterrent effect of school policies against harassment).

14          The University's interest in enforcing its sexual harassment policy is clear in Choudhry's

15  case. As detailed above, Choudhry was found by the OPHD investigation to have, while Dean,

16  engaged in repeated demeaning and harassing behavior that interfered with a subordinate

17  employee's ability to do her job. OPHD found that Choudhry hugged and kissed Sorrell, rubbed

18  her arms, shoulders, and elbows, and, on one occasion, put her hands on his waist. According to

19  Sorrell, this behavior left her feeling anxious, afraid, humiliated, and severely upset. In his filings

20  here and in a recent open letter, Choudhry has downplayed his conduct, ignored the harm he

21  caused, and generally failed to take responsibility for anything other than having "put [Ms.

22  Sorrell] in an uncomfortable position." (Heckenlively Decl., Ex. H.) In light of Choudhry's actions

23  and his denial of their impact, UC has a strong interest in pursuing the charges against him.

24          The harm to the University from an injunction would be serious and significant. In

25  contrast, the only "harm" Choudhry will experience is that he will be required to continue with

26  disciplinary proceedings, as would any other faculty member charged with misconduct. The

27  disciplinary procedure will provide him a full and fair opportunity to present his case, and he will

28  maintain his tenure until the proceeding concludes, enjoying the benefits it confers. Courts have

1  repeatedly declined to issue injunctions under just these circumstances, when similar interests

2  were at stake. *See Bonnell*, 247 F.3d at 826 (reversing district court's order reinstating suspended

3  professor after finding that the injunction would cause significant harm to the college, including

4  that it would prevent the college from protecting its students from harassment); *Ohio State*, 136 F.

5  Supp. 3d at 871 (refusing to enjoin student disciplinary proceedings when injunction would "cast

6  doubt on [the university's] power to regulate its student body"); *Requa*, 492 F. Supp. 2d at 1283

7  (declining to issue injunction that would prevent school district from sanctioning misconduct).

8       **5.  An Injunction Would Be Against the Public Interest**

9       Finally, an injunction would be against the public interest. The public, like UC, has "a

10  deeply vested interest in the creation and maintenance of an educational system . . . free from

11  harassment, lewdness and inappropriate behavior." *Requa*, 492 F. Supp. 2d at 1283. "Allegations

12  of sexual harassment inherently address a matter of public concern," and the public has an interest

13  "in knowing that [such allegations] are properly investigated and not allowed to continue in any

14  given arena." *Bonnell*, 241 F.3d at 826. Moreover, courts have long recognized that responsibility

15  for maintaining a safe educational environment is vested in schools and that courts should not

16  "interfere with the internal affairs and operations of a college or university . . . in the absence of

17  the most compelling reasons." *Charles S.*, 20 Cal. App. 3d 83 at 90; *see Williams*, 662 F.2d at

18  1017 ("Any intervention by the federal courts into the functioning of the tenure scheme would

19  seriously hinder [the state] in its attempt to fulfill its commitment to provide public education.").

20       Choudhry has shown no compelling reason to interfere with the University's internal

21  procedures and maintenance of the safety of its campuses. Choudhry's only argument that an

22  injunction is in the public interest is that his case implicates constitutional concerns. (Mot. at 22.)

23  But, as discussed above, Choudhry is not likely to prevail on any of his constitutional claims.

24  **IV.   CONCLUSION**

25       For the foregoing reasons, Choudhry's preliminary injunction motion should be denied.

26  DATED: October 6, 2016         MUNGER, TOLLES & OLSON LLP

27           By:      */s/ Bradley S. Phillips*
                  BRADLEY S. PHILLIPS

28

1

**CIVIL L.R. 5-1(i) ATTESTATION**

2

I, Bryan H. Heckenlively, am the ECF user whose identification and password are being

3

used to file the foregoing document and the attachments thereto.  In compliance with Civil Local

4

Rule 5-1(i)(3), I hereby attest that all signatories have concurred in the documents bearing their

5

signatures.

6

DATED: October 6, 2016            MUNGER, TOLLES & OLSON LLP

7

By:    _____/s/ Bryan H. Heckenlively_____

8

BRYAN H. HECKENLIVELY

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28