UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE RICHARD SEEBORG, JUDGE

| | | |
|---|---|---|
| SUJIT CHOUDHRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **No. C 16-5281 RS** |
| | ) | |
| REGENTS OF THE UNIVERSITY OF | ) | |
| CALIFORNIA, JANET NAPOLITANO, | ) | |
| NICHOLAS B. DIRKS, | ) | |
| CAROL CHRIST, JANET BROUGHTON, | ) | |
| AND BENJAMIN HERMALIN, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | San Francisco, California |
| | | Monday, November 7, 2016 |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:           ZUCKERMAN SPAEDER LLP
                         1800 M Street, NW, Suite 1000
                         Washington, DC 20036
                  **BY: WILLIAM W. TAYLOR, III, ESQUIRE**
                         **CAROLINE J. MEHTA, ESQUIRE**

                         FUTTERMAN DUPREE DODD CROLEY MAIER LLP
                         180 Sansome Street, 17th Floor
                         San Francisco, California 94104
                  **BY: JAMIE L. DUPREE, ESQUIRE**

For Defendants:          MUNGER, TOLLES & OLSON
                         355 South Grand Avenue, 35th Floor
                         Los Angeles, California 90071-1560
                  **BY: BRADLEY S. PHILLIPS, ESQUIRE**

(Appearances continued on next page)

Reported By:   Katherine Powell Sullivan, CSR #5812, RPR, CRR
               Official Reporter - U.S. District Court

**<u>APPEARANCES (CONTINUED):</u>**

For Defendants:         MUNGER, TOLLES & OLSON
                560 Mission Street, 27th Floor
                San Francisco, California  94105-2907
        **BY:  BRYAN H. HECKENLIVELY, ESQUIRE**

<u>Monday - November 7, 2016</u>                                    <u>1:26 p.m.</u>

<u>P R O C E E D I N G S</u>

---oOo---

THE CLERK:  Calling case C 16-5281, Choudhry versus
Regents of the University of California.

Counsel, please state your appearances.

MR. TAYLOR:  William Taylor for Professor Choudhry.
With me is my partner, Caroline Mehta, and Jamie Dupree.
Professor Choudhry is also with us at counsel table.

THE COURT:  Good afternoon.

MR. PHILLIPS:  Good afternoon, Your Honor.  Brad
Phillips, from Munger, Tolles and Olson.  And with me is
Bryan Heckenlively, also from Munger, Tolles and Olson.

THE COURT:  Good afternoon.

MR. PHILLIPS:  Thank you.

THE COURT:  This matter is on calendar for the motion
for preliminary injunction.

I would appreciate it if we can divide the discussion into
two parts; the first being the *Younger* abstention issue, which
I would like to take up first.  And then once we've had a
discussion on that issue, then we can discuss whether or not
there's been an adequate showing of entitlement to injunctive
relief.

So let's begin with abstention.  And I'll let the moving
party begin.

**MR. TAYLOR:** May it please the Court.

I had intended to address *Younger* as an initial matter. The University urges the Court not to reach any of the claims that are set forth in the complaint or in the motion papers. And it argues that the Court should abstain based upon principles of federalism articulated early on in *Younger vs. Harris*, and *Middlesex*, *Middlesex County Bar*.

And what they argue is that those cases demonstrate that this Court, as most federal courts have considered, must stay its hand, notwithstanding the fact that it has jurisdiction and it has a federal cognizable claim before it.

And what the defendants do not say in their pleading is how this court can abstain in the face of the Supreme Court's pronouncement in *Sprint vs. Jacobs*.

Your Honor --

**THE COURT:** Well, but the *Sprint* case doesn't throw out the *Middlesex* case. The *Sprint* case is a very different case than that, I think. The *Sprint* case is, as I understand it, it's a private dispute. Two parties go in front of the Iowa Utility Board.

This case, in my mind, is much closer to *Middlesex* because that case involved a disciplinary proceeding involving attorney discipline. It had all the indicia that this case has of how the proceeding goes.

So I don't think *Sprint* helps you very much.

**MR. TAYLOR:** Well, Your Honor, *Middlesex* is a case in which the state bar, which is, as the Court said, an official agency of the state government, ordered by the Supreme Court of the State of New Jersey, was acting in the exercise of sovereign power of the state. And that in that context it -- the quote in *Sprint* said we are addressing the tendency of the lower courts to overextend *Middlesex* and expressed concern that the courts were not adhering to the notion that the court in *Nopsi* and in cases which had followed that were tethering the abstention doctrine to three unique and easily described principles.

If I may, Your Honor, Justice Ginsburg wrote a short and rather clear decision in *Sprint*. And I hear you when you say you are not persuaded that it helps us. I propose to persuade you that it has perhaps more relevance to the discussion than --

**THE COURT:** Well, I mean, the first question, before you determine whether or not you apply the *Middlesex* factors, is, is this akin to a quasi criminal proceeding?

And when you look at the factors that have been outlined in these cases, initiated against the federal plaintiff seeking some kind of sanction, that's the case here; not a private dispute resolution proceeding, that's true here; the state actor routinely is the party to this kind of proceeding, the University, that's true here; it begins with an internal

investigation that culminates in disciplinary charges, that's true here; all of those indicia of quasi criminal proceedings which would then get us to applying the *Middlesex* factors are present here.

MR. TAYLOR: Except that the University of California is not enforcing the law of the State of California.

THE COURT: Well, where does it say that enforcing the law of the state, as you just articulated, it is one of the factors that I'm to determine whether or not it is of a quasi criminal nature? That's not one of the factors.

MR. TAYLOR: Well, Justice Ginsburg identified the three factors, the three exceptional circumstances. One is an ongoing state criminal case, which this is not. And the second is --

THE COURT: It's akin to it. It doesn't say it has to be a criminal case. That would be easy, but your -- I assume you agree that's not. It's whether or not it is -- it goes to the core of the state's judicial procedures, whether or not it's akin to criminal proceedings. If it was simply the predicate was a criminal proceeding, that would be a quite simple analysis. And I agree with you, it wouldn't be present here. But that's not --

MR. TAYLOR: But I think what she was saying is, unless it is a state criminal proceeding, then you -- then you must look to some of the -- to the other factors.

And, you know, when the Ninth Circuit decided the *ReadyMark* case, it identified the state agency as acting in a private capacity.  The State of California --

**THE COURT:**  Are you talking about *ReadyLink*?

**MR. TAYLOR:**  Yes.  Beg your pardon.

The State of California has -- the University of California in this case is not enforcing the law or policy of the State of California insofar as Section --

**THE COURT:**  How in *Middlesex* was -- it was an attorney discipline procedure.

**MR. TAYLOR:**  Correct.

**THE COURT:**  So the law of the State of New Jersey, you say, was reflected in, what, the judicial code --

**MR. TAYLOR:**  It was the power, the sovereign power of the State of New Jersey flowing through the Supreme Court to the bar is being exercised in that case.  And they are --

**THE COURT:**  But there's no -- but there's no law of New Jersey that's being applied there.  It's the rules of ethics.  It's the rules of legal ethics.

**MR. TAYLOR:**  But it's the power of the State of New Jersey to issue licenses to lawyers, which was the power that was being -- that was being invoked there, and which, as the Court said, makes this like a criminal proceeding because you have the sovereign acting against the individual.

And here, as I said, Your Honor, this is certainly an

entity of -- owned by the state, which is bound by the due process clause.  But this is, in essence, an employment issue.

This entity, the University of California, is attempting to fire Professor Choudhry.  And it is not, in that capacity, attempting to prosecute him or obtain a restraining order against him or do anything else that is -- that represents --

THE COURT:  In *Middlesex* the lawyer wasn't going to be imprisoned either.

MR. TAYLOR:  I know, but he was going to lose his license to practice.

THE COURT:  But you're now suggesting that it has to have some sort of criminal sanction.  And plainly it doesn't because *Middlesex* didn't involve that.

So that line is not required.  It doesn't have to have a criminal penalty or sanction to it; right?

MR. TAYLOR:  No.  It doesn't.

THE COURT:  Okay.

MR. TAYLOR:  It doesn't.  But if you permit me, Your Honor, I think Justice Ginsburg says we are today saying that the -- *Middlesex* has been overextended.  And we are telling you today that the three factors that the Court identified in N-o-p-s-i, in *Nopsi*, are the three factors and no further.  No further.

Now, they do not overrule *Middlesex*, of course, but they say that *Middlesex* is an appropriate case in which to abstain

because it was an important state policy interest to govern the practice and the ethics of lawyers. It was a power which was being exercised through a state agency, if you will, and by the state -- and by the state Supreme Court, which distinguishes that --

**THE COURT:** They have a very powerful interest in the public education system?

**MR. TAYLOR:** It does, but not in the administration of discipline by the University of California.

**THE COURT:** Why not?

**MR. TAYLOR:** Because that is power which is being exercised by an -- under a code adopted by these institutions themselves, not by the state. The sexual harassment provisions of the code at the University of California are very different from California state law.

**THE COURT:** I will say this very candidly: I don't see the distinction between the state bar and the state public education system that you seem to see. And certainly there are -- granted there are District Court opinions that have, in a University disciplinary procedure, found *Younger* abstention to be appropriate. The Arizona *Cameron vs. Regents of Arizona*. I mean, there are certainly cases that have not embraced this very narrow line drawing that you're doing here.

**MR. TAYLOR:** Well, I think the line that you've asked me about is one between a state agency or state entity which is

acting as a private actor in the marketplace, the way the Ninth
Circuit referred to the conduct of the state agency in
*ReadyLink*, and one which is exercising powers of state
government to -- to implement and protect state policies or
state powers.  We don't have a court case here obviously.

    **THE COURT:**  You know, going to the *ReadyLink* case,
again, one that I just don't see how that helps you because in
that case it's plainly a dispute between private entities, the
private entity and the State Compensation Insurance Fund.
There are no investigation or formal charges that are commenced
by a state agency to sanction *ReadyLink*.  It truly is a
proceeding -- it's initiated by *ReadyLink*.  The analog here
would be by the professor.  And, you know, it's to get a
resolution of a fairly usual dispute that we see in court all
the time.

    Here, there's no way to characterize this, other than a
disciplinary proceeding brought by the state actor to consider
whether or not discipline should be imposed up to, as I
understand it, termination.

    **MR. TAYLOR:**  That's --

    **THE COURT:**  So *ReadyLink* is -- *ReadyLink Healthcare* is
just a very different proposition.

    **MR. TAYLOR:**  Well, you know, Your Honor, if we had a
case on all fours, I'm sure that we would present it to you.

    **THE COURT:**  But, unfortunately for you, I do think

they have a case that's pretty close, and that's *Middlesex*.
And *Cameron*.  Again, not a binding precedent, but *Cameron vs.*
*Regents of Arizona*.  And there's some other District Court
cases.  *Doe vs. Hazard* out of the Eastern District of Kentucky.
These are cases that are pretty close, I think.

**MR. TAYLOR:**  With all due respect, Your Honor, the
difference is about state sovereignty.  The difference is when
the University of California is acting as a private employer.
That is what is going on in this case.  And that is not what
was going on in *Middlesex*.  This --

**THE COURT:**  Well, but you see where I part company
with you is, this is not a dispute, an employee/employer
dispute about compensation or -- or even about at-will
employment or the like.  This is a disciplinary proceeding
brought -- initiated by the public university.  And that's
where it is more akin to a quasi criminal procedure in my mind.
And it has all the indicia of that.

You know, we'll talk about it later, but it's going into a
hearing process.  The professor can be represented.  The
professor can cross-examine, have his counsel cross-examine.
They're going to have a hearing.  They're going to then make a
recommendation.

It's not a -- a proceeding between private litigants or
even a state litigant and a private litigant to resolve some
sort of commercial dispute or even an employment dispute.  It's

1    a disciplinary procedure.

2           **MR. TAYLOR:**  Well, it is an employment dispute because

3    the University or the law school is attempting to fire an

4    employee.  And it takes the position that notwithstanding the

5    other -- the other claims in our case, it has every right to do

6    that after it had said it wasn't going to do so.  That does go

7    to -- to the claims themselves.

8           But for the Court to say, I'm going to abstain merely

9    because it's a state agency -- and that's why I think we part

10   company.  If the District Court were to have to abstain merely

11   because one of the participants, one of the parties in the

12   litigation is a state agency, then the limitations that the

13   Supreme Court was attempting to impress the lower courts with

14   wouldn't make any difference.

15          **THE COURT:**  But, see, I'm not suggesting that the

16   standard should be if it's a state agency, then you abstain

17   under *Younger*.

18          I've got to look at, I think, the nature of the state

19   proceedings that are involved.  UC may be in all sorts of

20   proceedings or issues that come up where the *Younger* abstention

21   would not be appropriate just because it's the University of

22   California, a public entity, a public education entity.  But

23   you've got to look at the nature of the proceedings.  I think

24   that's what the *Sprint* case tells us to do.

25          It's the nature of the proceedings that are critical here.

And that's where I think it is very important and significant that the nature of the proceedings are, like it was in *Middlesex*, a disciplinary proceeding. That is very different, I think, than a dispute like, you know, *ReadyLink*, where they're trying to resolve some commercial dispute.

     **MR. TAYLOR:** Well, Your Honor, I --

     **THE COURT:** In other words, I'm not suggesting that I -- to the extent you're hearing me say simply because one of the litigants is a public university that, therefore, the *Younger* abstention, I'm not suggesting that. I realize it's a much more nuanced process than that.

  But I think here the nature of the particular proceedings, pretty powerfully one that's --

     **MR. TAYLOR:** I think that's -- that's the mistake in the defendants' position. It doesn't matter how much process we're going to get in this proceeding. The due process violation is that the proceeding occurs at all.

     **THE COURT:** It's the nature of the process, not how much. That's where I part company with you.

     **MR. TAYLOR:** Well --

     **THE COURT:** It is -- it is very different, in my mind, than, as I say, to -- to litigants going to get their dispute resolved. It's -- and it is relevant and significant at some point how extensive the process being provided is. But it's the nature rather than the extent of the process that I think

is critical for the *Younger* abstention analysis.

     **MR. TAYLOR:**  If we were -- had two private parties here, and we -- you had this -- this same dispute, there wouldn't be any question about abstention.

     **THE COURT:**  You're right.

     **MR. TAYLOR:**  And so the only -- the only distinction that -- that I am attempting to persuade the Court is not appropriate, is that this is because the University of California has a set of disciplinary procedures that it must follow in order to take tenure from a faculty member.  That's the only distinction.

   It is in all other respects acting as a private employer. It must comply with the due process clause for other reasons, but it doesn't -- it is not --

     **THE COURT:**  So should I simply ignore the fact that it's a public university?

     **MR. TAYLOR:**  Essentially --

     **THE COURT:**  Why?

     **MR. TAYLOR:**  Because that's what -- that's what the Court tells us.  The fact is that it is not the state.  It is the University, which is an agency of the state.  And it is not, in this disciplinary proceeding, attempting to implement, enforce or -- or enable state policies concerning sexual harassment.  It is seeking to discipline and to take tenure from one of its paid employees in a circumstance in which it

had, as we demonstrate, amply and clearly agreed that it would
not do that.

So the -- the -- if the Court were to abstain, it would
simply permit the bait and switch, which we demonstrate fully
in our papers, and which I'm prepared to talk about today,
merely because the budget of the University of California is
provided in substantial part by the people.

It is acting here not to implement state policy but to
implement its own, its own authority to discipline or terminate
an employee.  And that's the reason why you shouldn't abstain.

**THE COURT:**  Let me direct you to -- we've been talking
about whether or not *Younger* applies here.  Let's assume for a
moment that it does, that I conclude that it does.

You still have an argument that, because there's an
exception to *Younger*, that it's -- there are exceptional
circumstances here: bias, bad faith, that high bar.

**MR. TAYLOR:**  Yes.

**THE COURT:**  So I want to give you an opportunity to
address that while we're still on *Younger*.

**MR. TAYLOR:**  All right.

Let me collect myself a moment here.

The bias or bad faith, which is an exception to *Younger*,
permeates the record in this case.  And if -- and I say that
because, first of all, the State of -- the defendants do not
deny the essential facts in the case.  That is, that there was,

in the summer of 2015, a letter which was addressed to Sujit
Choudhry and which told him that, there are terms which you
must comply with, and that if you do so you will continue your
tenure as the dean of the law school.  And that he was assured
frequently that that was the case, up to and to the end of the
year in which both the provost, Mr. Steel, and Ms. Broughton
urged him not to return to NYU or anywhere else, but gave him
their full support in his role as dean of the Berkeley Law
School, which is what he has been heavily recruited to do and
which he had left other gainful employment to do.

     None of those people said to him, and by the way,
Professor Choudhry, there is another shoe that can drop at any
time.  Indeed, if you look at the conduct of all of these
actors during this period, it leads only to one inference.  The
only inference is that they and he all believed that it was
over.  And the only -- the most relevant probative fact in this
record is that it wasn't until March of 2016, when the
firestorm of criticism arose and the president of the
University ordered these actions to commence, that people began
to look for a rationale and for -- for some justification
and --

          **THE COURT:**  Let's go back over some of those things.
     We had the letter, the letter in 2015, July 2015, Steel
letter.  And we can argue back and forth about its -- I don't
think it's clear one way or the other.  I mean, as you say, it

certainly does indicate that there's going to be certain action taken.  And it says there could be subsequent -- or could be subject to further discipline if -- and I know you focus on the word "if" -- there's nonconformance to those requirements.

And then, as you suggest, there's -- the timeline shows the lawsuit by Ms. Sorrell gets filed, and then there's lots of activity, and the president of the University publishes an editorial.  I went through all of that.  And then at a certain point, this gets referred to further consideration.

Where is the -- where is the evidence of bias and bad faith?  It may be that you can argue that the University made mistakes, and the like, going along the path and weren't clear enough in exactly where your client stood.  But what's the evidence of some bad faith that would be sufficient to satisfy the high bar under the section of *Younger*?

MR. TAYLOR:  Well, first of all, the participants in the proceeding in 2015 have all acted during that period consistently with the understanding that it was over.

And it wasn't until the president of the University was confronted with the criticism of her and the University's handling of sexual misconduct cases that she personally ordered that these proceedings commence.  And she called him a groper.

THE COURT:  Well, that's not entirely clear.  She's making reference to another professor, and it appears that it's talking about this other individual who's known as a serial

groper.  When you look at the statement by the president of the University, you can argue it back and forth.  But it's not entirely -- at least on the surface it's not clear that she's making reference to your client.  She's making reference perhaps to somebody else.

      **MR. TAYLOR:**  Well, not that it's -- that it's outcome determinative on Your Honor, but certainly the media read that as an accusation that he was a groper and a sexual predator, and that it was at that point that, you know, Mr. Steel made a statement on the 11th of April, in which he said -- and that's the Exhibit 17, I believe, if I may.

    He says in his statement -- and this is Exhibit 17, Your Honor.  I have an extra copy if I may hand it up.

      **THE COURT:**  Okay.  Thank you.

      **MR. TAYLOR:**  He said -- and he was the person most close to this matter when the firestorm broke, and he defended the -- the process which had taken place in 2015, and he said, "Based upon the findings of the investigation, I believe that a combination of disciplinary actions monitoring his behavior and formal training will be an appropriate -- an effective response and would produce necessary changes in his behavior."

    Now, that's before things really start to go south.  And then after Ms. Broughton announced that -- the commencement of the second process, Mr. Steel wrote an open letter to the campus which the defendants have graciously agreed I can make a

part of the record today as Exhibit No. 25.

**THE COURT:** Very well.

**MR. TAYLOR:** And he -- this is in May of 2016, in which he says as clearly as it can possibly be said, that when a Title IX -- this is on the first page, Your Honor -- "When a Title IX investigation determined that the dean violated the University's sexual harassment policy, my staff and I reviewed the case thoroughly. We then carefully developed and imposed on the dean, following standard procedures, precedence and advice of from legal counsel, a set of sanctions in a strongly worded letter."

And then in the next -- two paragraphs later talks about the dean being sanctioned in line with standing precedent. And he refers in the final paragraph to this resolution of the matter.

Your Honor, the -- the bad faith is apparent from the post hoc pretext that is being -- that is being advanced here, that this was all along a possibility, and Mr. Choudhry should have known that there was this other avenue of discipline that could occur to him at any minute. He should have -- he should have known that there was a possibility of a tenure action, and he just didn't consider it.

And none of the -- the evidence that we put before your case makes any difference because the University had the power, and it just had chosen not to exercise it. They deny entirely

that a settled expectation or an entitlement, for purposes of the due process clause, was obtained by him. And, indeed, after this process begins, they eject him from campus. They -- they deprive him of the ability to teach students. They cut his salary. They put him in a building somewhere across the campus. And they --

**THE COURT:** He remains a tenured faculty member.

**MR. TAYLOR:** He does, Your Honor. But may I say I don't think anybody in this room thinks that he has a career that he can pursue, that is realistic under the present circumstances. There's basically -- they have basically forced him into the position where he cannot pursue his career.

And the bad faith, Your Honor, is exemplified, too, by the fact that this is the president of the University putting her thumb on this process and saying, I want this man barred from campus, and I want him fired.

**THE COURT:** Well, you make the argument that this process that's now underway, that the hearing committee drawn from the academic senate, somehow the fix is in and all that.

What's your support for that? Why do you suggest that -- I mean, these are all presumptively members of the faculty in good standing who are -- have independence and the like. Why do you suggest that the fix is in on this process?

**MR. TAYLOR:** Well, I must say, if you put yourself in Professor Choudhry's position and look at the fact that the

people from whom the hearing committee is going to be selected

have all voted to give an award to the complainant in

connection --

     **THE COURT:** Right.

     **MR. TAYLOR:** -- with this very matter, and that the

University president has said publicly that he is guilty, as

she hopes he will be charged, it's very hard to see the sort of

calm and objective deliberativeness that these -- that this set

of procedures is designed to bring about.

    Indeed, if anybody were to say what does

President Napolitano want her officials to do, it is --

     **THE COURT:** Well, your premise is that all of these

faculty members, tenured faculty members, on this part of the

academic senate are totally under the thumb of the University

president. And I don't know what the basis for that is.

    I mean, I'm not suggesting -- I'm not saying that you

can't show me that. I just don't see it here in what you

presented to me. Because my understanding is that the -- the

hearing officers from whom the panel will be drawn are those

who don't have any -- they have recused themselves. They view

that they have some concern about their ability to be fair and

neutral, and you're just -- you're making a suggestion there

isn't anybody on the faculty of this university who can operate

in a neutral fashion as a hearing officer. And I don't know

where you're coming from.

1        **MR. TAYLOR:** I'm actually making a slightly different

2  suggestion.

3        **THE COURT:** Okay.

4        **MR. TAYLOR:** I put to the Court and to counsel for the

5  defendants that no objective person could perceive that the

6  process which is underway is fair.

7        **THE COURT:** Okay.

8        **MR. TAYLOR:** And that the people --

9        **THE COURT:** And why not? That's what I'm trying to

10  get at.

11        **MR. TAYLOR:** First of all, because the University,

12  bound by its officials, must -- must honor the entitlement

13  which was created, the expectation that was created in 2015.

14        **THE COURT:** Well, we don't know whether or not --

15  first of all, I am not -- we'll hear discussion about whether

16  or not that is indeed an entitlement. But why do you -- why do

17  you think it's prejudged? I mean, they can -- they haven't

18  acted yet. They haven't made their -- had their proceeding

19  yet.

20    So why do you effectively say the fix is in?

21        **MR. TAYLOR:** Well, Your Honor, I think at the

22  preliminary injunction stage, I think we can -- we fairly

23  demonstrate an atmosphere of bias. And statements by

24  university officials seeking to justify this so-called second

25  investigatory process, which are frankly on their face

1   contradicted by the record, and the very -- the people who were

2   involved --

3        **THE COURT:**  But, see, that's where I'm having some

4   trouble.  We have, as I understand it, the prospect of a

5   hearing committee that's being put together.  You have some

6   question about whether or not they can be fair and honest in

7   this process.  But we -- there's a process that is set up to

8   have this play out.

9       You're presuming it's entirely inadequate, and from the

10  *ab initio* it's somehow not going to be a fair proceeding.  And

11  for injunctive relief, jumping ahead to that, you're asking me

12  to put a stop to it.

13       And I don't see where you are -- where you have the

14  indication that -- maybe you will be proven right if somehow

15  the proceeding takes its course and you can point to some

16  aspect of it that wasn't fair and neutral and adequate.  But

17  you're saying stop the process in its tracks.  And I don't

18  see -- I don't see why I should assume that it -- it cannot be

19  an appropriate process.

20        **MR. TAYLOR:**  Well, I think, Your Honor, we have -- we

21  have advanced a number of points.  That being one of them.  The

22  principal point, however, is that the process itself is the

23  harm.  The very -- the fact -- as in a double jeopardy case, as

24  in *Mannes* --

25        **THE COURT:**  Yes, *Mannes* is.  But double jeopardy is

1  such a unique circumstance.  I mean, this is not a

2  double-jeopardy situation.

3      MR. TAYLOR:  But the -- there is -- there is relevance

4  and force in the notion that when you have a right not to be

5  proceeded against again, when you have complied with the terms

6  that you were asked to comply with and given assurance that --

7  by the very people who are in power, who were in power then,

8  and some of who are in power today, given assurance that if you

9  do that, you will continue as dean.  And by the way, in order

10  to continue as dean, you have to have tenure.

11      THE COURT:  Well, we're kind of moving into the

12  preliminary injunction issue.  So what I'd like to do is hear

13  from the University's side on the *Younger* abstention.  And then

14  I'll give you an opportunity to get back up again, Mr. Taylor,

15  to talk about the injunctive relief request.

16      MR. TAYLOR:  Thank you, Your Honor.

17      THE COURT:  So let me hear from the University.

18      MR. PHILLIPS:  Thank you, Your Honor.

19      A couple of -- I'll try to be relatively brief, if I may,

20  because, frankly, Your Honor has made a number of the points

21  that I would have made with respect to *Sprint* and so on.

22      I will say that I regret, somewhat, not having discussed

23  *Sprint* in our opening opposition brief.  Although, I will also

24  say, Your Honor, that it did not ever occur to me or my

25  colleagues that in a case in which the plaintiff in his

preliminary injunction motion said where state officials

wielding enforcement authority, et cetera, opposite with

respect to enforcement action, the government is bound by those

promises.  And where they rely on guilty plea cases and say

that his situation is directly analogous to those, it did not

occur to me, or to us, that counsel -- that plaintiff would

contend that this was actually a dispute between two private

parties as in *Sprint* and as in the *ReadyLink* case.

**THE COURT:**  Well, what do I make of Mr. Taylor's point

that if this were not a public university, the nature of this

dispute would be one where there wouldn't be *Younger*

abstention?

**MR. PHILLIPS:**  And we would have -- excuse me.

**THE COURT:**  Go ahead.

**MR. PHILLIPS:**  We would have no due process claim and

no equal protection claim, Your Honor, which are the claims

that he makes.

He can't have it both ways.  He can't say this is just a

private employer, and, oh, by the way, they are violating my

due process rights and my equal protection rights.  The whole

basis for his preliminary injunction motion disappears before

your eyes if you conclude that the University here is just a

private actor, like *Sprint* or like the State Compensation

Insurance Fund.

Your Honor, with respect to the State Compensation

Insurance Fund, it is nothing like the University of California.  The University of California is an entity created by the Constitution of California with clearly the authority to make state policy and to make state laws.  Indeed, the legislature has very limited authority over the University.

The State Compensation Insurance Fund, under the Insurance Code, Section 11711.5, says that the State Compensation Insurance Fund is not a branch of the State of California.  So it's a very, very different entity from the University of California.  And the *ReadyLink* case has really nothing to do with this case, Your Honor.

And I think it's crystal clear, as Your Honor --

THE COURT:  Mr. Taylor makes the good point that there is a distinction between this kind of proceeding and the proceeding in *Middlesex*, where we can -- we can perhaps quibble about are you exercising, as he discussed it, the sovereignty of the state in terms of its licensing authority over the lawyers that may practice in the courts.  In this instance, the State of New Jersey.

We have an issue here which is akin to a classic employment circumstance.  The reason we have it here is because it's a public university.  But it's very different than -- there are private analogs to what this public university is doing in terms of its faculty and the like.

In *Middlesex* and the state bar, there is no -- there is

the state bar, and that's the only show in town.  There's no nongovernmental analog.

So why is that not something I should take into account?

**MR. PHILLIPS:**  Well, Your Honor, because this is simply -- this is a state actor taking action against -- here the federal plaintiff, against Mr. Choudhry, for alleged wrongful acts.  The state initiated the proceeding.  There's been an investigation.  Formal charges have been filed.  He's subject to termination.  And he claims he's entitled to due process rights and equal protection rights.

We don't dispute that he has due process rights and equal protection rights because we are the University of California, whether shown a violation of any of those rights.  But it makes it very different from a private player.

Your Honor, it is also true that both before and after *Sprint*, the cases -- there are numerous cases that we have cited where courts have applied *Younger* abstention to a disciplinary proceeding against an employee, or in some instances a student, in essentially directly analogous circumstances, notwithstanding the fact that in the same circumstances a private university brought those disciplinary proceedings against either a student or a faculty member.  A *Younger* abstention would not even arise as an issue.

Every one of the cases that we have found -- and the plaintiffs cite no case, not a single case where a Court has

declined to abstain under *Younger*, where a state -- public
university or a public school has initiated disciplinary
proceedings against either a student or an employee.

**THE COURT:** Well, then, let's assume for a moment that
I agree with the way you've just articulated it. Then we still
get to the exception to the -- to the *Younger* rule, *Younger*
doctrine. And that is exceptional circumstances.

So let's assume for -- we've gotten to that point. We've
gone through -- all of the *Middlesex* factors have been applied,
and I agree with you that it falls within those factors.

But we still have to deal with the -- with the arguments
that there's been bias and bad faith and irreparable harm and
the like. So go ahead and address that.

**MR. PHILLIPS:** Well, Your Honor, the Ninth Circuit in
the *Partingon* case said there's no showing of bad faith where
there's no allegation of repeated harassment by enforcement
authorities with no intention of securing a conclusive
resolution or of pecuniary bias by the tribunal.

Those are the two prongs that the Ninth Circuit says are
the exceptional circumstances under which you can exercise
jurisdiction, notwithstanding *Younger*, "with no intention of
securing a conclusive resolution or a showing of pecuniary
bias."

And the same thing, Your Honor, is said by the Second
Circuit in the *Diamond D* case, where they say, "For a federal

plaintiff to invoke the bad faith exception, the party bringing

the state action must have no reasonable expectation of

obtaining a favorable outcome, such as where a proceeding has

been brought to retaliate for or to deter constitutionally

protected conduct."

**THE COURT:** That's when you consider *Mannes vs.*

*Gillespie* --

**MR. PHILLIPS:** Yes.

**THE COURT:** -- in light of --

**MR. PHILLIPS:** Yes, Your Honor. This is clearly not a

situation where the University does not have reasonable

expectation of a favorable outcome based on the charges.

And, Your Honor, the Second Circuit said, "To invoke this

exception, the federal claimant must show that the state

proceeding was initiated with and animated by a retaliatory,

harassing or other illegitimate motive."

And there is simply no evidence of that, Your Honor. The

only evidence is there were findings made following an

investigation of sexual misconduct by the plaintiff, and that

the University had instituted disciplinary proceeding based

upon those findings.

And, Your Honor, with respect -- and I will put aside for

the moment --

**THE COURT:** I mean, I don't think that entirely

captures what they're arguing. I mean, and it will get us

into, kind of, the injunctive relief factors that we're going
to have to deal with.

But they're arguing that there's been a total bait and
switch in this instance.  That, you know, in good faith
Professor Choudhry thought he had come to a finality on this,
and then whatever political forces or otherwise result in the
president of the University launching this whole new ballgame
and that, therefore, that's, you know, accepting their
allegations as presented, that that's reflective of bad faith.

MR. PHILLIPS:  Well, Your Honor, a couple of points.
First of all, the evidence doesn't show that.  What the
evidence shows is that the executive vice president and vice
chancellor and provost imposed sanctions on Dean Choudhry in
his administrative capacity.

Indeed, the letter, which is Exhibit 25 from Mr. Steel,
says, "We then carefully developed and imposed on the dean
these sanctions."

It doesn't say anything whatsoever about a settlement or a
resolution or anything of the sort.  In fact, there is no
document anywhere that talks about a settlement of the
resolution.

THE COURT:  You are also making a distinction --
again, this may be merging into the other issues, and I just
want to make sure I understand it -- some distinction between
the administrative process that divests someone of their title,

1  in this instance a deanship administrative title, and then the

2  process by which discipline is invoked that could lead to the

3  termination or the removal of tenure.  And those are two very

4  separate processes.

5      Is that of significance and consequence in your argument

6  here?  Is that --

7          **MR. PHILLIPS:**  I'm not sure if it's significant to

8  consequence with respect to *Younger* abstention, Your Honor.

9          **THE COURT:**  Right.

10         **MR. PHILLIPS:**  Because regardless of whether you think

11 there was or wasn't a settlement, and regardless of whether you

12 think Dean Choudhry thought it was over or anyone else thought

13 that it was over, you nevertheless have no showing of bad faith

14 of the sort that the courts have said are sufficient to

15 overcome the *Younger* abstention.

16         **THE COURT:**  I appreciate that.  Let me stop you there.

17     Let's assume that the facts are that I read the letter and

18 I conclude that the letter does communicate the notion that,

19 assuming there are no further violations, that's the end of the

20 game.  And then I conclude that there is, contrary to that --

21 that reading of that letter, the University embarks on this

22 second go around.

23     You're saying even -- and I conclude that I think that's,

24 you know, inappropriate conduct in some fashion or another.

25     You're saying that that is not -- even if it I find that

1   to be not the appropriate way to proceed, that that's not

2   tantamount to finding of bad faith?

3        MR. PHILLIPS:  Absolutely, Your Honor.  It absolutely

4   is not tantamount to that.

5        And I would point out, Your Honor, again, the only two

6   things that warrant an exception to the *Younger* abstention are

7   a showing that there is no intention of securing a subsequent

8   result.  It's where the --

9        THE COURT:  What did that mean, the subsequent result

10  meaning?

11       MR. PHILLIPS:  Meaning that the proceeding is brought

12  to harass the person and maybe cause them expense, et cetera,

13  but not to obtain a determination on the merits of the

14  proceeding.

15       Clearly, there is no evidence here that the University

16  does not intend to proceed through the merits and obtain a

17  determination on the merits of the proceeding, Your Honor.  And

18  there's also no showing that the proceeding will be biased,

19  Your Honor.

20       And I would point out that the Ninth Circuit --

21       THE COURT:  How about the plaintiff sort of suggested

22  that the motivation of the renewed disciplinary proceeding is

23  to get the University good press and to -- so it looks like the

24  University is doing something and all of that.

25       Isn't that fairly close, assuming they -- again, I know

1  you dispute it, but isn't that kind of close to harassing sort

2  of conduct?

3  **MR. PHILLIPS:**  No, I don't think so actually, Your

4  Honor.  I don't think so.  Even if I accepted any of that as

5  true, which I don't --

6  **THE COURT:**  Understood.

7  **MR. PHILLIPS:**  -- which we don't, even if you accept

8  that, that's simply the University, you know, doing what it is

9  entitled to do, maybe it would otherwise not have decided to

10  proceed with because of, you know, various issues that are

11  around in the world and feeling that it's a better policy for

12  the University of California to be more -- to enforce more

13  strictly rather than less strictly its policies on sexual

14  harassment.

15  But, Your Honor, with respect to the issue of the two

16  separate proceedings, deans serve at the will of the

17  chancellor.  The chancellor could fire the dean for essentially

18  no reason anytime he chooses.

19  Here, the chancellor, through the executive vice

20  chancellor and provost, instead imposed sanctions on him in his

21  capacity as dean.

22  **THE COURT:**  And the chancellor was Mr. Dirks?

23  **MR. PHILLIPS:**  The chancellor was Mr. Dirks.

24  **THE COURT:**  Mr. Steel was --

25  **MR. PHILLIPS:**  Mr. Steel was the executive vice

1    chancellor and provost acting with delegated authority from the

2    chancellor, Your Honor.

3        And the letter, Your Honor, specifically says that if any

4    credible evidence that he's violated policy again, "you may be

5    subject to immediate further disciplinary action up to and

6    including your termination as dean."

7        Well, that sentence is entirely inconsistent with the

8    notion -- with the Faculty Code of Conduct, because with the

9    Faculty Code of Conduct he couldn't be subject to immediate

10   further disciplinary action.  He would have to go through the

11   whole proceedings under the Faculty Code of Conduct.  And

12   sanctions could well exceed termination as dean under the

13   Faculty Code of Conduct.

14       But, Your Honor, you asked the question about the two

15   separate proceedings.  This is -- it's Administrative

16   Procedure 16.  And it is Exhibit A to Mr. Heckenlively's

17   declaration.  And it is general University policy regarding

18   academic appointees, University policy on faculty conduct and

19   the administration of discipline.

20       And I'll read things to Your Honor, but I hope you keep in

21   mind that we are talking about the dean of the law school who

22   was represented by counsel at this point.  And that in two

23   places, the first place it says:

24           "Faculty members serving in administrative roles,"

25       i.e. a dean, "may be subject to disciplinary sanctions

1  under this policy in addition to administrative actions,

2  if the faculty member's misconduct in the role of the

3  administrator also violates the ethical and professional

4  standards for faculty set forth in the Faculty Code of

5  Conduct."

6  And then later, Your Honor, on pages 6 and, 7 it says:

7      "Faculty members serving as administrators may be

8  subjected to disciplinary action under this code and

9  professional misconduct in their administrative role that

10  violates the ethical principles and falls within the types

11  of unacceptable conduct set forth in this code.

12  Disciplinary action against a faculty member holding an

13  administrative title may proceed in two parts.  One part

14  involves the removal of administrative title or other

15  administrative sanction under procedures established by

16  the regents and the administration.  Such action need not

17  adhere to the disciplinary procedures set forth in this

18  policy.

19      "The other part involves the proposed imposition of

20  any type of disciplinary sanctions set forth in this

21  policy which must proceed in accordance with the

22  procedures for discipline in the Faculty Code of Conduct.

23  The removal of the administrative title or other

24  administrative action does not preclude or require the

25  imposition of a disciplinary sanction under this policy."

Now, I don't know whether Professor Choudhry had read these general University policies, notwithstanding the fact he was the dean of the law school and might have expected him to have read them. But whether he did or didn't really doesn't matter. He should have understood that there were two different procedures, under one of which Executive Vice Chancellor Steel had the authority to discipline him as dean, and under the other of which he could be subject to sanction in a privileges and tenure proceeding, Your Honor.

And, I mean, the Ninth Circuit very clearly has said, Your Honor, in *U.S. vs. Litton Industries*, that courts do not normally consider assertions of administrative bias prior to the completion of an adjudicative proceeding.

Professor Choudhry has raised a number of claims he has with respect to the procedures and so on, both in the proceeding itself and if he is unhappy with those and the result he can go to state court. And the availability of state court relief with respect to those things is, as the *Middlesex* court held, sufficient to warrant *Younger* abstention.

**THE COURT:** Let me just make sure I understand your procedural position here.

As we've been discussing, you made an abstention argument and then you're also opposing the showing that they're making of entitlement on the classic test, if you will, for injunctive relief.

If I agree with your position on abstention, is it your view that I should not reach the issues with respect to the preliminary injunction?

**MR. PHILLIPS:**  Absolutely, Your Honor, yes.

Could I just -- because this is a case that we did not cite in our opposition brief because we raised the *Younger* arguments first, and then they filed their brief.

We do cite the case in our motion to dismiss, which we filed just last week.  But the case of *Gonzalez vs. Waterfront Commission of New York Harbor*.  It's at 755 F.3d 176.  It's a Third Circuit decision post *Sprint* in 2014, where the employee of the Waterfront Commission of New York, clearly a public entity, the employee sought to enjoin a disciplinary proceeding that had been brought against him by the Commission pursuant to the collective bargaining agreement between the Commission and the local union.  Obviously, a classic employer/employee dispute.  And the Court, the Third Circuit, explained in *Sprint*, said, "This case fits neatly within the quasi criminal framework outlined in *Sprint*," and says -- goes on and describes the proceeding, which is virtually directly analogous to the proceedings here, and said this is a textbook example of a quasi criminal action.

And then there is another case involving a public employee, Your Honor, *Killion vs. Coffey*, which is 2015 WL 7345749, a New Jersey District Court decision.  Again, post

*Sprint* disciplinary proceeding brought against city police officers as employees.  And the Court holds that such disciplinary proceedings against an employee fall within the category of cases in which the courts should abstain under *Younger*.

Unless Your Honor has other questions about the abstention issues --

**THE COURT:**  No, that's fine.  Thanks.

Before we go on to the injunctive relief issues in specific, do you have any comments you want to make on the abstention issue?

**MR. TAYLOR:**  I do, Your Honor.

Mr. Phillips says that we're trying to have it both ways. I think the Court's response to that was simply what I wanted to emphasize to the Court.

In some respects, it may seem inconsistent to say that the defendants are required to follow the due process clause because they are -- they are acting as a state agency and, at the same time, they're not exercising sovereign powers, but that's precisely what the law is.  And that is what we are saying, that it is not inconsistent to argue that we have made a due process violation and that this is not a criminal or quasi criminal proceeding.

Your Honor, insofar as the bad faith issue is concerned, you are -- you observed that these issues tend to merge, and

they do.  But let me -- let me begin discussion of the -- of

the showing on the merits because it does involve motivation.

And motivation is the essence of bad faith.

So I heard Mr. Phillips say that the University could

decide at some later time to take actions, which it was

empowered to do, and doesn't matter what had gone on before.

If the University has that power, then they are free to

exercise it when and wherever they agree to do so.  And that, I

take it, is the position that the University and the defendants

must take.

And then I ask myself, what explains the fact that

Dean Choudhry returned to his post as dean, worked with the

people who are today engaged in -- in this process who are

today calling him a piraya and a sexual predator, worked with

those same people, with Patty and Chris and Steel, into March

of 2016, and no one mentioned a word about tenure, tenure

process or second investigation, until March, when, as I put

it, the firestorm of criticism occurred and Ms. Sorrell files

her lawsuit --

**THE COURT:**  Where, though, is the obligation to do

that?  I mean, first of all, the University emphasizes that

there are two very different processes going on here.  There's

one that pertains to your client's position as dean.  And that

is one process.

And then there is the process with respect to his tenure

1   and continued employment with the University as a professor.

2       Those are two very different processes.  So why is it that

3   you -- there is this entitlement -- whatever one may say about

4   the letter, which at best interpretation is vague, I think, as

5   to exactly what it's doing, but it's plainly directed towards

6   his position as dean.  It's not talking about his position as a

7   university-tenured professor.

8       So why is it that they are obliged somehow to have earlier

9   than they did so advise Professor Choudhry that there might be

10   disciplinary proceedings going on down the line?

11         **MR. TAYLOR:**  Well, they can't fool him.  They can't --

12         **THE COURT:**  How did they fool him?

13         **MR. TAYLOR:**  They fooled him by saying, if you do

14   these things -- maybe they didn't intend to fool him.  I doubt

15   that they did, as a matter of fact, looking at this record.

16   But they said, if you comply with the terms of this resolution,

17   then you have a bright career as dean here.

18       Now, this is the provost and the chancellor.  These are

19   University officials.  They are the very people who at that

20   very stage of that process had the power to initiate a P and T

21   proceeding based upon violations of the Faculty Code of

22   Conduct.  And they entered into this settlement.  And we

23   have -- we have briefed that issue thoroughly.

24       But they -- an institution, which is bound by these kinds

25   of requirements to act rationally and fairly, can't say, well,

I just didn't tell you about this other shoe that's going to
drop when I told you that if you did these things everything
would be all right.

They caused him to write a letter of apology. They caused
him to write a letter of apology to this woman. They caused
him to pay for personal coaching. They caused him to be
monitored. All of which he agreed to. And they told him that
if you do this, you will have a bright career as the dean.
They told him, in fact, it was over.

Now, today, today the University says, even if we told him
that, it doesn't matter. That's wrong. That's a violation of
the due process clause.

**THE COURT:** Well, is shabby treatment the same as a
violation of due process?

**MR. TAYLOR:** It can be.

**THE COURT:** How so?

**MR. TAYLOR:** It doesn't have to be. If --

**THE COURT:** But let's assume -- let's assume that one
looks at how the University proceeded in this and said, boy,
they didn't treat this faculty member very well.

That's not tantamount to they're precluded from initiating
a -- under their faculty code, a disciplinary proceeding to
determine what's -- I mean, they're not estopped from that
simply if one were to conclude that they -- they didn't -- they
didn't treat this person very well.

1   **MR. TAYLOR:** If you look at the regulation, they say

2 if there is a settlement, there shall be no P and T hearing.

3   **THE COURT:** Right. But I guess my point and what I'm

4 trying to get at is, critical to your case is my conclusion

5 that that was a binding settlement that concluded proceedings.

6 Because, otherwise, if it's -- if it's simply that there's been

7 shabby treatment by the University, that almost isn't directly

8 relevant --

9   **MR. TAYLOR:** We wouldn't be here if that was --

10   **THE COURT:** It's got to be --

11   **MR. TAYLOR:** -- if that was our position. Although,

12 it might nevertheless be true.

13  But what I --

14   **THE COURT:** So just so we're on the same page, the

15 July 2015 letter from Mr. Steel, that is the contract, in your

16 view?

17   **MR. TAYLOR:** Your Honor, I don't rest my case on

18 contract. I am about to --

19   **THE COURT:** Isn't a settlement always -- I mean,

20 that's what a settlement is, is a contract.

21   **MR. TAYLOR:** It's different -- it's different from

22 what -- what some people think of as a contract in which

23 there's bargaining back and forth and so forth.

24  If the due process clause -- what's wrong, what's

25 constitutionally wrong with this -- in this case is that the

University is officials.  The University, the defendants,
created and agreed to a settled expectation and entitlement for
Sujit Choudhry.  They induced that.  They agreed to it.  And
that --

**THE COURT:**  Another way of saying that, in your view,
when Mr. Steel wrote his letter and then the instances that
your client said that certain of the officials of the
University gave him some assurances, as a result of that
collection of evidence, the University is precluded from
initiating disciplinary proceedings against your client.

**MR. TAYLOR:**  Yes, Your Honor.

**THE COURT:**  Okay.

**MR. TAYLOR:**  And, furthermore, they are further
precluded because they caused him to do things to his detriment
in reliance on that --

**THE COURT:**  Being the training and the apology letter?

**MR. TAYLOR:**  That's correct.  He was given the
entitlement that he would not have to defend himself again.  He
would not go through the process the defendants are putting him
through now.

And the conduct which we are asking the Court to enjoin is
the conduct which is depriving him of that entitlement, which
is a property right.

**THE COURT:**  Should I take any significance from the
fact that your client doesn't sign this letter?

1          **MR. TAYLOR:**  No.

2          **THE COURT:**  Why is that not --

3          **MR. TAYLOR:**  You don't have to sign a letter to make

4   the conduct of the state actor -- to create an entitlement to

5   you.

6       If the -- and it may be, and indeed is, more than the

7   letter.  The assurances given to him by the provost in the

8   course of both the letter in the latter part of the year and,

9   indeed, the provost's description of what he did are all -- and

10  everybody believed, everybody involved in that process believed

11  that it was over, that they had come up with what was a

12  measured and fair way to address this investigation.  And they

13  said this is what it is.  If you do this, it's over.

14      And you can't turn around -- if I may say so, you can't

15  turn around and say, well, all of that doesn't mean anything

16  because we have this other power, and we elect now to try to

17  use it.

18          **THE COURT:**  Okay.  Your understanding and theory is

19  that that letter is the -- the property interest that was

20  created by that letter for purposes of constitutional analysis

21  is an entitlement to continued -- to finality -- how -- let me

22  let you characterize it.

23          **MR. TAYLOR:**  Yes.

24          **THE COURT:**  What is the property created by the July

25  letter?

1    **MR. TAYLOR:**  The entitlement to pursue his career

2    without -- without having to go through another disciplinary

3    process.  You know, the only --

4    **THE COURT:**  His career as a tenured faculty member or

5    his career as the dean of the law school?  I'm just trying to

6    get an understanding.

7    **MR. TAYLOR:**  Well, it doesn't matter.  He is an

8    employee of the University.  And he is entitled to have the

9    Constitution protect the expectation, the entitlement which he

10   has given, which he clearly complied with.

11   **THE COURT:**  How do I know he will -- before the

12   administrative proceeding, the disciplinary proceeding plays

13   itself out, how do I know he will be deprived of the property

14   interest?

15   **MR. TAYLOR:**  He's already being deprived of it.  He's

16   already being deprived --

17   **THE COURT:**  Well, that's why I was asking about dean

18   versus a tenured faculty member.  He is, as he sits here today,

19   as I understand it, a tenured faculty member.

20   **MR. TAYLOR:**  That's correct.

21   **THE COURT:**  So he has not been deprived of that as of

22   today.

23   **MR. TAYLOR:**  He's being --

24   **THE COURT:**  He may never be deprived of that.  So why

25   at this stage has, even if you assume he does have a

property -- he doesn't have this entitlement to remain as dean,
I presume.  So where -- how do we know if he's going to be
deprived of what you characterized as the property interest?

**MR. TAYLOR:**  He is entitled not to have to go through
that process.

**THE COURT:**  Okay.  And where do I look at -- if the
question is, there is the property interest and you're saying
he's entitled not to be deprived of it, and he's entitled not
to have it questioned?

**MR. TAYLOR:**  He's entitled not to have the University
seek to take it away from him based on the same facts which
were before the provost and which were submitted to him for his
evaluation under the Faculty Code of Conduct.

If you look at the --

**THE COURT:**  So the property interest is not in the
tenured faculty position.  It's the property interest is -- is
entitlement to not have anyone question the tenured faculty
position?

**MR. TAYLOR:**  It's not to be proceeded against in a
disciplinary matter by the University of California in
connection --

**THE COURT:**  That's a pretty amorphous property
interest, isn't it?

**MR. TAYLOR:**  No.  The disciplinary procedures which we
have been talking about here are in black and white.  And they

are -- they have various steps in them.  And to be -- to become
a respondent in such a proceeding is in and of itself a
significant event.

Our position -- our position, Your Honor, is when the
provost, who is the person who had the authority at that very
moment to refer the matter to the P and T hearing for tenure,
he and he alone had the power to refer then for a tenured
decision, settle it.

That's what happened here.  And that, under the
University's own rules and regulations, means that you can't do
it again just because you decide the sanction wasn't severe
enough.

And the -- how do we know, how do we know this is what
happened?  Well, we know because not only what the letter says
itself, but because eight months passed with no one suggesting
that there was any reason to be concerned whatsoever about the
Tyann Sorrell allegations, and certainly not that he was
dangerous or a sexual predator or he didn't have the right or
the qualification to do his job.

Thirdly, Your Honor -- and this is important -- the case
that was resolved in 2015 was resolved in accordance with the
University's own procedures.

They can say all they want that this is just about the
deanship.  That's the post hoc justification for what happened
here.

1    But if you look at the disciplinary procedures, they say

2  that before filing formal charges, the EVCP may offer a

3  settlement.  And if it's accepted, there is no P and T

4  procedure.

5    The conduct which was under investigation then is the very

6  same conduct which is at issue today.  It is the very same

7  conduct.  And it is -- they don't argue otherwise.  They simply

8  say, we now have the right, after giving him these assurances,

9  to do it again.

10    And that is, if I may say so, wrong.  For any entity to

11  engage in the process that they went through, to the

12  satisfaction of everybody, and then to say because something

13  else happens, nothing else happened with regard to Tyann

14  Sorrell.  Nothing else happened with regard to Sujit Choudhry,

15  though she filed a lawsuit.  She filed a lawsuit.

16    **THE COURT:**  But, again, what I'm trying to get at is,

17  you're carrying the -- the right to encompass a right to be

18  free from a disciplinary proceeding.

19    **MR. TAYLOR:**  Yes, I am.

20    **THE COURT:**  And then a lot of your argument sort of

21  assumes that the decision has already been made that -- that

22  your client is going to be divested of tenure and continued

23  employment with the University.

24    We don't know the second part yet.  So the -- the

25  violation in your mind is the fact that there's a disciplinary

1    proceeding that he has to participate.

2            **MR. TAYLOR:**  We do know that charges have been filed

3    and that the provost is recommending his dismissal.

4            **THE COURT:**  Okay.  Then at the proceeding, as I

5    understand it, Professor Choudhry has a right to be

6    represented, he has a right to -- all of the usual adjudicative

7    hearing processes that we are used to are going to be in place;

8    right?

9            **MR. TAYLOR:**  That's a question about what are the

10   processes.  We don't --

11           **THE COURT:**  I mean, again, what I'm trying to get at

12   is, at the end of the day, if your assumption about the process

13   proves true and the action that the University takes does

14   result in losing the tenured faculty position, you then have a

15   right to go to state court and appeal it, as I understand it;

16   right?  Don't you?

17           **MR. TAYLOR:**  Your Honor, I presume that if and when

18   that occurs, we will do whatever we can.

19           **THE COURT:**  Of course.

20           **MR. TAYLOR:**  But we're --

21           **THE COURT:**  And we don't know if it's -- how it's

22   going to come out.  So right now the only -- and I understand

23   that you also have your argument that somehow, to put it in the

24   vernacular, the fix is in.  I understand.  We've already talked

25   about that.

1      But the real -- the current injunctive relief request is

2   asking me to stop the process, not stop a decision.

3          **MR. TAYLOR:**  Correct.

4          **THE COURT:**  To stop the process.

5          **MR. TAYLOR:**  That is correct.

6          **THE COURT:**  And one of the things that I'm having some

7   difficulty is, if I'm not entirely with you that the fix is in,

8   then stopping the process, I'm wrestling with the idea that

9   there's a due process right not to have the process play itself

10  out.

11         **MR. TAYLOR:**  There is.

12         **THE COURT:**  Okay.  Well --

13         **MR. TAYLOR:**  There is a due process right when the --

14  when the defendants have created the entitlement, the very

15  entitlement which they are now taking.  The entitlement they

16  created was that there would be no more disciplinary --

17         **THE COURT:**  Of course, that will be part of your

18  argument in the event that the process goes forward and the

19  University does take that action.  And you will presumably say,

20  you can't do that because we had a preexisting settlement, if

21  you will, as a result of that July letter.

22      So you will have the opportunity to make that argument.

23  But I understand your position is your client will be harmed

24  simply by virtue of having the proceeding go forward.

25      But we've got to identify a property interest that is

entailed in this idea of you have a property right that's
involved in this disposition by virtue of the letter not to
have this proceeding go forward at all.  And that's what I'm
having some difficulty with, if you understand my question.  It
may have been inartful.

**MR. TAYLOR:**  No, I think I do.  And I'm hopeful that I
can satisfy you that your question has a very good answer.

The answer is that this -- these defendants and this
entity are not permitted under the Constitution to conclude to
resolve a factual investigation into violations of the Faculty
Code of Conduct in 2015, and conclude a settlement with him
under the University's own rules and regulations, and the very
next year the same -- the person in the same office who
concluded the settlement is now -- is now proceeding to -- to
pursue the charges against him.

It is the very same as Mr. Steel, the person who is in the
same position --

**THE COURT:**  Although, it's not Mr. Steel anymore;
right?

**MR. TAYLOR:**  That, I think, is a distinction that has
no significance for these purposes.

**THE COURT:**  I'm not suggesting that it does.

**MR. TAYLOR:**  I understand.

And one comes away with the -- with the obvious argument
from the defendants that, you know, it's just too bad that you

relied on that. It's just too bad that you didn't exercise your alternative to go back to NYU at that time. It's just too bad that nobody told you that there was this separate set of procedures that would be aimed at your tenure, because we have the power and we can exercise it no matter what happened to you in 2015.

And that's -- that is a violation of the due process clause. That is exactly what is prohibited by the obligation to deal fairly and forthrightly and truthfully with people who are in Professor Choudhry's position.

This is -- you know, the facts are the facts. They are not seriously disputed. The government -- I mean, the defendants don't seriously contend that anybody told him, by the way, you know, it's not all over. In fact, they are content to accept the notion that he believed that it was all over and that he was led to believe it was all over by people who wanted him to believe it was all over so he would stay in his position as dean.

To induce that behavior on his part and then for some other motivation, for some motivation other than simply addressing misconduct of a faculty member, the University, through its president, begins an entirely new process as if none of this had ever happened before, and proposes now to take him through a long, complicated and grievous process at the end of which they hope to take his tenure and put him on the

street.

I grant you that we don't know yet what the result of that process would be. But this is a record which is stunning in the evidence that he was, in fact, told that, if you do this, if you comply with these terms, as Mr. Steel, who's the provost at the time said this was a resolution, you comply with these terms, you have a bright career as a dean. But -- but just, by the way, you know, I forgot to tell you that next March it may be that somebody tries to take -- tries to come along and take your tenure, based, Your Honor, not on some different set of facts, not on some supplemental sets of facts, on exactly the same facts, the very same report.

THE COURT: Let me also direct you, to give you an opportunity to comment, you were talking about the property aspect of due process. You also argue his liberty interest.

MR. TAYLOR: Yes.

THE COURT: You said there's a *de facto* suspension.

MR. TAYLOR: Yes.

THE COURT: I understand -- you can add to this, but just so that I make sure I understand your argument, summer funding was denied, no teaching opportunities, different office outside of his office. Those are what you're pointing to, to be effectively a suspension.

MR. TAYLOR: Right.

THE COURT: And then you're also arguing the equal

1   protection argument.  So I want to give you an opportunity to

2   comment on those before I hear from Mr. Phillips.

3         **MR. TAYLOR:**  The liberty interest is articulated in

4   *Stiesberg vs. California*.  It's one which it is

5   constitutionally protected and if -- in a personnel action, a

6   person is treated in a way that might seriously damage his

7   standing in the community or effectively preclude future work

8   in the individual's chosen profession.

9         **THE COURT:**  Of course, in *Stiesberg* they found there

10   wasn't --

11         **MR. TAYLOR:**  They did.

12         **THE COURT:**  Right.

13         **MR. TAYLOR:**  They did, because there wasn't.  But in

14   this case there is.

15      This is academia.  This is -- this career that this man

16   has successfully pursued for his entire life and in which he is

17   a scholar of international distinction is being taken from him.

18   And it's being taken from him for reasons that have nothing to

19   do with the conduct which was at issue.  It's being taken from

20   him because decisions were made to -- it was in the

21   University -- was necessary for the University to do that.

22      You cannot read Ms. Napolitano's letter to Chancellor

23   Dirks and not understand that this is driven by a -- a concern

24   about whether the University has been and is being sufficiently

25   severe on sexual harassment cases.

And it is his misfortune that this case is available for the University to make it their poster child.  Even though, even though the process went through to finality in 2015, there are many people who think it wasn't severe enough.  And for that reason and that reason only, we're going to put him through it again.

If Your Honor please, that's why we're here.  That's -- we're not here simply trying to derail a university disciplinary process.  We're here because this man is being severely mistreated.  And the motivation is directly relevant to that.

There is no -- the defendants do not offer any explanation for the timing of this set of events.  And the only conclusion you can draw, and I think Mr. Phillips is candid about it, different policies, different time, different priorities.  And they have the power and, therefore, they choose to exercise it.

With all --

**THE COURT:**  When you're talking about motivation, part of your claim, one of the other aspects under the equal protection argument is that you're claiming discriminatory intent.  And I know that you've got -- you point me to what you perceive is disparate treatment with some of the other faculty members who are white male faculty members.

I think we agree that the analysis for equal protection will require some, perhaps, showing with respect to disparate

treatment but also some evidence of animus.  Where is the

evidence of animus here, discriminatory animus?

        MR. TAYLOR:  I'm not proposing that as a ground on

which to grant the preliminary injunction today.

        THE COURT:  Okay.  Fair enough.

        MR. TAYLOR:  I think we have it.  And we make -- we

make the claim when we have a basis for it.

        The principal focus of our motion for a preliminary

injunction, Your Honor, is because without it, the irreparable

harm that Mr. Choudhry is entitled to have the Constitution

protect him against is going to occur.  And it's going to occur

notwithstanding the fact that these defendants, these officials

of the State of California, induced him into an agreement and

to enter into conduct which they said, if you do this, it's

over.  That -- that has to be binding on the entity itself.  It

can't be this, well, it's not binding on the president or it's

not binding on the regents.

        Mr. Steel had the power and he was, in fact, the only

person who had the power under the rules at the time to send it

to a P and T hearing or not.  He chose not to.  And, as he says

in his after-the-fact justifications, I thought, I thought

after consulting precedent, procedures, lawyers, this was a

fair and good resolution, resolution of this.  And that's why I

did it.  And now I understand some people may think I wasn't

harsh enough.  But that's the -- that's what he conveyed to

Mr. Choudhry. And shame on us, I suppose, for not saying, well, Mr. Steel, is there anything else we ought to be worried about?

But I don't believe that the Constitution requires that -- that he anticipate that the actors, the defendants, would go back on the word that they gave him and that they would put him through this again for no reason whatsoever that is -- that justifies -- that justifies it or that is in furtherance of the University of California's policies or its need to enforce a rigorous antisexual harassment scheme.

That was done in his case. And it's -- we've never contested that -- the basic facts involved. We contest some of the details of it. But what we say to you is, the man stood up, understood what was being alleged against him, didn't agree with all of it, but was told, if you do this, Dean Choudhry, your career here will be secure, you will not have to defend against any more process based upon these very same facts.

Your Honor, if -- I could go on.

**THE COURT:** Well, thank you, Mr. Taylor. Thank you, both.

I'll let Mr. Phillips have an opportunity.

**MR. PHILLIPS:** Your Honor, to be crystal clear, Your Honor, the University vigorously disputes the notion that the decision to go forward with a priveledged tenure proceeding has nothing to do with Professor Choudhry's conduct. I think it

1    has everything to do with Professor Choudhry's conduct.

2         **THE COURT:**  You don't dispute, though, that it is --

3    for whatever that conduct may be, it's the same conduct that

4    was the --

5         **MR. PHILLIPS:**  Yes, that's correct.

6         **THE COURT:**  -- subject of the July 2015 letter.

7    Nothing has intervened.

8         **MR. PHILLIPS:**  Right.  We don't dispute that the same

9    conduct is the same conduct, that's correct, Your Honor.

10        Your Honor, it's telling that neither in their brief,

11   either of their briefs, if you set aside the guilty plea cases,

12   which I think we can fairly set aside, if you set aside those

13   cases neither in their briefs, two of them, or today in oral

14   argument has counsel for the plaintiffs cited a single case

15   that supports the argument that this sort of settlement that

16   they claim occurred, which I'll come back to in a minute, but

17   not a single authority that indicates that such a settlement

18   gives you a due process, a constitutionally cognizable property

19   interest.  And we have cited a number that say quite to the

20   contrary.  Cases which in their reply brief they don't even so

21   much as mention, far less respond to or attempt to distinguish.

22   I think that's telling in its silence, Your Honor.  Zero legal

23   authority for that.

24        But coming back to the facts, Your Honor, there is no

25   evidence of a settlement here other than Professor Choudhry's

1  self-serving statements in his declaration.  There is no

2  mention of a settlement in the July 30 letter.  And there is no

3  mention of a settlement in any other document that's been

4  presented.

5         **THE COURT:**  Well, the July 30 letter -- I mean, it is

6  vaguely worded.  But you don't dispute, I take it, that there's

7  any other meaning to or -- let me rephrase it, a legitimate

8  meaning when you read that letter to say it's indicating that

9  if the suggested course of conduct is engaged in that there's

10 not anticipated to be any further discipline.

11        **MR. PHILLIPS:**  Silent on the subject, Your Honor.

12 Totally silent on the subject.

13        **THE COURT:**  I mean, we can look at it again.

14        **MR. PHILLIPS:**  I understand, Your Honor.  It is simply

15 silent on the subject.  It does not say, if you do this nothing

16 further will happen.

17     And although he says he was told that --

18        **THE COURT:**  It does say, "We look forward to you

19 having a successful career as dean."

20        **MR. PHILLIPS:**  Right.

21        **THE COURT:**  Well, one can assume or infer from that it

22 is indicating -- I think in fairness we have to say -- and your

23 position is it's not a contract, and we'll go back to that in a

24 moment.

25     But, certainly, the reading of the letter seems to

1  indicate if a certain course of conduct is followed and there

2  are no -- and there are no further instances that are contrary

3  to those understandings, that, you know, you -- the expectation

4  is you're going to remain in the deanship.

5        MR. PHILLIPS:  I don't disagree with that notion that

6  that is how Professor Choudhry could have read the letter.

7        THE COURT:  Okay.

8        MR. PHILLIPS:  Not an unreasonable reading --

9        THE COURT:  Right.

10       MR. PHILLIPS:  -- of the letter to reach that

11 expectation on his part.

12       THE COURT:  Yes.

13       MR. PHILLIPS:  But I will also point out, Your Honor,

14 that we cite the *Contreras* case in our brief, which is quite

15 clear, that states plaintiff having a long-term career, being a

16 long-term employee, being told, quote, that the job was his for

17 as long as he wanted were not sufficient to create an implied

18 contract or property right to such long-term employment.  So

19 even if such comments were made, Your Honor, they are not

20 enough to create any sort of contract.

21      But, Your Honor, there's no mention of a settlement.

22 There's no mention --

23       THE COURT:  He then engages in conduct that one could

24 argue is consideration for the deal, if you will.  He pays for

25 the training, as I understand it.  Or there's training.

There's some sort of training.  And proceeds along with the --
he gets a salary reduction.

     **MR. PHILLIPS:**  Your Honor, complying with the
sanctions imposed by the University --

     **THE COURT:**  Right.

     **MR. PHILLIPS:**  -- doesn't constitute consideration
flowing to the University.  It constitutes his choosing to
comply with the sanctions rather than not complying with them
and presumably being terminated as dean.

     And potentially, I imagine, if he refused to comply with
the sanctions having other proceedings brought against him for
failure to do so.  He says, I complied with the sanctions.  He
wrote a letter of apology to the woman whom he had been found
to have sexually harassed.  He was complying with the
sanctions.

     There is no evidence at all that plaintiff had any right
to accept, reject, negotiate or contest those sanctions or at
that point to contest any findings that had been made by the
University with respect to his conduct.

     He does have that right now under the privileges and
tenure proceedings.  But his role as dean --

     **THE COURT:**  His conduct in compliance is -- is --
let's not put a label on it in terms of contract or settlement
or the like.  But he -- is it unfair to say that when he
engaged in that conduct, he's doing it in the expectation that

1  that will conclude the disciplinary proceedings?

2          **MR. PHILLIPS:**  He may have had that expectation, Your

3  Honor.

4          **THE COURT:**  And why is -- is he mislead in that

5  fashion?

6          **MR. PHILLIPS:**  No, Your Honor.  I don't think he's

7  been mislead.

8          **THE COURT:**  Why not?

9          **MR. PHILLIPS:**  I think presumably, as I said before,

10  he's dean of the law school.  He's represented by counsel.  And

11  he presumably/presumptively is familiar with the University's

12  procedures and that the Faculty Code of Conduct has an entirely

13  separate set of procedures and very explicitly allows for a

14  second set of proceedings, Your Honor.

15      And, Your Honor, they cite to the fact that if there's a

16  settlement, then there's no need for a further proceeding.

17  Well, that's correct, Your Honor.

18      But when there is a settlement, as Vice Provost Broughton

19  said in her declaration, vice provost for faculty said in her

20  declaration, when a settlement of a faculty discipline

21  proceeding is concluded, there is a written settlement

22  agreement.

23      And, Your Honor, submitted by the plaintiffs, Exhibit 12

24  to the Mehta declaration, is an example of precisely such a

25  settlement agreement, the kind of settlement agreement one

would expect when a lawyer, of all people, enters into a
settlement agreement, Your Honor, signed by both parties with
all sorts of lawyering language. And that's certainly what one
would have expected here if there was going to be some sort of
a settlement.

His expectations may have been otherwise. Whatever were
in people's minds at the point, I don't know. But it doesn't
matter, Your Honor, because there wasn't a settlement. And,
Your Honor, even if there had been a settlement, it wouldn't
form the basis for a preliminary injunction, Your Honor.

All he's saying that he's entitled to under that
settlement is to avoid the proceedings.

Well, Your Honor, we've cited a number of cases.

There's the *DeBoer* case from the Ninth Circuit in 2002.
And the Ninth Circuit initially held that the plaintiff's
contract with the city gave him a constitutionally protected
property interest. That decision wasn't vacated by the Supreme
Court. And on remand, the Ninth Circuit held:

"The common law breach of contract claim provides
adequate process for the deprivation of a property right
derived from a contract unless the deprivation constitutes
denial of a present entitlement."

And the Supreme Court -- the Ninth Circuit quotes the
Supreme Court as describing -- defining "present entitlement"
as a right by virtue of which one is presently entitled either

to exercise ownership dominion over real personal property or
to pursue a gainful occupation.

These proceedings, Your Honor, fall on neither of those
categories.

Now, he may argue that the conclusion of the proceeding
might deprive him of the ability to engage in a gainful
occupation.  But that's not what's at issue here, Your Honor.
The issue here is whether the proceeding can go forward.

And, Your Honor, in the *Robbins* case there was, in fact, a
settlement.  And part of the settlement, part of what the
plaintiffs -- and it was a written settlement agreement.

Part of what the plaintiff said he was entitled to under
the settlement agreement was that certain administrative
appeals against him would not be pursued.  And the Court said
that that was not the kind of right to which a property
interest may attach, quote, regardless of the expense that
these proceedings may entail and regardless of the consequences
of a negative action.

It was a settlement agreement.  We're not going to proceed
against you on these various things.  They undo the settlement
agreement.  They breach the settlement agreement.  Seeks an
injunction.  And the Court says no, that's not the sort of
property interest that you're entitled to protection of under
the due process clause.

And, Your Honor, there's a case we again didn't cite in

our original brief, but we do cite it in our motion to dismiss. It's *Clark vs. California Department of Forestry*. And it's at 2016 WL 4411816.

It's a Northern District of California decision just three months ago, Your Honor, in which there was a settlement agreement involving a California Department of Forestry disciplinary action against the plaintiff who was an employee. Required removal of his records from his personnel file, reinstatement of his lost earnings. Plaintiff alleged that he -- they voluntarily agreed to waive all his claims for liability in exchange for the agreement about his record and lost earnings.

And the Court held, citing *Lujan* and the Ninth Circuit's decision in *Duarte*, quote, There is generally no present entitlement to any property interest that is only contractual. Which is what the interest it here asserts is.

Your Honor, with respect to the other alleged violations of his due process rights, I would submit, Your Honor, those are actually irrelevant to the preliminary injunction motion.

The only thing he's asking the Court to preliminarily enjoin is the second disciplinary proceeding. So the other due process issues, reputation and so on, are all irrelevant to the preliminary injunction motion.

And I gather he's conceded as much with respect to the equal protection issue.

1    **THE COURT:** Although reputational argument, doesn't he

2  argue that the very fact that the proceeding is going to harm

3  provide --

4    **MR. PHILLIPS:** Well, I didn't read it that way, but

5  it's possible.

6    I didn't read it that way, Your Honor, but to the extent

7  that he is, the law is crystal clear that in the absence of

8  constructive discharge, which is what the *Stiesberg* case

9  actually says, damage to one's reputation is not the basis for

10  a preliminary injunction.

11    And with respect to irreparable harm otherwise, Your

12  Honor, the United States Supreme Court and numerous other

13  courts have held that loss of employment -- temporary loss of

14  employment doesn't constitute irreparable harm; that expending

15  time, money, and energy to defend disciplinary procedures isn't

16  irreparable harm; possible injury to reputation as a result of

17  the proceedings isn't irreparable harm.  And it's all

18  speculative.  All of that is speculative.

19    And on the other side, Your Honor, the University does, in

20  fact, have a very substantial interest in enforcing its rules

21  against sexual misconduct and sexual harassment.  And that, I

22  submit, is the reason why these proceedings are going forward.

23  And the public's interest and the University's interests would

24  be disserved by prohibiting the University from doing that

25  here.

1    Thank you.

2         THE COURT:  Could you just remind me of the timing of

3    where things stand.

4         These proceedings, are they scheduled?

5         MR. PHILLIPS:  Your Honor, the charges have been

6    filed.

7         Professor Choudhry's response to those is due when?  Can

8    you remind me?

9         MR. TAYLOR:  We actually have obtained an agreement

10   that the response can be deferred to some point beyond the

11   Court's decision.

12        MR. PHILLIPS:  Right.  That's correct.

13        MR. TAYLOR:  But not indefinitely.

14        MR. PHILLIPS:  Right.  But not indefinitely.  But not

15   until after this Court decides this motion.

16        THE COURT:  This and perhaps an appellate court.

17        MR. PHILLIPS:  Potentially.  I don't know that that's

18   actually part of the agreement, Your Honor, but we can work

19   that out among ourselves, I expect.

20        THE COURT:  Okay.

21        MR. PHILLIPS:  But, yes, that's -- that's the

22   situation, Your Honor.

23        THE COURT:  Okay.

24        MR. PHILLIPS:  And I will say that -- I'm sorry.  I

25   will say, my understanding is that these things typically take

a while.

I mean, putting aside Professor Choudhry's response itself, I think the proceedings in general would likely take months, not weeks or days.

**THE COURT:** Okay.

**MR. PHILLIPS:** Certainly.

**THE COURT:** Mr. Taylor.

**MR. TAYLOR:** I've been doing this long enough to recognize when a Court seems to be prepared to adjourn.

**THE COURT:** Yes, because you're seeing me push papers around. You're very perceptive.

**MR. TAYLOR:** That is some circumstantial evidence, Your Honor.

I did want to say, finally, that we're not asking -- the harms that have flowed and are flowing from the wrongs that we have -- that we are addressing today are many. We're not asking the Court to try to deal with all of them. There's some which would be beyond the power of the Court to deal with no matter what.

But there is one thing the Court can do to prevent further irreparable harm, and that is to stay -- to enjoin these proceedings for the very reason Mr. Phillips says, that, you know, the rationale for why they're doing this is simply that because they can.

**THE COURT:** Thank you very much. Very helpful

1    argument.  And I will go back and do my work and get you an

2    order.

3         (At 3:08 p.m. the proceedings were adjourned.)

4                         -   -   -   -

5

6

7                     **CERTIFICATE OF REPORTER**

8         I certify that the foregoing is a correct transcript

9    from the record of proceedings in the above-entitled matter.

10

11   DATE:   Tuesday, November 29, 2016

12

13

14                    *Katherine Sullivan*

15   _____

16        Katherine Powell Sullivan, CSR #5812, RMR, CRR
                      U.S. Court Reporter

17

18

19

20

21

22

23

24

25